1

**BURSOR & FISHER, P.A.**

2

Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)

3

1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596

4

Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700

5

Email: ndeckant@bursor.com
          jvenditti@bursor.com

6

7

*Attorneys for Plaintiff and the Putative Class*

8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11

I.L., individually and on behalf of all others
similarly situated,

12

                    Plaintiff,

13

          v.

14

15

SIX FLAGS ENTERTAINMENT CORP.,
and MAGIC MOUNTAIN LLC,

16

                    Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

Case No.

**CLASS ACTION COMPLAINT**

(1) Violation of Title III of the Americans with
    Disabilities Act of 1990 ("ADA"), 42
    U.S.C. §§ 12101, *et seq.*
(2) Violation of California's Unruh Civil
    Rights Act, Cal. Civ. Code §§ 51, *et seq.*
(3) Violation of the California Disabled
    Persons Act ("CDPA"), Cal. Civ. Code §§
    54, *et seq.*

**DEMAND FOR JURY TRIAL**

1    Plaintiff I.L. ("Plaintiff") brings this action on behalf of himself and all others similarly

2  situated against Defendants Six Flags Entertainment Corporation and Magic Mountain LLC

3  (collectively, "Defendants" or "Six Flags").  Plaintiff makes the following allegations pursuant to

4  the investigation of his counsel and upon information and belief, except as to allegations

5  specifically pertaining to himself and his counsel, which are based on personal knowledge.

6                                           **INTRODUCTION**

7    1.    This putative class action lawsuit seeks to put an end to systemic civil rights

8  violations committed by Six Flags against disabled individuals, as set forth under Title III of the

9  Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq*., and corresponding

10  California statutes,[1] within California and across the United States.

11    2.    Defendants own and operate Six Flags-branded theme parks and Hurricane Harbor-

12  branded water parks throughout the United States and California.  In fact, Six Flags "is the world's

13  largest regional theme park company"[2] with "27 theme [parks] and water parks across North

14  America,"[3] including 24 parks in the United States, four of which are located within California.[4]

15  Defendants' theme parks and water parks (collectively, "amusement parks," or the "Amusement

16

17

18  [1] The ADA generally prohibits "public accommodations" from discriminating against people with disabilities.  *See* 42 U.S.C. § 12182(a).  Likewise, California has enacted several statutes which also bar discrimination against people with disabilities, including the Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, *et seq*., and the California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq*., both of which state that a violation of the ADA is a violation of each of those respective acts.  *See* Cal. Civ. Code § 51(f); Cal. Civ. Code § 54.1(d).

19

20

21  [2] *Six Flags At-a-Glance*, https://investors.sixflags.com/investor-overview/six-flags-at-a-glance; see also *Six Flags Reports Third Quarter 2023 Performance* (Nov. 2, 2023), https://investors.sixflags.com/news-and-events/press-releases/2023/11-02-2023-100206226 ("Six Flags Entertainment Corporation [is] the world's largest regional theme park company and the largest operator of water parks in North America[.]").

22

23

24  [3] Six Flags, *Company History*, https://investors.sixflags.com/investor-overview/company-history; *see also* Six Flags Entertainment Corporation, *Quarterly Report (Form 10-Q)* (Aug. 11, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/701374/000155837023014657/six-20230702x10q.htm ("We are the largest regional theme park operator in the world and the largest operator of water parks in North America based on the number of parks we operate.  Of our 27 regional theme parks and water parks, 24 are located in the United States[.]").

25

26

27  [4] Specifically, Defendants operate the following amusement and water parks in California: Six Flags Magic Mountain (Valencia, CA); Six Flags Discovery Kingdom (Vallejo, CA); Hurricane Harbord Concord (Concord, CA); and Hurricane Harbor Los Angeles (Valencia, CA).

28

Parks" at issue) are places of public accommodations subject to Title III of the ADA, the Unruh Act, and the CDPA. *See* ADA, 42 U.S.C. § 12181(7)(I).

3.     Plaintiff I.L. is a natural person and a Veteran of the United States Army who has physical and mental impairments that substantially limit several major life activities, as explained further below. Plaintiff is therefore an individual with a disability within the meaning of state and federal civil rights laws.

4.     As a disabled American, Plaintiff has the right to meaningfully access, enjoy, and participate in society just as non-disabled persons do. No person or entity subject to Title III of the ADA may discriminate against an individual on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201. Nor can a public accommodation deny disabled persons the opportunity to participate in or benefit from the entity's goods, services, facilities, privileges, advantages, or accommodations, *see* 42 U.S.C. § 12182(b)(1)(A)(i); provide disabled persons with a benefit that is unequal to that afforded to other individuals, *see id*. § 12182(b)(1)(A)(ii); provide disabled persons a different or separate good, service, facility, privilege, advantage, or accommodation from that provided to other individuals, *see id*. § 12182(b)(1)(A)(iii); or utilize standards or criteria or methods of administration that have the effect of discriminating on the basis of disability, *see id*. § 12182(b)(1)(D).

5.     Further, public accommodations cannot impose impermissible eligibility criteria that screen out or tend to screen out individuals with disabilities unless the criteria are shown to be necessary for the provision of the public accommodation's goods and services. 42 U.S.C. § 12182(b)(2)(A)(i). And they must make "reasonable modifications in polices, practices, or procedures, when such modifications are necessary" to provide disabled individuals full and equal enjoyment. *Id*. § 12182(b)(2)(A)(ii).

6.     The U.S. Department of Justice's ("DOJ") regulations implementing the ADA further provide that a "public accommodation shall not ask about the nature or extent of a person's disability … [and] shall not require documentation[.]" 28 C.F.R. § 36.302(c)(6).

7.      Defendants discriminated against Plaintiff by failing to provide him with an opportunity to participate in and benefit from Defendants' amusement services free from discrimination.  Specifically, in 2020, Six Flags implemented its current procedures for making accommodation requests at Defendants' amusement parks in the United States, called the "Attraction Access Program."  Under the Attraction Accessibility Program, Defendants require guests with disabilities to register ahead of their visits to Six Flags theme parks across the U.S. with the International Board of Credentialing and Continuing Education Standards ("IBCCES").  Despite its name, the IBCCES is a private, for-profit company that is not affiliated with any governmental agency or regulatory body.  The IBCCES describes itself as "the industry leader in cognitive disorder training and certification for healthcare, education and corporate professionals around the globe."  To obtain an accommodation at the Amusement Parks at issue, guests must register online with IBCCES and obtain an Individual Accessibility Card ("IAC") at least 48 hours in advance of their park visit.  Further, as part of the online registration process, guests must disclose sensitive personal information and provide private medical documentation in support of their accommodation requests.  This requirement violates the ADA's implementing regulation under 28 C.F.R. § 36.302(c)(6).

8.      To ensure compliance with the ADA, "[p]ublic accommodations must … consider[] how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).  Here, nondisabled guests visiting Defendants' Amusement Parks may purchase their tickets for admission to Six Flags or Hurricane Harbor at, and upon arrival to, Defendants' facilities, and they may then enter the Parks and enjoy all the benefits on offer, without any advance planning or preparation.  But because disabled persons must gather the necessary medical documentation and submit it with their application on the IBCCES website *prior* to their Park visit, persons with disabilities do not have that same luxury afforded to nondisabled persons.

9.      Defendants have therefore failed to implement policies, procedures, and practices respecting the civil rights and needs of disabled individuals.  Instead of ensuring access,

Defendants' disability access policy has prevented disabled persons from exercising their rights to meaningfully access, enjoy, and participate in society just as non-disabled persons.

10.    As explained below, Plaintiff submitted an IBCCES application, obtained an IAC, and visited one or more of Defendants' facilities in California multiple times during the 2022-2023 season as Six Flags.   Plaintiff was denied full and equal access as a result of Defendants' Attraction Access Program.  Similar denials of full and equal access to Defendants' services have been faced around the country by members of the putative classes.  Defendants require all disabled park guests use the unlawful IBCCES system to request accommodations at Defendants' amusement parks.

11.    Defendants' decision to implement the Attraction Access Program at all of their Amusement Parks in 2020 was, on information and belief, based purely on financial considerations, and resulted in the widespread violation of Plaintiff's and putative Class Members' civil rights.

12.    Defendants have further demonstrated through their interactions with Plaintiff that Defendants' employees are not properly trained regarding the civil rights, communication needs, privacy considerations, or how to interact with disabled individuals.

13.    Accordingly, Plaintiff brings this action individually and on behalf of all others similarly situated to compel Defendants to cease unlawful discriminatory practices and implement policies and procedures that will ensure Plaintiff full and equal enjoyment of, and a meaningful opportunity to participate in and benefit from, Defendants' services.  Plaintiff seeks declaratory, injunctive, and equitable relief and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and its implementing regulations.

14.    Additionally, Plaintiff brings this action individually and on behalf of all other similarly situated California residents and seeks declaratory, injunctive, and equitable relief and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, *et seq.*,

1   and California's Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq*., and for statutory

2   damages in accordance with California Civil Code §§ 52(a) and 54.3.

3       15.    The ADA and the Unruh Act expressly contemplate injunctive relief aimed at

4   modification of a policy or practice that Plaintiff seek in this action.  *See* ADA, 42 U.S.C. §

5   12188(a)(2) ("Where appropriate, injunctive relief shall also include requiring the provision of …

6   service, modification of a policy, or provision of alternative methods."); *see also* Unruh Act, Cal.

7   Civ. Code § 52(c)(3).

8       16.    Consistent with 42 U.S.C. § 12188(a)(2) and the Unruh Act, Plaintiff seeks a

9   permanent injunction requiring that, *inter alia*: (1) Defendants take all steps necessary to bring

10  their disabilities accommodations request process into full compliance with the requirements set

11  forth in the ADA and its implementing regulations, as detailed below; (2) Defendants adequately

12  train park employees regarding the civil rights, communication needs, and privacy considerations

13  of disabled individuals; and (3) Plaintiff's representatives monitor Defendants' facilities to ensure

14  the injunctive relief ordered pursuant has been implemented and will remain in place.

15      17.    Plaintiff's claims for permanent injunctive relief are asserted as a nationwide class

16  claim pursuant to Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) was specifically intended to be utilized

17  in civil rights cases where plaintiffs seek injunctive relief for their own benefit and that of a class

18  of similarly situated individuals.  To that end, the note to the 1996 amendment to Rule 23 states:

19          Subdivision(b)(2).  This subdivision is intended to reach situations
20          where a party has taken action or refused to take action with respect
            to a class, and final relief of an injunctive nature or a corresponding
21          declaratory nature, settling the legality of the behavior with respect to
            the class as a whole, is appropriate . …  Illustrative are various
22          actions in the civil rights field where a party is charged with
            discriminating unlawfully against a class, usually one whose
23          members are incapable of specific enumeration.

24      18.    In addition, Plaintiff's claims for statutory damages pursuant to Cal. Civ. Code §§

25  52(a) and 54.3 are asserted as a California-only class claim pursuant to Fed. R. Civ. P. 23(b)(3).

26      19.    For the foregoing reasons, Plaintiff brings this action individually and on behalf of

27  all others similarly situated based on Defendants' unlawful conduct, seeking damages, restitution,

28

declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for violation of: (1) Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq*.; (2) California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, *et seq*.; and (3) California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq*.

## THE PARTIES

20.     Plaintiff I.L. is a citizen of California, residing in Bakersfield, California.  Plaintiff is a natural person, a Veteran of the United States Army, and a season ticket holder during the 2022-2023 season at Six Flags.  Plaintiff has several ADA-qualifying disabilities, including sciatic nerve damage on the left side of his body, post-traumatic stress disorder ("PTSD"), and gastroesophageal reflux disease ("GERD").  As a result, Plaintiff has difficulty gripping objects and has unsteady hands, has diminished use of his shoulders and upper body, is unable to remain standing for a significant amount of time (no more than ten minutes at a time), has difficulty walking extensive distances, experiences heightened sensitivity to crowds, noise, and touch, and must be able to urgently access restrooms at a moment's notice and without delay, among other limitations.  These physical and mental impairments therefore substantially limit several "major life activities," including Plaintiff's ability to independently care for himself, perform manual tasks, eat, stand, bend, concentrate, think, communicate, and work.  42 U.S.C. § 12102(2)(A). Additionally, Plaintiff's GERD impedes "operation of a major bodily function," namely, Plaintiff's digestive and bowel functions.  42 U.S.C. § 12102(2)(B).  Thus, Plaintiff's impairments are disabilities protected by the ADA, Unruh Act, and CDPA.

21.     On or around May 11, 2022, Plaintiff applied for accommodations at Six Flags Magic Mountain ("Magic Mountain" or the "Park") in Valencia, California, by submitting an application through the IBCCES website, which included (per IBCCES rules) a mandatory disclosure of sensitive personal information and submission of medical documentation, in accordance with IBCCES's requirements.  Specifically, Plaintiff submitted a document issued by the Veterans Association that states Plaintiff's disabilities and diagnoses and explains the types of accommodations Plaintiff commonly requires as a result of those disabilities and diagnoses. Following registration through the IBCCES website, Plaintiff received an IBCCES Individual

Accessibility Card ("IAC"), as is required for disabled persons to partake in the Attraction Access Program.  Thereafter, Plaintiff visited Magic Mountain on multiple occasions during the 2022-2023 season at Six Flags.  As explained in detail below, Defendants' procedure for requesting accommodations for requesting accommodations at the Amusement Parks through the IBCCES website resulted, and continues to result, in the widespread denial of Plaintiff's and Class Members' full and free use of the Park facilities.

22.     Defendant Six Flags Entertainment Corp. ("SFEC" or "Six Flags") is a Delaware corporation with its principal place of business located at 1000 Ballpark Way, Suite 400, Arlington, Texas 76011.  SFEC has done business in California and throughout the United States at all times during the Class Period.  At all relevant times, acting alone or in concert with Defendant Magic Mountain LLC, SFEC has owned or leased and operated regional Six Flags-branded theme parks and Hurricane Harbor-branded water parks (collectively, the "Amusement Parks" or "Parks") throughout the United States and California.  In fact, Six Flags "is the world's largest regional theme park company,"[5] with 24 theme and water parks in the United States, including four amusement parks in California—namely, Six Flags Magic Mountain in Valencia (the "Valencia Park" or "Magic Mountain"); Six Flags Discovery Kingdom in Vallejo (the "Vallejo Park" or "Discovery Kingdom"); Hurricane Harbor in Concord (the "Concord Park" or "HH Concord"); and Hurricane Harbor Los Angeles in Valencia (the "LA Park" or "HH LA") (collectively, the "California Parks").  SFEC is a "private entity" within the meaning of the ADA, *see* 42 U.S.C. § 12181(6) ("The term 'private entity' means any entity other than a public entity[.]"), and its facilities—the Amusement Parks—are places of "public accommodation," *see id*. § 12181(7)(I) ("The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce … (I) a park, zoo, **amusement park**, or other place of recreation ….") (emphasis added); *accord* 28 C.F.R. § 36.104

---

[5] *Six Flags At-a-Glance*, https://investors.sixflags.com/investor-overview/six-flags-at-a-glance; see also *Six Flags Reports Third Quarter 2023 Performance* (Nov. 2, 2023), https://investors.sixflags.com/news-and-events/press-releases/2023/11-02-2023-100206226 ("Six Flags Entertainment Corporation [is] the world's largest regional theme park company and the largest operator of water parks in North America[.]").

(same).[6]

23.    Thus, as the owner (or lessor[7]) and operator of the Amusement Parks, SFEC subject to Title III of the ADA.  *See* 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.").  Relevant to Plaintiff's claims, since 2020, SFEC, acting alone or in concert with Defendant Magic Mountain LLC, has maintained a uniform policy and practice at each of its 24 Amusement Parks in the United States regarding disability access that requires disabled persons seeking accommodations at the Parks to register with IBCCES, a for-profit private entity, in advance of their scheduled visits through a burdensome online application process that requires, *inter alia*, disclosure and submission of sensitive medical information and documentation not necessary for the verification, assessment, or provision of reasonable accommodations ensuring equal access, in violation of state and federal law.  At all relevant times, acting alone or in concert with Defendant Magic Mountain LLC, SFEC formulated, directed, controlled, had the authority to control, and/or participated in the

---

[6] *See also Masci v. Six Flags Theme Park, Inc.*, 2014 WL 7409952, at *9 (D.N.J. Dec. 31, 2014) ("[T]here is no dispute that Six Flags qualifies as a 'place of public accommodation[.]'") (citing 42 U.S.C. § 12181(7)(I)); *LaBonte v. Riverside Park Enterprises, Inc.*, 2022 WL 17253663, at *3 (D. Mass. Nov. 28, 2022); *Bench v. Six Flags Over Texas, Inc.*, 2014 WL 12586743, at *8 (N.D. Tex. July 7, 2014); *accord Davis v. SeaWorld Parks & Ent., Inc.*, 2023 WL 4763451, at *8 (M.D. Fla. July 25, 2023) ("SeaWorld's theme park constitutes a 'public accommodation' as defined in the ADA."); *A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.*, 469 F. Supp. 3d 1280, 1302 (M.D. Fla. 2020), *aff'd,* 50 F.4th 1097 (11th Cir. 2022); *Galvan v. Walt Disney Parks & Resorts, U.S., Inc.*, 425 F. Supp. 3d 1234, 1239 (C.D. Cal. 2019) ("Places of public accommodation, like Disneyland, must 'provide disabled patrons an experience comparable to that of able-bodied patrons.'") (citation omitted); *Castelan v. Universal Studios Inc.*, 2014 WL 210754, at *5 n.6 (C.D. Cal. Jan. 10, 2014) ("Universal Studios theme park is indisputably a place of public accommodation.  The statute explicitly mentions 'amusement park' as an example.") (citing 42 U.S.C. § 12181(7)(I)); *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1215 (11th Cir. 2012); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

[7] Six Flags leases 12 of its 27 Amusement Park facilities, including its Hurricane Harbor facility in Concord, California (the "Concord Park").  *See* Six Flags Entertainment Corporation, 2022 Annual Report (Mar. 28, 2023), https://investors.sixflags.com/~/media/Files/S/Sixflags-IR-V2/documents/annual-reports/ny20007291x4-ars-six-flags-edgar-asfiled.pdf ("Of our 27 theme parks and water parks, 12 are located on property that we lease and do not own.").  Defendants own the remaining 15 Park facilities located in North America, including three of its four California Parks—namely, Magic Mountain in Valencia (*i.e.*, the Park that Plaintiff visited), Discovery Kingdom in Vallejo, and Hurricane Harbor Los Angeles.

1    acts and practices set forth in this Complaint.

2        24.    Defendant Magic Mountain LLC ("Magic Mountain") is a California limited

3    liability company with its principal place of business located at 26101 Magic Mountain Parkway,

4    Valencia, California 91355.  Magic Mountain is a wholly owned subsidiary of SFEC, and it has

5    done business in California at all times during the Class Period.  Specifically, at all relevant times,

6    acting alone or in concert with SFEC, Magic Mountain has owned and operated "Six Flags Magic

7    Mountain," an amusement park located in Valencia, California (the "Valencia Park").  Magic

8    Mountain is a "private entity" within the meaning of the ADA, *see* 42 U.S.C. § 12181(6), and the

9    Valencia Park is a place of "public accommodation," *see id*. § 12181(7)(I); *accord* 28 C.F.R. §

10   36.104 (same).  Magic Mountain is therefore subject to Title III of the ADA, *see* 42 U.S.C.

11   § 12182(a).

12       25.    Relevant to Plaintiff's claims, since 2020, Magic Mountain, acting alone or in

13   concert with SFEC, has maintained a uniform policy and practice regarding disability access at its

14   Valencia Park that requires disabled persons seeking accommodations at the Park to register with

15   IBCCES, a for-profit private entity, in advance of their scheduled visits through a burdensome

16   online application process that requires, *inter alia*, disclosure and submission of sensitive medical

17   information and documentation not necessary for the verification, assessment, or provision of

18   reasonable accommodations ensuring equal access, in violation of state and federal law.  At all

19   relevant times, Magic Mountain, acting alone or in concert with SFEC, formulated, directed,

20   controlled, had the authority to control, and/or participated in the acts and practices set forth in this

21   Complaint.

22       26.    Defendants SFEC and Magic Mountain (collectively, "Defendants" or "Six Flags")

23   wholly own and operate the Amusement Parks and are responsible for the creation,

24   implementation, and administration of the Attraction Access Program, as well as for the training of

25   Park employees.  Defendants have sold, and continue to sell, tickets to their Amusement Parks in

26   California and throughout the United States at all times during the Class Period.

27       27.    Plaintiff reserves the right to amend this Complaint to add different or additional

28   defendants, including without limitation any officer, director, employee, supplier, or distributor of

Defendants who has knowingly and willfully aided, abetted, and/or conspired in the discriminatory and unlawful alleged herein.

**JURISDICTION AND VENUE**

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises directly under the "laws[] … of the United States"—namely, Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*., and its implementing regulations—and thus raises a federal question.  For the same reason, this Court also has subject matter jurisdiction under 28 U.S.C. § 1343(a)(4) ("The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: … (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights[.]").  In addition, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

29.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action where the aggregate claims for all members of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and there is at least minimal diversity in that Plaintiff and most members of the proposed classes, are citizens of a state different from Defendant Six Flags Entertainment Corporation.

30.     This Court has personal jurisdiction over the parties because Defendants have, at all times relevant hereto, systematically and continually conducted, and continue to conduct, business in California, including within this District.  Indeed, Defendant SFEC maintains four amusement parks in this State, and Defendant Magic Mountain maintains one amusement park in California, located within this District.  Defendants therefore have sufficient minimum contacts with this state, including within this District, and/or have intentionally availed themselves of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its products and/or services to residents within this District and throughout California, such that they should reasonably expect to be brought into court in this State and District as a result of their activities here.  Additionally, Defendant Magic Mountain is an "unincorporated association" under

1

2

3

4

5

6

7

CAFA, and Defendant Magic Mountain is therefore "a citizen of the State where it has its principal place of business [California] and the State under whose laws it is organized [also California]." 28 U.S.C. § 1332(d)(10). Thus, this Court has general personal jurisdiction over Magic Mountain because it was formed, and maintains its principal place of business, in California. Further, Plaintiff resides in California, is a citizen of California, registered for the Accessibility Card at issue from California, purchased his park tickets from California, visited one or more Defendants' facilities in California, suffered injury in California, and submits to the jurisdiction of this Court.

8

9

10

11

31.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Also, Plaintiff resides in this District. Moreover, Defendants systematically conduct business in this District and throughout the State of California.

12

### **FACTUAL BACKGROUND**

13

14

**A.     Overview Of Federal And State Laws Prohibiting Discrimination On The Basis Of Disability**

15

**i.     Title III of the ADA**

16

17

18

19

20

21

22

23

32.     In 1990, the United States Congress made findings that laws were needed to more fully protect "some 43 million Americans [with] one or more physical or mental disabilities;" that "historically society has tended to isolate and segregate individuals with disabilities;" that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;" that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living and economic self sufficiency for such individuals;" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101.

24

25

33.     Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations:

26

27

28

> No individual shall be discriminated against on the basis of disability
> in the full and equal enjoyment of the goods, services, facilities,
> privileges, advantages, or accommodations of any place of public
> accommodation by any person who owns, leases (or leases to), or

operates a place of public accommodation.

42 U.S.C. § 12182(a) (General Rule).

34.   To aid in the construction of this rule under Section 12182(a), the ADA sets forth several general prohibitions relevant to Plaintiff's claims:

**(b) CONSTRUCTION**

**(1) GENERAL PROHIBITION**

**(A) Activities**

**(i) Denial of participation**
It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

**(ii) Participation in unequal benefit**
It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.

**(iii) Separate benefit**
It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others. …

**(D) Administrative methods**
An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration—
(i) that have the effect of discriminating on the basis of disability; or
(ii) that perpetuate the discrimination of others who are subject to common administrative control.

42 U.S.C. §§ 12182(b)(1)(A)(i)-(iii), 12182(b)(1)(D).  The general prohibitions cited above are

1    supplemented by various, more specific requirements.[8]

2        35.    Particularly relevant here, public accommodations: (1) may not impose "eligibility

3    criteria" that tend to screen out disabled individuals, 42 U.S.C. § 12182(b)(2)(A)(i) (prohibiting

4    "the imposition or application of eligibility criteria that screen out or tend to screen out an

5    individual with a disability or any class of individuals with disabilities from fully and equally

6    enjoying any goods, services, facilities, privileges, advantages, or accommodations"); and (2) must

7    make "reasonable modifications in polices, practices, or procedures, when such modifications are

8    necessary" to provide disabled individuals full and equal enjoyment, *id.* § 12182(b)(2)(A)(ii)

9    (prohibiting "a failure to make reasonable modifications in policies, practices, or procedures, when

10   such modifications are necessary to afford such goods, services, facilities, privileges, advantages,

11   or accommodations to individuals with disabilities"); *accord* 28 C.F.R. § 36.302(a) ("A public

12   accommodation shall make reasonable modifications in policies, practices, or procedures, when

13   the modifications are necessary to afford goods, services, facilities, privileges, advantages, or

14   accommodations to individuals with disabilities ….").

15       36.    Further, in enacting the ADA, Congress explained that one purpose is "to ensure

16   that the Federal Government plays a central role in enforcing the standards established in this

17   chapter." 42 U.S.C. § 12101(b)(3). To that end, Congress gave the Attorney General the

18   responsibility to promulgate regulations implementing the provisions of Title III of the ADA. *See*

19   42 U.S.C. § 12186(b). "To flesh out the details of [Title III's] general rule, Congress charged the

20   Attorney General with the task of promulgating regulations clarifying how public accommodations

21   must meet these statutory obligations." *United States v. AMC Ent., Inc.*, 549 F.3d 760, 763 (9th

22   Cir. 2008). Several of these implementing regulations are relevant to Plaintiff's claims. *See, e.g.*,

23   28 C.F.R. § 36.302 (addressing "[m]odifications in policies, practices, or procedures").

24       37.    Title III implementing regulations plainly prohibit public accommodations from

25   _____

26   [8] The specific requirements and prohibitions of "subsection (b)(2)(A) [of Section 12182], by its
     clear terms, provides a <u>non-exhaustive, illustrative list</u> of certain actions that qualify as
     discrimination." *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1011-12 (9th Cir. 2017)
27   (emphasis added, citation omitted); *see also Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119,
     128-29 (2005) (noting that the general non-discrimination rule in subsection (a) is "supplemented
28   by various, more specific requirements," such as those found in subsection (b)(2)(A)).

making any inquiries about the existence of a guest's disability, let alone the specific abilities or limitations the guest may have. *See* 28 C.F.R. § 36.302(c)(6) ("**A public accommodation shall not ask about the nature or extent of a person's disability … [and] shall not require documentation**[.]") (emphasis added); *see also id.* § 36.302(f)(8) ("A public accommodation may not require proof of disability, including, for example, a doctor's note, before selling tickets for accessible seating."); *id.* § 36.311(c)(1) ("A public accommodation shall not ask an individual using a wheelchair or other power-driven mobility device questions about the nature and extent of the individual's disability."). *See also Davis v. SeaWorld Parks & Ent., Inc.*, 2023 WL 4763451, at *10 (M.D. Fla. July 25, 2023); *A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.*, 469 F. Supp. 3d 1280, 1308 (M.D. Fla. 2020), *aff'd*, 50 F.4th 1097 (11th Cir. 2022); *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1291 (11th Cir. 2018); *Garneaux v Kym Ventures LLC*, 2018 WL 8131765 (N.D. Ga. Sept. 6, 2018) (citing and applying 28 C.F.R. § 36.302(c)(6)); *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *8 (C.D. Cal. Feb. 12, 2014) ("[T]he regulation [under 28 C.F.R. § 36.302(c)(6)] prohibits all inquiries regarding the nature or extent of a person's disability other than the two exceptions specified [in that section]. … [T]his regulation precludes law enforcement and personnel such as [defendant] from investigating whether purported [disabilities] … are what [individuals requesting accommodations] say they are.") (emphasis added); *id.* ("[T]his provision plainly prohibits all inquiries other than the two permitted inquiries, while also limiting the permitted inquiries to [specific] situations[.]").

38.     As courts applying 36.302(c)(6) have explained, "[t]his 'regulation [] protects individuals with disabilities from possibly unwanted questioning.'" *Davis*, 2023 WL 4763451, at *10 (quoting *Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1356 (S.D. Fla. 2015)).

39.     To be sure, notwithstanding the general rule announced by 28 C.F.R. § 36.302(c)(6), in certain specific contexts, the implementing regulations permit some sort of **limited** inquiry (*i.e.*, a simple inquiry that does *not* require "screening" or the submission of sensitive medical information or documentation) for verification purposes. *See, e.g.*, 28 C.F.R. § 36.302(f)(8)(i) ("For the sale of single-event tickets, it is permissible to inquire whether the individual purchasing the tickets for accessible seating has a mobility disability or a disability that

1    requires the use of the accessible features that are provided in accessible seating, or is purchasing

2    the tickets for an individual who has a mobility disability or a disability that requires the use of the

3    accessible features that are provided in the accessible seating.") (emphasis added); *id.* §

4    36.302(f)(8)(ii) ("For series-of-events tickets, it is permissible to ask the individual purchasing the

5    tickets for accessible seating to attest in writing that the accessible seating is for a person who has

6    a mobility disability or a disability that requires the use of the accessible features that are provided

7    in the accessible seating.") (emphasis added); *id.* § 36.302(f)(8)(iii) ("A public accommodation

8    may investigate the potential misuse of accessible seating where there is good cause to believe that

9    such seating has been purchased fraudulently.") (emphasis added); *id.* § 36.302(c)(6) ("A public

10    accommodation … may make two [limited] inquiries to determine whether an animal qualifies as a

11    service animal[] … [but, g]enerally, a public accommodation may not make these inquiries …

12    when it is readily apparent that an animal is trained to do work or perform tasks for an individual

13    with a disability (e.g., the dog is observed guiding an individual who is blind or has low vision,

14    pulling a person's wheelchair, or providing assistance with stability or balance to an individual

15    with an observable mobility disability) (emphasis added); *id.* § 36.311(c)(2).

16         40.     However, even under these exceptional instances, where the ADA anticipates that

17    further inquiry and/or documentation may be required to ascertain whether a requested

18    accommodation is reasonable and necessary, the ADA still does not permit a public

19    accommodation to engage in a free-wheeling assessment or require, as a blanket matter, all patrons

20    seeking accommodation to disclose their disabilities or provide proof of impairment through

21    submission of sensitive medical documentation.[9]  In any case, none of the specific exceptions to

22    

23    _____

[9] For instance, with respect to requests for accommodations in the context of examinations and
courses, the implementing regulations are clear that "[a]ny request for documentation, if such
documentation is required, is reasonable and limited to the need for the modification,
accommodation, or auxiliary aid or service requested." 28 C.F.R. § 36.309(b)(1)(iv) (emphasis
added).  This regulation has two critical implications.  First, it constrains the timing of a
documentation request.  That is, by limiting such requests to documentation supporting "the need
for the … accommodation … requested," *id.*, Section 36.309(b)(1)(iv) indicates that the request for
documentation must follow, and not precede, the request for accommodation.  Otherwise, the
documentation request could not be limited to needs relevant to the accommodation request.
Second, any such inquiry must be based on an individualized assessment of the given
circumstances concerning a specific accommodation request addressing a particular impairment.

24    

25    

26    

27    

28

the general rule announced under 28 C.F.R. § 36.302(c)(6), "prohibit[ing] all inquiries regarding the nature or extent of a person's disability," *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *8 (C.D. Cal. Feb. 12, 2014), are applicable here.

41.     And even if an exception applied such that a limited request for proof of disability *is* permitted under the ADA (that is not the case), the implementing regulations are clear that a public accommodation must be flexible with respect to the form such proof may take.  For instance, 28 C.F.R. § 36.311(c)(2) states that "[a] public accommodation may ask a person using an other power-driven mobility device to provide a credible assurance that the mobility device is required because of the person's disability."  However, in that case, Section 36.311(c)(2) provides the following limitations on any such inquiry:

> A public accommodation may ask a person using an other power-driven mobility device to provide a credible assurance that the mobility device is required because of the person's disability.  A public accommodation that permits the use of an other power-driven mobility device by an individual with a mobility disability <u>shall accept the presentation of a valid, State-issued disability parking placard or card, or State-issued proof of disability, as a credible assurance that the use of the other power-driven mobility device is for the individual's mobility disability.  In lieu of a valid, State-issued disability parking placard or card, or State-issued proof of disability, **a public accommodation shall accept as a credible assurance a verbal representation**, not contradicted by observable fact, that the other power-driven mobility device is being used for a mobility disability</u>….

28 C.F.R. § 36.311(c)(2) (emphasis added).  Thus, owners, lessors, and operators of places of public accommodations may not limit proof of disability to specific categories of documentation, to the exclusion of others – such as a "[s]tatement from a healthcare provider or Individualized Education Plan"[10] – where other forms of proof, like a "valid, State-issued disability parking

---

In other words, by mandating the public accommodation's documentation request to be tailored to the particular accommodation requested, Section 36.309(b)(1)(iv) necessarily requires that documentation requests be made on a case-by-case basis.  As a result, a blanket policy requiring that all disabled patrons provide a specific form of medical documentation simultaneously with their accommodation requests, and without regard to the particular impairment at issue or accommodation sought, constitutes an unlawful inquiry under the ADA.

[10] *Six Flags Magic Mountain Safety & Accessibility Guide*, https://static.sixflags.com/website/files/sfmm_ada-guidelines.pdf.

placard or card, or … a verbal representation" (*id.* § 36.311(c)(2)), would suffice.  A "request for documentation" pursuant to such a rigid policy would not be "reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested."  *Id.* § 36.309(b)(1)(iv).

42.     Further, DOJ regulations provide, in relevant part, that "[a] public accommodation that sells tickets for a single event or series of events shall modify its policies, practices, or procedures to ensure that individuals with disabilities have an equal opportunity to purchase tickets for accessible seating[] … [d]uring the same hours; … [t]hrough the same methods of distribution; … [i]n the same types and numbers of ticketing sales outlets, including telephone service, in-person ticket sales at the facility, or third-party ticketing services, as other patrons; and [ u]nder the same terms and conditions as other tickets sold for the same event or series of events."  28 C.F.R. § 36.302(f)(1)(ii).[11]  Thus, where non-disabled individuals are able to spontaneously purchase tickets to an event upon arrival at the facility, without prior planning, a place of public accommodation must afford disabled persons that same luxury.

43.     The DOJ's commentary accompanying its rulemaking confirms that a covered entity must assess accommodation requests on a case-by-case basis, taking into account, *inter alia*, the specific accommodation sought.  *See, e.g.*, *Accommodations and in Commercial Facilities* ("Final Rule"), 75 Fed. Reg. 56236, 56236 (Sep. 15, 2010) (codified at 28 C.F.R. part 36) ("When a person has [an ADA-qualifying] disability, a covered entity may have to make reasonable modifications in its policies and practices for that person.  However, this determination is an individual assessment and must be made on a case-by-case basis."); *id.* at 56294 ("[T]he case-specific factors underlying the statute's readily achievable standard cannot be reconciled with a formulaic accounting approach, and [] a blanket formula inherently is less fair, less flexible, and less effective than the current case-by-case determination for whether an action is readily

---

[11] In the same vein, Section 36.302(e)(1)(i) provides that "[a] public accommodation that owns, leases (or leases to), or operates a place of lodging shall, with respect to reservations made by any means, including by telephone, in-person, or through a third party—(i) Modify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms[.]"  28 C.F.R. § 36.302(e)(1)(i) (emphasis added).

achievable."); *see also id*. at 56297 ("[In the context of accommodations requests made in testing and examination settings, t]he Department believes that appropriate documentation may vary depending on the nature of the disability and the specific modification or aid requested, and accordingly, [] entities should consider a variety of types of information[.]").

44.     Further, in expressly prohibiting places of public accommodation from "requir[ing] documentation," the DOJ observed that requiring individuals with disabilities to provide medical documentation in every case and without regard to the specific accommodation requested and other fact-specific circumstances "**would be unnecessary, burdensome, and contrary to the spirit, intent, and mandates of the ADA**." *Id*. at 56272 (emphasis added); *see also, e.g.*, *id*. at 56300 (Sep. 15, 2010) (codified at 28 C.F.R. part 36) ("A public accommodation shall not ask a person using a mobility device questions about the nature and extent of the person's disability.") (citing 73 FR 34508, 34556 (June 17, 2008)); *see also id*. (acknowledging "the Department's **longstanding, well-established policy of not allowing public accommodations or establishments to require proof** of a mobility disability" and noting that "the privacy of individuals with mobility disabilities and respect for those individuals are [] vitally important") (emphasis added).

45.     Thus, the DOJ regulations, rulemaking commentary, and guidance documents have consistently rejected a formalistic process for making and assessing accommodation requests.

46.     As explained in detail below, Defendants uniformly violate Sections 12182(a) (general rule), 12182(b)(1)(A)(i) (denial of participation), 12182(b)(1)(A)(ii) (participation in unequal benefit), 12182(b)(1)(A)(iii) (separate benefit), 12182(b)(1)(D) (administrative methods), 12182(b)(2)(A)(i) (eligibility criteria), and 12182(b)(2)(A)(ii) (failure to make reasonable modifications in policies, practices, or procedures) of the ADA, as well as the ADA's implementing regulations set forth under, *inter alia*, 28 C.F.R. § 36.302.

### ii.     California Law Protecting Disability Access

47.     "In California, '[t]wo overlapping laws, the Unruh Civil Rights Act (§ 51) and the Disabled Persons Act (§§ 54-55.3), are the principal sources of state disability access protection.'"

1   *Thurston v. Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 305 (2021), *review denied* (Dec. 22,

2   2021) (quoting *Jankey v. Lee*, 55 Cal. 4th 1038, 1044 (2012)).

3                          **California's Unruh Civil Rights Act**

4        48.     Section 51(b) of the California Civil Code, known as the "Unruh Civil Rights Act"

5   (the "Unruh Act"), provides protection from discrimination by all business establishments in

6   California, including public accommodations, and prohibits discrimination on the basis of, *inter*

7   *alia*, disability.  Specifically, Section 51(b) provides that:

8                    All persons within the jurisdiction of this state are free and equal, and
                     no matter what their … disability [or] medical condition … are
9                    entitled to the full and equal accommodations, advantages, facilities,
                     privileges, or services in all business establishments of every kind
10                   whatsoever.

11  Cal. Civ. Code § 51(b).

12       49.     Pursuant to Section 51(f) of the Unruh Act, "[a] violation of the right of any

13  individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall []

14  constitute a violation of this section."  Cal. Civ. Code § 51(f).  "[A]n Unruh [ ] Act claimant …

15  need not prove intentional discrimination upon establishing an ADA violation[.]"  *Thurston v.*

16  *Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 309 (2021), *review denied* (Dec. 22, 2021).[12]

17       50.     Private citizens may enforce the Unruh Act, as the California Legislture has

18  provided a private right of action.  *See* Cal. Civ. Code § 52(c) ("Whenever there is reasonable

19  cause to believe that any person or group of persons is engaged in conduct of resistance to the full

20  enjoyment of any of the rights described in this section, and that conduct is of that nature and is

21  intended to deny the full exercise of those rights, … any person aggrieved by the conduct may

22  ────────────────────────────
23  [12] *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 678 & n.13 (2009) ("The 2008 Legislature was
    informed—and may be presumed to have been aware—that <u>damages under the Unruh [ ] Act might</u>
    <u>be awarded for denial of ADA mandated access without proof of intentional discrimination</u>. …
24  Yet, … the reform approach the Legislature ultimately chose did not include requiring such …
    proof of intent to discriminate. … <u>Even if we agreed with defendant that adding an intent</u>
25  <u>requirement to the Unruh [ ] Act would be warranted to curb abuse, we would not be free to</u>
    <u>substitute our own judgment for that of the Legislature</u>.") (emphasis added, internal footnote
26  omitted); *see also* Senate Committee on the Judiciary, *Analysis of Senate Bill No. 1608 (2007–2008*
    *Reg. Sess.) as amended April 21, 2008*, page 7 (noting that in the context of an ADA violation,
27  federal case law "provides that a plaintiff is not required to show intentional discrimination in order
    to recover under Unruh"); Assembly Committee on the Judiciary, *Analysis of Senate Bill No. 1608*
28  *(2007–2008 Reg. Sess.) as amended May 27, 2008*, page 4 (same).

bring a civil action in the appropriate court by filing with it a complaint."); *id*. § 52(e) ("Actions brought pursuant to this section are independent of any other actions, remedies, or procedures that may be available to an aggrieved party pursuant to any other law.").

51.     Where an aggrieved person brings a civil action in court pursuant to the Unruh Act, the "complaint shall contain … [a] request for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the complainant deems necessary to ensure the full enjoyment of the rights described in this section."  Cal. Civ. Code § 52(c)(3).

52.     Further, Section 52(a) authorizes aggrieved persons to obtain statutory damages "for each and every" Unruh Act violation, as follows:

> Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51[] … is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but <u>in no case less than four thousand dollars ($4,000)</u>, and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51[.]

Cal. Civ. Code § 52(a) (emphasis added).

53.     As explained below, Defendants violate Section 51(b) of the Unruh Act by, *inter alia*, implementing, and failing to reasonably modify, the Attraction Access Program, which results in the widespread denial of the full and equal accommodations, advantages, facilities, privileges, and/or services in Defendants' business establishment to which disabled persons are entitled.  Defendants also violate Section 51(f) of the Unruh Act through their violations of the ADA under Sections 12182(a), 12182(b)(1)(A)(i), 12182(b)(1)(A)(ii), 12182(b)(1)(A)(iii), 12182(b)(1)(D), 12182(b)(2)(A)(i), and 12182(b)(2)(A)(ii), and of the ADA's implementing regulations under 28 C.F.R. §  36.302, as detailed below.

### The California Disabled Persons Act

54.     Pursuant to the California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq*., "[i]ndividuals with disabilities or medical conditions have the same right as the general public to the full and free use of … public buildings, … public facilities, and other public places."

Cal. Civ. Code § 54(a).  Defendants are subject to Section 54(a) because Plaintiff has "disabilities" and/or "medical conditions" within the meaning of the CDPA, and Defendants' Amusement Parks are undeniably facilities open to the general public.

55.     The CDPA further provides that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, … and privileges of all … places of public accommodation, amusement, or resort, and other places to which the general public is invited[.]"  Cal. Civ. Code § 54.1(a)(1) (emphasis added).  For purposes of this section, the CDPA defines "'[f]ull and equal access'… [to] mean[] access that meets the standards of Title[] … III of the Americans with Disabilities Act of 1990 (Public Law 101-336)1 and federal regulations adopted pursuant thereto, except that, if the laws of this state prescribe higher standards, it shall mean access that meets those higher standards."  Cal. Civ. Code § 54.1(a)(3).

56.     Additionally, like the Unruh Act, the CDPA wholly incorporates ADA violations.  *See* Cal. Civ. Code § 54(c) ("A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section."); *see also* Cal. Civ. Code § 54.1(d) ("A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section, and this section does not limit the access of any person in violation of that act.").

57.     Private citizens may enforce the CDPA, as the California Legislture has provided a private right of action.  *See* Cal. Civ. Code § 54.3(b).

58.     Section 54.3(a) of the CDPA authorizes aggrieved persons to obtain statutory damages in an amount not less than $4,000 for each CDPA violation.  Specifically, that section states, in relevant part, that "[a]ny person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities as specified in Sections 54 and 54.1 … or otherwise interferes with the rights of an individual with a disability under Sections 54[ and] 54.1 … is liable for each offense for the actual damages … up to a maximum of three times the amount of actual damages but in no case less than one thousand dollars ($1,000), and attorney's fees as may be determined by the court in addition thereto, suffered by any person denied any of the rights

provided in Sections 54[ and] 54.1….."  Cal. Civ. Code § 54.3(a) (emphasis added).

59.    "A showing of intent is not required to obtain damages under the [CDPA]."
*Delgado v. Orchard Supply Hardware Corp.*, 826 F. Supp. 2d 1208, 1219 (E.D. Cal. 2011) (citing
*Donald v. Cafe Royale, Inc.*, 218 Cal. App. 3d 168, 177-80 (1990)).

60.    Further, pursuant to Section 55 of the CDPA, "[a]ny person who is aggrieved or
potentially aggrieved by a violation of Section 54 or 54.1 of this code[] … may bring an action to
enjoin the violation.  The prevailing party in the action shall be entitled to recover reasonable
attorney's fees."  Cal. Civ. Code § 55; *see also* Cal. Civ. Code § 54.3(b) ("The remedies in this
section are nonexclusive and are in addition to any other remedy provided by law, including, but
not limited to, any action for injunctive or other equitable relief available to the aggrieved party or
brought in the name of the people of this state or of the United States.").

61.    As explained below, Defendants violated Sections 54(a) and 54.1(a)(1) of the
CDPA because their procedure for requesting accommodations at the Amusement Parks through
the IBCCES website resulted in the denial of Plaintiff's full and free use of Defendants' physical
Park facilities.  *See* Cal. Civ. Code §§ 54(a), 54.1(a)(1); *see also Turner v. Ass'n of Am. Med.
Colleges*, 167 Cal. App. 4th 1401, 1412 (2008), *as modified on denial of reh'g* (Nov. 25, 2008)
("Civil Code section 54, subdivision (a) entitles disabled persons to 'full and free use' of 'public
*places*.'") (emphasis added); *id*. ("[The CDPA's] <u>focus is upon *physical* access to public places,
though the statute may also be construed as requiring equal physical access to a nontangible
location such as an internet site</u>.") (italics in original, underlining added for emphasis; internal
citations omitted) (quoting *Urhausen v. Longs Drug Stores California, Inc.*,155 Cal. App. 4th 254,
261 (2007)).[13]  Defendants also violated Sections 54(c) and 54.1(d) of the CDPA vis-à-vis their

---

[13] That is, although "[n]othing in the language of section 54 can be reasonably construed to require
a modification of the [disability access] procedures themselves" (*i.e.*, because the IBCCES
registration process takes place online, in advance of a guest's Park visit), the CDPA nevertheless
requires modification of this policy "<u>to the extent necessary to guarantee physical access to the
place in which the [requested accommodations are to be] administered</u>."  *Turner*, 167 Cal. App. 4th
at 1412 (emphasis added).  And here, as explained below, Defendants' Attraction Access Program
imposes administrative burdens and prerequisites that nondisabled persons are not required to
observe in order to guarantee park access, and which ultimately prevent disabled persons from
utilizing the Amusement Parks and certain services, benefits, and/or privileges available at

1   ADA violations, as detailed below.  *See* Cal. Civ. Code §§ 54(c), 54.1(d).

2       **B.**    **Defendants' Disability Access Procedures**

3       62.    "For 59 years, Six Flags has entertained millions of families with world-class

4   coasters, themed rides, thrilling water parks and unique attractions."[14]  "Six Flags Entertainment

5   Corporation is the world's largest regional theme park company and the largest operator of

6   waterparks in North America, with $1.5 billion in revenue and [27] parks across [North

7   America],"[15] including 24 parks in the United States, four of which are located within California.

8       63.    "One of the things that allows some guests to enjoy theme parks is the measures

9   taken to make parks accessible to those with disabilities."[16]  Such measures are crucial, as the

10   Centers for Disease Control and Prevention ("CDC") estimates that 26% of the population – or one

11   in four people – has a disability, which indicates that amusement parks host nearly 100 million

12   guests with disabilities every year.[17]  Theme parks have therefore developed a wide range of

13   accommodations for their visitors with disabilities.

---

Defendants' facilities in the same manner as nondisabled persons.  Additionally, the Attraction Access Program includes a pre-screening process and unlawful disclosure/medical documentation requirement that tends to screen out disabled persons by, *inter alia*, causing harm to disabled persons' dignity interest, in effect discouraging them from further visiting the Parks in the future. Thus, modification of Defendants' Attraction Access Program is "necessary to guarantee physical access to the" Amusement Parks.  *Id.*

[14] IBCCES Certified Autism Center, *Six Flags to Become First Family of Parks to Earn Certified Autism Center™ Designation* (Feb. 6, 2020), https://certifiedautismcenter.com/2020/02/06/six-flags/.

[15] *Id.*; *see also* Six Flags Entertainment Corporation, Quarterly Report (Form 10-Q) (Aug. 11, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/701374/000155837023014657/six-20230702x10q.htm.

[16] Kenny the Pirate, *A Rigid New System for Theme Park Disability Access Begins* (Jul. 14, 2023), https://www.kennythepirate.com/2023/07/14/a-rigid-new-system-for-theme-park-disability-access-begins/ ("In fact, for some people, a trip to a theme park that does a stellar job with its accommodations can be a bit of a breath of fresh air.  For example, Disney Parks provide accommodation for those who are unable to wait in a conventional queue through its DAS program.").

[17] *See* Theme Park Insider, *A New Solution for Disability Access at Theme Parks?* (Nov. 17, 2021), https://www.themeparkinsider.com/flume/202111/8617/ ("'According to the CDC, 26% of the population has a disability. So pick those numbers, and 97 million of the 375 million guests who go to amusement parks every year have some sort of disability.  That's one in four people who have a disability.'").

64.     In 2020, Six Flags implemented its current procedures for making accommodation requests at Defendants' amusement parks in the United States, called the "Attraction Access Program."[18]  Under the Attraction Accessibility Program, Defendants require guests with disabilities to register ahead of their visits to Six Flags theme parks across the U.S. with the International Board of Credentialing and Continuing Education Standards ("IBCCES"),[19] a private for-profit company that describes itself as "the industry leader in cognitive disorder training and certification for healthcare, education and corporate professionals around the globe."[20]  There are several steps required for park guests to obtain accommodations under the disability access program, pursuant to which park guests must register with IBCCES and obtain an Individual Accessibility Card ("IAC") at least 48 hours in advance of their park visit.[21]  Broadly speaking, the steps are as follows: (1) complete the online application; (2) take IAC to participating park; and (3) get access to available accommodations.[22]

---

[18] *See* Six Flags Magic Mountain, *Attraction Accessibility*, https://www.sixflags.com/magicmountain/plan-your-visit/accessibility ("**What happened to the Equal Access Pass?**  The Equal Access Pass program was completely replaced by the Attraction Access Pass program.").

[19] *See Six Flags Magic Mountain Safety & Accessibility Guide*, https://static.sixflags.com/website/2022+Accessibility+Guide+-+V6.pdf ("Guests with cognitive disorders, disabilities or mobility impairments who request helpful accommodations must obtain the IBCCES Individual Accessibility Card (IAC) by registering at www.accessibilitycard.org.  The registration process requires the information listed below be uploaded into a secure online portal. Once a Guest has filled out the online application and uploaded necessary documentation, they will be able to access their digital Accessibility Card.  Guests will present the IBCCES Accessibility Card and Information Sheet to the Ride Information Center (Guest Services) inside each park to receive any necessary accommodations.").

[20] IBCCES Certified Autism Center, *Six Flags to Become First Family of Parks to Earn Certified Autism Center Designation* (Feb. 6, 2020), https://certifiedautismcenter.com/2020/02/06/six-flags/ ("Six Flags will [] be the first network of parks to implement IBCCES' Accessibility Card.  The cards may be used during all Six Flag park visits."); *see also* USA Today, *Travelers with disabilities need this card for accommodations at some theme parks* (Sep. 21, 2023), https://www.usatoday.com/story/travel/experience/theme-parks/2023/09/21/disabilty-pass-theme-park-accomodations-accessability/70910695007/ ("Six Flags parks across the country have used the [IBCCES Accessibility Cards] for three years.").

[21] *See* IBCCES, *Streamlining Accommodations With the IBCCES Accessibility Card*, *available at* https://accessibilitycard.org/ (directing applicants to "register for [the] IAC at least 48 hrs prior to [their] planned visit to a park").

[22] *See id*.

65.     **Step 1:** "Guests with cognitive disorders, disabilities or mobility impairments who request helpful accommodations [at Six Flags amusement parks] must obtain the [IAC] … by registering at www.accessibilitycard.org" in advance of their park visit.[23]  This registration process involves filling out an online application through IBCCES, which requires submission of documentation regarding, *inter alia*, guests' medical conditions and contact information for a healthcare, education, or government professional.  Specifically, to obtain an IAC, disabled persons seeking accommodations must, *inter alia*, specify their disability, list the type(s) of accommodation sought, and submit various documentation, including a photo of the person who will be using the pass and medical records verifying the individuals' claimed disability, such as a statement from a healthcare provider, government entity, or educational support professional related to the accommodations requested.[24]  The same information and detailed medical documentation is required of all applicants at the time the request for accommodations is made, regardless of the nature of a guest's disability or the accommodation(s) requested.  Thus, a guest seeking a standard accommodation for an obvious mobility impairment must submit the same documentation in support of his or her request as guests with invisible disabilities seeking more unusual accommodations.[25]  In effect, the submission of documentation is not based on particular need for verification, and decisions about whether and what documents are necessary for verification are not made on a case-by-case basis.

---

[23] *Six Flags Magic Mountain Safety & Accessibility Guide*, https://static.sixflags.com/website/files/sfmm_ada-guidelines.pdf.

[24] *See id.* ("The registration process requires the information listed below be uploaded into a secure online portal. … Necessary Documentation/Information for registration includes: [(1)] Contact Information[; (2)] Cardholder Information[, including, *inter alia*, a r]ecent photo of the cardholder for identification purposes[, b]irth date[, and h]elpful accommodations needed … [; and (3)] **Healthcare Information[, including a s]tatement from a healthcare provider or Individualized Education Plan (IEP or equivalent)**[.]") (emphasis added); *see also* Six Flags Magic Mountain, *Attraction Accessibility*, https://www.sixflags.com/magicmountain/plan-your-visit/accessibility ("The IBCCES requires doctor's notes with [] detailed information ….").

[25] Six Flags Magic Mountain, *Attraction Accessibility*, https://www.sixflags.com/magicmountain/plan-your-visit/accessibility ("**If I have a cast, brace on/in a wheelchair do I need a doctor's note since my disability is obviously visible?**  Yes.  To ensure fairness, the new policy applies equally to all guests with disabilities or other impairments, whether visible or not.  All guests with a disability or other qualifying impairment … are required to present a valid doctor's note in order to receive an Attractions Access Pass.").

66.    **Step 2:** "Once a Guest has filled out the online application and uploaded necessary documentation, they will be able to access their digital Accessibility Card."[26]  Importantly, guests seeking accommodations must apply through IBCCES in advance of their park visits, as they cannot any longer seek accommodations in-person at the park on the day of their visits.[27]  In other words, if a guest—unaware of the new IBCCES procedure in place at all Six Flags amusement parks—simply shows up to the park and requests accommodations upon arrival, it is already too late; Six Flags will not accommodate guests under such circumstances, as advance registration is required.  There is also no flexibility for disabled individuals to submit accommodation requests via any other format beyond the uniform application form on the IBCCES website.[28]  As above, these restrictions regarding the timing and form of an accommodation request apply to all park guests seeking accommodations, even to those guests whose disabilities and accommodation needs are obvious.  Defendants will not provide any accommodation, even as a one-time courtesy, to guests who arrive to the park without an IAC.[29]

67.    **Step 3:** Finally, with the IAC in hand, the last step is for the guest to gain access to the available accommodations upon arrival at the park.  To do so, "Guests will present the IBCCES Accessibility Card and Information Sheet to the Ride Information Center (Guest Services) inside each park to receive any necessary accommodations."[30]  For instance, Six Flags offers the "Attraction Access Pass" to "individuals with disabilities [that] … prevent[] them from waiting in the queue lines to fully enjoy their experience at the Park."[31]  Attraction Access Passes

---

[26] *Id.*

[27] *See id.* ("**If I need special accommodations, like an attraction access pass, can I just visit the Ride Information Center or do I need to card first?**  Any guest who wishes to receive helpful accommodations must first apply and receive the card <u>before</u> visiting the Ride Information Center.") (underlining added for emphasis).

[28] *See id.*

[29] *See id.* ("**Can I still get a one-time courtesy visit (of receiving an attraction access pass) without the card?**  All guests must register for the new IBCCES program prior to visiting the RIC for the first time this season. … The new IBCCES Accessibility Card applies to all cognitive disorders and physical impairments.").

[30] *Id.*

[31] *Six Flags Magic Mountain Safety & Accessibility Guide*, https://static.sixflags.com/website/2022+Accessibility+Guide+-+V6.pdf.

1
2
3
4
5
6
7
8
9
10
11

are issued to qualified individuals that present their IACs at Guest Services. "The Attraction Access Pass provides [such] individuals with a wait time interval for the day, … [which is] based on the average historical wait based on attendance for all rides that the Attractions Access Pass applies to," and the cardholder may board the ride of his or her choice "no earlier than the time written on the pass by the Ride Information Center (Guest Services) Rep (first ride) or before the wait time interval has passed since [his or her] last ride."[32] Guests with the Attractions Access Pass do not have to get a reservation or return time to ride the ride; they simply arrive at the ride and get placed in a queue in order of arrival at the exit. Once they have ridden, the ride operator will write the ride name and time of the ride on the Attraction Access Pass. This time becomes the basis for the next ride being available to the guest. This accommodation allows the guest to rest in a comfortable location or enjoy other attractions in the area until their wait time interval is over.[33]

12
13
14
15
16

68.     Finally, the IAC "lasts for one year and can be used worldwide at any attraction or property that partners with the IBCCES."[34] After one year, the IAC expires; thus, guests "must apply annually for a new card."[35] This is true, even where the disability, by its nature, or the documentation provided in connection with a guest's initial application, indicated that the impairment in question and corresponding need for accommodation would be permanent.

17
18
19
20
21
22

69.     As noted above, Defendants' accommodations request system is administered by "IBCCES, the training and certification organization behind certified autism centers and other accessibility-related programs, [which] … created [the IAC] to help streamline accommodations processes at theme parks and other attractions."[36] "However, for those unable to access the card, there is a risk of the system creating limitations (particularly for those with a developmental

23
24
25
26
27
28

---

[32] *Id.*

[33] *See id.*

[34] Six Flags Magic Mountain, Attraction Accessibility, https://www.sixflags.com/magicmountain/plan-your-visit/accessibility.

[35] *Id.*

[36] USA Today, *Travelers with disabilities need this card for accommodations at some theme parks* (Sep. 21, 2023), https://www.usatoday.com/story/travel/experience/theme-parks/2023/09/21/disabilty-pass-theme-park-accomodations-accessability/70910695007/.

disability or intellectual disability who may not know about the rules)."[37]  Indeed, in actual

practice, the IBCCES pre-registration requirement "has the impact of posing more red tape for

already marginalized communities to access theme parks. … [The program has] caus[ed] concern

for those struggling with card access."[38]  As "Shannon Des Roches Rosa, senior editor of Thinking

Person's Guide to Autism and the mom of an autistic son, [explained,] … requiring preapproval

[from people who actually need accommodations] takes away from their ability to visit parks

spontaneously."[39]

70.    The documentation requirement is also problematic.[40]  To start, the requirement to

submit documentation is burdensome and cannot reasonably be met by all persons with an ADA-

qualifying injury, as the CDC has noted that at least 25% of adults do not have a usual health care

provider.[41]  Thus, Six Flags is "able to restrict accommodations (and therefore access to a desired

---

[37] Inside The Magic, *Theme Parks Single Out Disabled Guests to Make "Fun Faster"* (Sep. 23, 2023), https://insidethemagic.net/2023/09/theme-parks-single-out-disabled-guests-to-make-fun-faster-cm1/ ("Theme parks have begun singling out disabled guests by requiring them to provide a card from a centralized board.").

[38] *Id*.

[39] USA Today, *Travelers with disabilities need this card for accommodations at some theme parks* (Sep. 21, 2023), https://www.usatoday.com/story/travel/experience/theme-parks/2023/09/21/disabilty-pass-theme-park-accomodations-accessability/70910695007/; *see also* Kenny the Pirate, *A Rigid New System for Theme Park Disability Access Begins* (Jul. 14, 2023), https://www.kennythepirate.com/2023/07/14/a-rigid-new-system-for-theme-park-disability-access-begins/ ("Guests requesting an attraction queue accommodation must obtain the IBCCES Individual Accessibility Card (IAC) by registering at www.accessibilitycard.org prior to their visit. … **[M]any guests are frustrated with [the new requirements].  Obtaining a card is an added layer of hassle to add to the process**.") (emphasis added).

[40] *See Six Flags Magic Mountain Safety & Accessibility Guide*, https://static.sixflags.com/website/files/sfmm_ada-guidelines.pdf ("The registration process requires … [park guests to] fill[] out the online application and upload[] necessary documentation. … Necessary Documentation/Information for registration includes: [(1)] Contact Information[; (2)] Cardholder Information[, including, *inter alia*, a r]ecent photo of the cardholder for identification purposes[, b]irth date[, **n]ame of the disability/disorder**[, and h]elpful accommodations needed … [; and (3)] **Healthcare Information[, including a s]tatement from a healthcare provider or Individualized Education Plan (IEP or equivalent)**[.]") (emphasis added); *see also* IBCCES Certified Autism Center, *An Answer for Ride and Attractions Accessibility Programs* (Oct. 1, 2019), https://certifiedautismcenter.com/2019/10/01/accessibility-programs/ ("The IAC registration system collects and stores documentation needed to access certain special needs accommodations or benefits at amusement parks and attractions.").

[41] *See* USA Today, *Travelers with disabilities need this card for accommodations at some theme parks* (Sep. 21, 2023), https://www.usatoday.com/story/travel/experience/theme-parks/2023/09/21/disabilty-pass-theme-park-accomodations-accessability/70910695007/ ("What if

---

attraction) because of documentation requirements."[42]  Further, given the sensitive nature of the documentation that applicants must submit, this requirement has given rise to dignity, privacy, and data security concerns.  For instance, "[c]ritics have expressed concern about uploading personal medical information to a third-party site," especially given that "private companies don't have to follow the same federal law restricting the release of medical information as health care providers, which worries some."[43]

71.    Online consumer complaints indicate that these concerns have become a reality, as disabled individuals are indeed harmed by the rigid Attraction Access Program at Six Flags:

---

you don't have documentation?  **At least 1 in 4 adults with disabilities doesn't have a usual health care provider, according to the Centers for Disease Control and Prevention**. [Nevertheless,] '[i]n order to receive an Accessibility Card, some documentation related to the accommodations is needed,' IBCCES said.") (emphasis added).

[42] Inside The Magic, *Theme Parks Single Out Disabled Guests to Make "Fun Faster"* (Sep. 23, 2023), https://insidethemagic.net/2023/09/theme-parks-single-out-disabled-guests-to-make-fun-faster-cm1/.

[43] USA Today, *Travelers with disabilities need this card for accommodations at some theme parks* (Sep. 21, 2023), https://www.usatoday.com/story/travel/experience/theme-parks/2023/09/21/disabilty-pass-theme-park-accomodations-accessability/70910695007/; *see also* Inside the Magic, *Universal Orlando Brings Guest to Tears After Rude Accessibility Interrogation* (Jul. 19, 2023), https://insidethemagic.net/2023/07/universal-accessibility-brings-guest-to-tears-after-ending-its-disability-service-cj1/ ("[T]heme park fans were outraged … that [the amusement parks] were ditching their current accessibility service to instead outsource the service elsewhere. Now, their biggest concerns are becoming a reality as those trying to use the new service face obstacles that brought one Guest to tears. … **The process of gaining an IAC – which is [] used at … Six Flags – has been labeled both complex and intrusive**.  Those hoping to obtain one must first register online at least 48 hours before they visit the Park, as well as provide photo identification and a statement from a doctor or healthcare provider or an Individualized Education Plan (IEP) as written confirmation that an IAC is required. … [I]t seems like Guests' biggest fear of IBCCES auditing their need for an access card is very much valid.") (emphasis added)

1
2
3
4
5
6
7
8
9
10
11



**r/sixflags** • 2 yr. ago
totaltraash6773

## 22yo, TX. Couldn't get disability access to Six Flags because I dont have the doctors forms to "prove it"?!

STAFF QUESTION

Listen. I completely understand the rules are in place to prevent individuals from abusing the system. However, the strict guidelines are pretty disrespectful.

I use a cane and brace to walk, and asked for access to disability services during long wait times so I can rest my leg. I was denied because I don't have any proof that I'm "actually disabled"... Six Flags has a policy in place so that you can sign up for a disability access card. But to qualify for the card you MUST have a diagnosis/doctors note. I dont have either. I told them I could get a note from my chiropractor, but apparently that wasn't good enough.

So now I'll be in constant pain waiting in line without being able to rest my leg. Thanks a lot for basically ruining my summer vacation, Six Flags.

12
13
Reddit post dated May 17, 2022.[44]

14
15
16
17
18
19
20
21
22



**r/sixflags** • 7 mo. ago
jeffm227

## Question on Great Adventures disability system.

So I have a very weird and unique disability, not gonna go into in detail here, but in the past (summer 2019) I was able to bring a note from my doctor that said I had a permanent disability and can't wait in standard queues. This was enough to get me an accessibility flash pass. It seems like that's no longer the case and I need some outside party to verify me and give me a card. The IBCCES needs a healthcare provider note and I can't get that for this weekend.

Any know if this is the only way to be able to skips lines for disability reasons or if there are other options/work arounds?

23
Reddit post dated May 25, 2023.[45]

24

25
26

---

[44] *Available at*
https://www.reddit.com/r/sixflags/comments/urv8c9/22yo_tx_couldnt_get_disability_access_to_si x/ (last accessed Dec. 18, 2023).

27
28
[45] *Available at*
https://www.reddit.com/r/sixflags/comments/13rx0tl/question_on_great_adventures_disability_syst em/ (last accessed Dec. 18, 2023).

Reddit post dated October 30, 2023.[46]

72.     As explained further below, modification to Defendants' current disability access policies, practices, and/or procedures is necessary to afford the goods, services, facilities, privileges, advantages, or accommodations of Defendants' Amusement Parks to individuals with disabilities, like Plaintiff.  Further, Plaintiff's proposed modifications (listed below) would not fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations, is readily achievable, and would not result in an undue burden to Defendants.  In fact, in adopting the unlawful Attraction Access Program, Defendants eschewed less discriminatory alternative methods for requesting reasonable accommodations that could have been implemented without much difficulty or expense.  This is exemplified by the fact that the Attraction Access Program at Six Flags described above is far more burdensome, restrictive, and, ultimately, discriminatory than other disability access programs in place at several major amusement parks today and in recent years.

73.     To start, prior to 2020, there was an entirely different process in place for individuals with disabilities to seek accommodation at Six Flags, and that program lacked many of the discriminatory features of Defendants' current Attraction Accessibility Program.  Defendants' prior disability access program – the "Equal Access Pass" ("EAP") program, which was overhauled in 2020 when Six Flags adopted the Attraction Access Pass program and IAC requirement in partnership with IBCCES – did not raise the same concerns as those relating to the

---

[46] *Available at* https://www.reddit.com/r/sixflags/comments/17jtear/disability_pass/ (last accessed Dec. 18, 2023).

1    new Attraction Accessibility Program, discussed *supra*.[47]  For instance, the EAP program did not

2    require guests to request accommodations in advance of their park visits through any "pre-arrival

3    screening process"[48] or that applicants submit any accommodation request "at least 48 [hours]

4    prior to" their planned park visit.[49]  Instead, spontaneous park-goers, like Plaintiff, were able to

5    request accommodations in-person, at the park, on the same day as their visit.  All guests had to do

6    to obtain the EAP was show up to the park, navigate to the "Hospitality" kiosk (*i.e.*, Guest

7    Services), and explain the nature of accommodation needed to an employee.[50]  Now, guests must

8    *still* observe this step upon arrival to the park, but *first* guests must complete registration on the

9    IBCCES website and obtaining the IAC.[51]  So, what was one step under EAP is now two steps

10   under the Attractions Access Program, with the latter being significantly more burdensome.

11        74.    Moreover, the extra pre-arrival screening step brings the experience of disabled

12   park-goers at Six Flags farther afield from that of non-disabled park-goers, who may make full use

13   and enjoyment of Defendants' amusement parks during a spontaneous visit, without any prior

14   planning.  Further, while EAP's in-person process was interactive and allowed employees to

16   [47] Six Flags, *2015 Safety & Accessibility Guide* (Feb. 17, 2015), at 4, *available at*
17   https://www.sixflags.com/sites/default/files/sfft_ada_handout_2.17.15.pdf ("The Equal Access
     Pass Program is designed to provide an avenue for those individuals with disabilities whose
18   disability prevents them from waiting in the queue lines to fully enjoy their experience at the Park.
     Specifically, the Equal Access Pass provides qualified individuals with the ability to schedule a
19   time to return to the ride/attraction (i.e., a reservation time) that is comparable to the current queue
     line wait time for a given ride/attraction.  An Equal Access Pass is provided for the Guest requiring
20   the accommodation and up to a maximum of 3 companions.  Upon presentation of a valid Equal
     Access Pass, the Ride Attendant will document your reservation time for the ride.  You may rest in
21   a comfortable location in the area until your reservation time has come or when the others from
     your party reach the boarding platform.").

22   [48] Theme Park Insider, *A New Solution for Disability Access at Theme Parks?* (Nov. 17, 2021),
23   https://www.themeparkinsider.com/flume/202111/8617/ ("['The IBCCES Accessibility Card
     program in place at] … all Six Flags parks in the United States … [is] an online, pre-arrival
     screening process[,' explained] IBCCES Board Chairman Myron Pincomb[.]").

24   [49] IBCCES, *Streamlining Accommodations With the IBCCES Accessibility Card*, available at
     https://accessibilitycard.org/.

25   [50] *See* Six Flags, *2015 Safety & Accessibility Guide* (Feb. 17, 2015), at 4, *available at*
26   https://www.sixflags.com/sites/default/files/sfft_ada_handout_2.17.15.pdf ("Please visit
     Hospitality to obtain an Equal Access Pass.").

27   [51] As noted above, under Defendants' current Attraction Accessibility Program, after completing
     registration on the IBCCES website and obtaining the IAC, guests must still go to Guest Services
28   on the day of their visit in order to (again) explain their need for accommodation to Six Flags staff.

consider guests' accommodations requests on a case-by-case basis (as the ADA requires[52]), this is not true of the timing and blanket documentation requirements of the Attractions Access Program. Defendants' policy extends no exception to these requirements, even for those with obvious disabilities. Defendants' Attraction Access Program is an impermissible "blanket" or "one size fits all" policy for all disabled persons. *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1290 (11th Cir. 2018). By contrast, with EAP, guests were not required to share such medical information and documentation with third parties – impinging upon guests' privacy and risking their data security – as they must do under the Attractions Access Program.

75.     Moreover, comparison to the disability access policies and practices of Defendants' main competitor – Disney[53] – highlight the pitfalls of the Attractions Access Program at Six Flags. Disney's current Disability Access Service ("DAS") program allows cognitively disabled guests like the plaintiffs (1) to enter immediately all rides with waits of less than 15 minutes, which is most rides; (2) to schedule appointment times for rides with longer waits; and (3) to never have to stand in a physical line for any ride. The critical difference between Disney's DAS program and the Attraction Access Program in place at Six Flags Amusement Parks is that "**Disney has chosen to accept each guest's verbal representations as to his disability without requiring any proof and issues him a DAS Card, no matter how slight or severe the … disability**." *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1291 (11th Cir. 2018) (emphasis added). In fact, based in part on this feature, the Eleventh Circuit rejected a challenge to Disney's DAS program pursuant to the ADA, holding that, "[u]nder the factual circumstances of this case, we conclude that Disney's [] issuance of DAS Cards, in and of itself, does not violate the ADA." *Id.*; *see also A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.*, 469 F. Supp. 3d 1280, 1308 (M.D. Fla. 2020), *aff'd*, 50 F.4th 1097 (11th Cir. 2022) (quoting 28 C.F.R. § 36.302(c)(6)

---

[52] *See, e.g.*, *Smith v. Walgreens Boots All., Inc.*, Case No. 20-cv-05451-CRB, 19 (N.D. Cal. Feb. 3, 2021) ("[W]hether an accommodation is 'reasonable' is a '**fact-specific, case-by-case inquiry that considers**, among other factors, the effectiveness of the modification in light of **the nature of the disability in question** and the cost of the organization that would implement it.'") (emphasis added) (quoting *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004))

[53] Disney owns and operates four theme parks in the United States, including Disneyland in California, and Disney World, Animal Kingdom, and Hollywood Studios in Florida.

1   and noting that per this regulation, "**Disney was unable to ask about the nature or extent of an**

2   **individual's disability**" in connection with its disability access system) (emphasis added); *accord*

3   *Davis v. SeaWorld Parks & Ent., Inc.*, 2023 WL 4763451, at *10 (M.D. Fla. July 25, 2023)

4   ("Under the applicable regulations, a public-accommodation['s] … questioning of the 'nature' or

5   'extent' of a disabled person's disability violates the ADA[.]"); *Garneaux v Kym Ventures LLC*,

6   2018 WL 8131765 (N.D. Ga. Sept. 6, 2018) ("Specifically, the ADA regulation [§ 36.302(c)(6)]

7   provides that a 'public accommodation shall not ask about the nature or extent of a person's

8   disability'").

9        76.    Further, in administering its DAS program, Disney, unlike Six Flags, undertakes an

10  individualized inquiry to determine the specifics of each guest's disability and to implement

11  modifications tailored to each plaintiff's needs." *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*,

12  900 F.3d 1270, 1291-92 (11th Cir. 2018) ("It is also noteworthy that Disney's Guest Relations

13  staff interact with parents of individual disabled guests when they arrive to obtain a DAS Card and

14  other services.  Guest Relations staff discuss additional accommodations, such as Re-ad Passes,

15  with parents who wish to discuss their autistic child's unique needs and are concerned the DAS

16  Card will not meet those needs.  While not every plaintiff received Re-ad Passes, that issue goes to

17  whether the ADA requires more accommodations than Disney currently provides and does not

18  diminish the fact that Guest Relations staff will discuss an individual's needs and consider whether

19  to provide additional accommodations.").  No such interactive process occurs under Defendants'

20  Attraction Access Program, upon arrival to the Park or otherwise.  Defendants' inflexible system

21  does not permit guests to make in-person accommodation requests under any circumstances.

22       77.    Accordingly, there is no question that Defendants could devise a new program, or

23  modify its current disability access system, so as to ensure equal access to Defendants' facilities in

24  compliance with state and federal laws prohibiting discrimination on the basis of disability.

25  Defendants' current Attractions Access Program, however, is not close.  As explained in detail

26  below, the pre-screening process for obtaining an IAC violates the ADA, Unruh Act, and CDPA

27  because, *inter alia*, it is inflexible, gives the same blanket treatment to all disabilities and

28  accommodation requests rather than considering them on a case-by-case basis, and imposes undue

1
2
3
4

burdens on disabled individuals not shared by nondisabled persons.  That, in turn, constrains the

manner in Defendants' facilities may be used and enjoyed by disabled persons and risks harm to

their dignity interests.  Defendants have therefore failed to implement policies, procedures, and

practices respecting the civil rights and needs of disabled individuals.

5
6

      **C.**      **Plaintiff and Members of the Putative Class Have Been Denied Full and Equal Access to Defendants' Facilities**

7
8
9
10
11
12

78.      Plaintiff I.L. is a citizen of California, residing in Bakersfield, California.  Plaintiff is Veteran of the United States Army who suffers from several ADA-qualifying disabilities, including sciatic nerve damage on the left side of his body, PTSD, and GERD.  *See* 42 U.S.C. § 12102(1)(A) ("The term 'disability' means, with respect to an individual … (A) a physical or mental impairment that substantially limits one or more major life activities of such individual[.]"); *accord* 28 C.F.R. § 36.105(a)(1)(i).

13
14
15
16
17
18
19
20
21
22
23
24
25

79.      Plaintiff's impairments substantially limit several major life activities.  First, Plaintiff's sciatic nerve damage causes chronic pain and impairs his mobility.  Specifically, Plaintiff has diminished use of his shoulders and upper body, which frustrates his ability to lift and bend.  Additionally, Plaintiff is unable to remain standing for significant periods (no more than ten minutes at a time) and has difficulty walking extensive distances.  Plaintiff also has difficulty gripping objects and has unsteady hands, which frustrates his ability to (among other things) dress and feed himself.  Next, as a result of PTSD, Plaintiff experiences heightened sensitivity to crowds, noise, and touch.  Finally, as a consequence of GERD, Plaintiff must be able to urgently access restrooms at a moment's notice and without delay, among other limitations.  Given these impairments, Plaintiff cannot work and is rated as 100% disabled by the Veterans Association ("VA").  *See* Cal. Gov't Code § 12926.1(c) ("[U]nder the law of this state, 'working' is a major life activity[.]"); *see also id*. § 12926(j)(1)(C) ("'Major life activities' shall be broadly construed and shall include … working."); *id*. § 12926(m)(1)(B)(iii) (same).[54]  Plaintiff also occasionally

26
27
28

---

[54] *See also* Unruh Act, Cal. Civ. Code § 51(e)(1) ("'Disability' means any mental or physical disability as defined in Sections 12926 and 12926.1 of the Government Code."); CDPA, Cal. Civ. Code § 54(b)(1) ("'Disability' means any mental or physical disability as defined in Section 12926 of the Government Code.").

requires the use of a motorized scooter to assist with his mobility limitations (*i.e.*, in circumstances requiring him to stand for significant periods or walk long distances, as at the Amusement Parks). *See* 29 C.F.R. § 1630.2(j)(3)(iii) ("[M]obility impairments requiring the use of a wheelchair substantially limit musculoskeletal function[.]").  In addition, Plaintiff's wife, a state-certified caregiver, serves as Plaintiff's full-time caregiver, as Plaintiff requires assistance with, *inter alia*, dressing and eating.  Plaintiff's impairments therefore substantially limit – and, in some cases, negate – several "major life activities," including Plaintiff's ability to independently care for himself, perform manual tasks, hear, eat, stand, bend, speak, breath, learn, read, concentrate, think, communicate, and work.  42 U.S.C. § 12102(2)(A) ("[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.") (emphasis added); *accord* 28 C.F.R. § 36.105(c)(1)(i). Additionally, Plaintiff's GERD impedes "operation of a major bodily function," namely, Plaintiff's digestive and bowel functions.  42 U.S.C. § 12102(2)(B) ("[A] major life activity also includes the operation of a major bodily function, including but not limited to, … digestive, bowel, [and] bladder … functions."); *accord* 28 C.F.R. § 36.105(c)(1)(ii).[55]  Further, PTSD is a recognized

---

[55] "GERD (gastroesophageal reflux disease) is a digestive disorder."  Cedars Sinai, *Gastroesophageal Reflux Disease (GERD)/Heartburn*, https://www.cedars-sinai.org/health-library/diseases-and-conditions/g/gastroesophageal-reflux-disease-gerdheartburn.html ("GERD (gastroesophageal reflux disease) is a digestive disorder.").  GERD "commonly cause[s] symptoms such as[:] heartburn, a painful, burning feeling in the middle of your chest, behind your breastbone, rising from the lower tip of your breastbone toward your throat[; and] regurgitation, or stomach contents coming back up through your esophagus and into your throat or mouth, which may cause you to taste food or stomach acid[.] … Other symptoms may include[:] chest pain[;] nausea[;] problems swallowing or pain while swallowing[; and] symptoms of complications in the mouth, throat, or lungs, such as chronic cough or hoarseness[.]"  https://www.niddk.nih.gov/health-information/digestive-diseases/acid-reflux-ger-gerd-adults/symptoms-causes.  *See also* U.S. Department of Health and Human Services, National Institute of Diabetes and Kidney Diseases, *Definition & Facts for GER & GERD*, https://www.niddk.nih.gov/health-information/digestive-diseases/acid-reflux-ger-gerd-adults/definition-facts#gerd ("Gastroesophageal reflux (GER) happens when your stomach contents come back up into your esophagus. … **Gastroesophageal reflux disease (GERD) is a more severe and long-lasting condition** in which GER causes **repeated symptoms that are bothersome**[.]") (emphasis added).

mental impairment that substantially limits brain function.[56]  *See id.*  Plaintiff's impairments therefore constitute disabilities under the ADA, Unruh Act, and CDPA.

80.     Plaintiff visited Six Flags Magic Mountain ("Magic Mountain" or the "Park") in Valencia, California, on multiple occasions during the relevant time period.  In fact, during the 2022-2023 season at Six Flags, Plaintiff was a Six Flags season ticket holder, and he and his wife visited Magic Mountain at least six times during that period, detailed below.  On certain occasions, those visits were planned, as with Plaintiff's first trip to the Park of the season in June 2022 to celebrate his birthday.  Other visits were spontaneous, as when Plaintiff and his wife made an unplanned stop at Magic Mountain in December 2022 on their way home from Venice, California, where they spent the day at the beach and on the pier.

81.     About one month before Plaintiff's first Park visit of the 2022-2023 season at Six Flags, on or around **May 15, 2022**, Plaintiff called the Six Flags customer service line to inquire about the availability of accommodations for Veterans at Magic Mountain.  The representative with whom Plaintiff spoke directed Plaintiff to instructions on the Six Flags website regarding how to request accommodations by submitting an application on the IBCCES website and obtaining an Individual Accessibility Card ("IAC").  That day, Plaintiff submitted his IBCCES application and, in doing so, provided sensitive personal and medical information and documentation in support of his accommodation request, as the IBCCES application requires.  Specifically, in connection with the IBCCES application, Plaintiff submitted a document issued by the VA that states Plaintiff's disabilities and diagnoses—listing both impairments relevant *and irrelevant* to his accommodation

---

[56] *See* 29 C.F.R. § 1630.2(j)(3)(iii) ("[A]pplying the principles set forth in … this section, it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: … **post-traumatic stress disorder** … substantially limit[s] brain function.  The types of impairments described in this section may substantially limit additional major life activities not explicitly listed above.") (emphasis added); *see also*, *e.g.*, *Thomas v. S.F. Hous. Auth.*, 2017 WL 878064, at *8 (N.D. Cal. Mar. 6, 2017) (recognizing that under § 1630.2(j)(3)(iii) PTSD constitutes a plausible disability for purposes of the ADA); *Stuart v. Vilsack*, 2016 WL 6902347, at *6 (E.D. Wash. Nov. 23, 2016) ("[PTSD] is a recognized impairment [under 29 C.F.R. § 1630.2(j)(3)(iii)]."); *Beadle v. Postal*, 2017 WL 1731683, at *3 n.4 (D. Haw. May 2, 2017) ("Thus, by alleging that Plaintiff suffers from PTSD, the FAC plausibly alleges that Plaintiff is disabled under the ADA.").

1   request, along with other extraneous personal and medical information—and explained the types of

2   accommodations Plaintiff commonly requires as a result of those disabilities and diagnoses.

3        82.   In his IBCCES application, Plaintiff selected the following pre-phrased

4   accommodations from a drop-down menu:

- Difficulty with gripping, grasping, or bracing: May need additional supports

- Sensitivity to crowds or enclosed spaces

- Sensitivity to noise: may benefit from headphones, sensory guides, and low sensory spaces

- Sensitivity to touch: may benefit from ride sensory guides and low sensory spaces

- Standing/Queuing: individual is not able to stand for a significant amount of time

- Wheelchair access or options required

        83.   Plaintiff received his digital IAC following submission of the IBCCES application. The IAC includes Plaintiff's photograph, notes that Plaintiff is not able to wait/queue in line for extended periods or stand in line with other guests, and lists each of the bullet points above as helpful accommodations, among other information.

        84.   Subsequently, on or around **June 11, 2022**, Plaintiff visited Magic Mountain with his wife for a planned day trip to celebrate Plaintiff's birthday.  In advance of the trip, Plaintiff printed out his digital IAC, and brought the paper copy to the Park with him on June 11, 2022. Upon arrival at Magic Mountain, Plaintiff entered the Park and presented his IAC at Guest Services in accordance with the Park's disability access procedures and obtained an Attraction Access Pass.  Shortly thereafter, Plaintiff presented both his IAC and Attraction Access Pass to a ride attendant at the attraction's alternative entrance.

        85.   However, upon doing so, the employee took Plaintiff's paper card and ripped it up into four pieces, then handed it back to Plaintiff and told him that he did "not look disabled enough" to have the listed accommodations, that he looked "able-bodied."  Plaintiff felt immediately distraught and embarrassed by the employee's insinuation that Plaintiff was lying about, and his dismissiveness of, Plaintiff's need for accommodation, the destruction of his IAC,

1  and the conspicuousness of the employee's display.  Plaintiff explained to the employee that "not

2  all disabilities are visible," and then went to Guest Services to talk to a manager about the Park

3  employee's cruel and humiliating treatment.  However, Guest Services did not offer any redress

4  but instead directed Plaintiff to make a complaint on the Six Flags website, stating that if he did so

5  a manager would get back to him.  After that, Plaintiff left the Park within 10 minutes, with his

6  ripped-up paper IAC in hand and without any resolution for his denial of Park access and ruined

7  birthday celebration.  In the parking lot, before leaving the premises, Plaintiff did exactly as Guest

8  Services advised: he submitted a complaint through Defendants' website.  However, no employee

9  of Six Flags ever reached out to him in response.

10         86.    Plaintiff returned to Magic Mountain with his wife on **July 17, 2022**.  On this

11  occasion, too, Plaintiff faced inappropriate treatment from Park employees regarding his need for

12  accommodation.  Specifically, after presenting his IAC at Guest Services and obtaining an

13  Attraction Access Pass, Plaintiff entered the alternate or standby entrance reserved for disability

14  access at Magic Mountain's "Justice League: Battle for Metropolis"[57] attraction.  Plaintiff then

15  presented his IAC and Pass to the ride attendant, and in response the Park employee took the paper

16  card from Plaintiff's hands, told Plaintiff that she needed to verify it, showed the IAC to one of her

17  co-workers, and then directed Plaintiff to leave and join the "regular" line, stating that she did not

18  know where Plaintiff got the IAC, but that his accommodation was not valid for that particular

19  ride.

20         87.    Plaintiff then requested multiple times that the employee return his IAC, but she

21  refused to return Plaintiff's paper IAC to him the first two or three times Plaintiff asked for it back,

22  telling Plaintiff that she needed to show it to her manager.  When Plaintiff then became visibly

23  upset and again insisted that she return his IAC, the employee ultimately gave it back to Plaintiff

24  and directed him to go to the front office.  She did not indicate for what purpose, and neither

25  Plaintiff nor his wife understood why she was telling them to do that.  Instead, they went to

26

27  [57] "Justice League: Battle for Metropolis" is a "full-sensory thrill ride" at Magic Mountain that
   promises a "4D ride experience with wind, fire, mist, fog and special effects[.]"
28  https://www.sixflags.com/magicmountain/attractions/justice-league-battle-for-metropolis-3.

Customer Relations to explain the situation regarding the IAC, but the Customer Relations manager told Plaintiff that he did not look like he had a disability, and that Plaintiff was lucky that the manager did not take his season pass from him.

88.     Plaintiff's next visit to Magic Mountain with his wife was on or around **September 10, 2022**.  This visit was plagued by yet another incident concerning Plaintiff's IAC.  At around 1:05 p.m. that day, Plaintiff presented his IAC and Attraction Access Pass to an attendant at one of the rides.  The attendant took Plaintiff's card and Pass and examined the wait time interval provided on the latter, but then told Plaintiff that there must be something wrong with his IAC and/or Pass because, according to the attendant, it looked like Plaintiff did not qualify for the Attraction Access Pass program accommodation.  The attendant then denied Plaintiff's request to use the attraction's alternate entrance reserved for disability access, telling Plaintiff that he would have to join the "regular" queue and wait.  At that point, Plaintiff walked away from the attraction altogether, finding that the ride was not worth either the sciatic pain he would experience by waiting on the line or the trouble of convincing the attraction attendant or any other Six Flags employee that he is, in fact, disabled and in need of reasonable accommodation, no matter how "able-bodied" he may appear to the employees at Six Flags in their fleeting interactions.  Ultimately, Plaintiff did not get to experience that ride.  And, once again, this negative interaction with a Park employee left Plaintiff feeling upset, embarrassed, frustrated, angry, and excluded.

89.     Next, Plaintiff and his wife spontaneously visited Magic Mountain on or around **November 25, 2022**, at around 6:00 p.m., to look at the Christmas lights.  On that occasion, Plaintiff only rode one ride, Ninja.  Though he enjoys many other Six Flags attractions, he specifically avoided any others in fear of receiving the same treatment as on their earlier visits in June, July, and September 2022.  Plaintiff and his wife also made a concerted effort on this occasion not to interact with Park employees, as they did not want to suffer another incident regarding Plaintiff's disabilities.

90.     On or around **December 4, 2022**, Plaintiff and his wife made another spontaneous trip to Magic Mountain, having decided to stop at the Park en route from Venice, California, where they spent the day at the beach and on the pier, to their home in Bakersfield.  Afraid of scrutiny,

1   retaliation, and judgment by Park employees, on this occasion Plaintiff decided not present his

2   IAC to Guest Services, obtain an Attraction Access Pass, request any accommodations, or do any

3   activities that would require them.  He figured that there was little-to-no point, as ride operators

4   would likely just deny him his accommodations anyway.

5       91.    Plaintiff did not return to Magic Mountain or any Six Flags Amusement Park until

6   nine months later, on or around **September 4, 2023**.  Significantly, despite earlier plans to go to

7   Magic Mountain for his birthday in June 2023, as he had done in June 2022, Plaintiff ultimately

8   decided to go to Disneyland in June instead because he did not want to risk having another

9   birthday ruined because of further negative interactions with Six Flags employees regarding his

10  disabilities, denials of access to Park services and benefits, and the public humiliation he

11  experience during past incidents in this vein.

12      **D.    Defendants Violate The ADA, Unruh Act, And CDPA**

13      92.    "To prevail on a Title III discrimination claim, [Plaintiff] must establish that: (1) he

14  is disabled within the meaning of the ADA; (2) [Six Flags] is a private entity that owns, leases, or

15  operates a place of public accommodation; and (3) [Six Flags] discriminated against him by

16  denying him public accommodations because of his disability."  *Lopez v. Catalina Channel*

17  *Express, Inc.*, 974 F.3d 1030, 1033 (9th Cir. 2020) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724,

18  730 (9th Cir. 2007) and 42 U.S.C. §§ 12182(a)–(b)).  As explained above, the first two elements

19  are satisfied here because Plaintiff's impairments are "disabilities" within the meaning of the

20  ADA, and there is no question that Defendants are private entities and that the Six Flags

21  Amusement Parks are places of public accommodation.

22      93.    The third element of an ADA claim – that Six Flags "discriminated against

23  [Plaintiff] by denying him public accommodations because of his disability," *Lopez*, 974 F.3d at

24  1033 – is also satisfied here.  Specifically, Defendants deny disabled persons full use and

25  enjoyment of the Amusement Parks and therefore violate the ADA in the following five ways.

26      94.    **First**, pursuant to the ADA's implementing regulations, a "public accommodation

27  shall not ask about the nature or extent of a person's disability … [and] shall not require

28

documentation[.]" 28 C.F.R. § 36.302(c)(6).  Further, as the DOJ's commentary accompanying its rulemaking confirms, a covered entity must assess accommodation requests on a case-by-case basis, taking into account, *inter alia*, the specific accommodation sought.  *See* Final Rule, 75 Fed. Reg. at 56236 ("[T]his determination is an individual assessment and must be made on a case-by-case basis.").  And here, Defendant violated the ADA by requiring Plaintiff and all disabled persons seeking accommodations at the Amusement Parks to submit sensitive medical documentation in support of their accommodation requests, simultaneously with submission of the request through the IBCCES website.  *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *8 (C.D. Cal. Feb. 12, 2014) ("[T]he regulation [under 28 C.F.R. § 36.302(c)(6)] prohibits all inquiries regarding the nature or extent of a person's disability other than the two exceptions specified [in that section].").

95.    **Second**, Defendants violate the ADA because the pre-screening process for accommodation requests, which includes advance registration and documentation requirements, prevents disabled persons from using and enjoying the Amusement Parks in the same manner that nondisabled persons may do so.  To determine whether a covered entity denies access to disabled persons based on such requirements, "courts consider how a facility is used by nondisabled guests and then determine whether the facility 'provide[s] disabled guests with a like experience.'"  *T.P. v. Walt Disney Parks & Resorts U.S., Inc.*, 2021 WL 3598573, at *3 (C.D. Cal. Apr. 20, 2021) (citation omitted).  Pursuant to the ADA, Unruh Act, and CDPA, "the facility [must] provide disabled guests with 'an experience comparable to that of able-bodied patrons.'"  *Id.* (citation omitted); *see also Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) ("Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience. … [P]ublic accommodations must consider using or adapting [] to help disabled guests have an experience more akin to that of non-disabled guests.").  In this case, nondisabled guests visiting Defendants' Amusement Parks may purchase their tickets for admission to Six Flags or Hurricane Harbor at, and upon arrival to, Defendants' facilities, and they may then enter the Parks and enjoy all the benefits on offer, without any advance planning or preparation.  This flexibility is particularly

important for season ticket holders who live in the same general area as one of the Parks, because such guests may reasonably opt to visit Six Flags spontaneously, as Plaintiff and his wife have done on multiple occasions.  It is therefore essential that a guest with disabilities be able to purchase a ticket for admission to the Park in-person upon arrival to Defendants' facility, seek and obtain the necessary accommodations, and fully use and enjoy the Park all within the same day, without any prior planning.  *See* 28 C.F.R. § 36.302(f)(1)(ii) ("A public accommodation that sells tickets for a single event or series of events shall modify its policies, practices, or procedures to ensure that individuals with disabilities have an equal opportunity to purchase tickets for accessible seating[] … [d]uring the same hours; … [t]hrough the same methods of distribution; … <u>[i]n the same types and numbers of ticketing sales outlets</u>, including telephone service, <u>in-person ticket sales at the facility</u>, or third-party ticketing services, as other patrons; and [ u]nder the same terms and conditions as other tickets sold for the same event or series of events.") (emphasis added).  **Yet, because disabled persons must gather the necessary medical documentation and submit it with their application on the IBCCES website *prior* to their Park visit, persons with disabilities do not have that same luxury afforded to nondisabled persons.**  Stated otherwise, although Defendant's policies permit nondisabled guests to make full use and enjoyment of Defendant's facilities during a spontaneous park visit, persons with disabilities that require accommodations, like Plaintiff, may not.  **In this regard, Plaintiff's experiences at Six Flags were not comparable to the experiences of nondisabled patrons**.

96.     Thus, Defendants denied Plaintiff an experience "akin to that of non-disabled guests" at Six Flags parks, *Baughman*, 685 F.3d at 1135.  In doing so, Six Flags deprived Plaintiff and members of the putative Class of the full and equal enjoyment of the Amusement Parks, in violation of the ADA's general rule set forth by Section 12182(a).  *See* 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the *full and equal enjoyment* of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]") (emphasis added).

97.     For the same reasons, Defendants also violated the general prohibitions under Sections 12182(b)(1)(A)(i) and 12182(b)(1)(A)(ii), in that the disparate experience of disabled and

nondisabled persons at Defendants' Amusement Parks: (1) denied Plaintiff the opportunity to participate in or benefit from the same goods, services, and privileges afforded to nondisabled persons, *see* 42 U.S.C. § 12182(b)(1)(A)(i); and (2) forced Plaintiff to participate in an benefit unequal to that afforded nondisabled park guests, *see id.* § 12182(b)(1)(A)(ii).

98.    **Third**, Defendants' pre-screening process for accommodation requests constitutes an unlawful "administrative method" because it is a "criteria or method[] of administration[] … that ha[s] the effect of discriminating on the basis of disability," in violation of 42 U.S.C. § 12182(b)(1)(D).  *See id.* ("Administrative methods[.]  An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration—(i) that have the effect of discriminating on the basis of disability[.]").

99.    **Fourth**, Defendants failed to make reasonable modifications in policies, practices, or procedures, in two regards: (1) by implementing, and failing to appropriately modify, the Attraction Access Program such that it complies with the ADA; and (2) by failure to properly trained regarding the civil rights, communication needs, and privacy considerations of disabled individuals.  *See* 42 U.S.C. § 12182(b)(2)(A)(ii) (prohibiting "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities…").

100.    **Fifth**, Defendants' Attraction Access Program imposes "eligibility criteria" that tends to screen out disabled individuals.  *See* 42 U.S.C. § 12182(b)(2)(A)(i) (prohibiting "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations…").  Plaintiff, for instance, decided to forgo a planned trip to Magic Mountain for his birthday in 2023 to avoid incurring further harm to his dignity as a result of Park employees' inconsistent and arbitrary administration of the Attraction Access Pass program and inadequate training.

101.    For the same reasons, Defendants "also violated the Unruh Act, as '[a] violation of the right of any individual under the [ADA] shall also constitute a violation of this section.'"

1   *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *9 (C.D. Cal. Feb. 12, 2014) (citing

2   Cal. Civ. Code § 51(f)).

3        102.   Likewise, "Defendants have violated the California Disabled Persons Act because

4   '[a] violation of the right of an individual under the [ADA] also constitutes a violation of this

5   section,' Cal. Civ. Code § 54(c), and the [Amusement Parks are] … facilit[ies] open to the general

6   public, *see id.* § 54.1(a)(1)." *Hurley*, 2014 WL 580202, at *10.

7        103.   Based on the above ADA violations and pursuant to 42 U.S.C. § 12188(a)(2),

8   Plaintiff seeks, individually and on behalf of all others similarly situated, a permanent injunction

9   requiring that:

10         a.   Defendants take all steps necessary to bring their disabilities

11            accommodations request process into full compliance with the requirements

12            set forth in the ADA, and its implementing regulations, including by

13            modifying the Attraction Access Program to: (i) enable persons with

14            disabilities to seek accommodations at Six Flags at the time and place of

15            their Park visit and without need for advance registration through the

16            IBCCES website; and (ii) eliminate the blanket requirement that all disabled

17            persons must submit personal medical information and documentation in

18            support of their request, without regard to the particular nature of the

19            accommodations sought;

20         b.   Defendants adequately train park employees regarding the civil rights,

21            communication needs, privacy considerations, and how to interact with

22            disabled individuals; and

23         c.   Plaintiff's representatives monitor Defendants' facilities to ensure the

24            injunctive relief ordered pursuant to Subparagraphs (a) and (b) above has

25            been implemented and will remain in place.

26        104.   Plaintiff also seeks, individually and on behalf of all others similarly situated,

27   injunctive relief under the Unruh Act, as well as statutory damages equal to not less than $4,000

28   per violation, per Class Member.  *See* Cal. Civ. Code §§ 55, 52(a).

105.     In the alternative, Plaintiff, individually and on behalf of all others similarly situated,  seeks statutory damages under the CDPA equal to not less than $1,000 per violation, per Class Member.  *See* Cal. Civ. Code § 54.3.

## CLASS ACTION ALLEGATIONS

106.     ***Class and Subclass Definition***.  Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of a Class and Subclass of similarly situated individuals, defined as follows:

(a)     ***Nationwide Class.***  Plaintiff seeks to represent a class of similarly situated individuals, defined as all persons in the United States with an ADA-qualifying disability who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, submitted an IBCCES application for accommodations in connection with a planned visit to any of Defendants' amusement and/or water parks in the United States (the "Class" or "Nationwide Class").

(b)     ***California Subclass.***  Plaintiff also seeks to represent a subclass comprised of all Class Members residing in California during the relevant time period, and all Class Members who submitted an IBCCES application in connection with a planned visit to any of Defendants' amusement and/or water parks in California (the "Subclass" or "California Subclass").

107.     Excluded from the Class are: (1) Defendants and their officers, directors, employees, principals, affiliated entities, controlling entities, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

108.     Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class and/or Subclass should be expanded or otherwise modified.

109.     The Nationwide Class seeks preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order that will prevent Defendants from continuing with their violations of the ADA, *see* 42 U.S.C. § 12188(a); 42 U.S. Code §

2000a–3, as well as an award of costs and reasonable attorneys' fees, *see* 42 U.S.C. § 12188(b).

Additionally, the California Subclass seeks class wide damages pursuant to the Unruh Act, Cal.

Civ. Code § 52(a), in the amount of $4,000 per violation, and, pursuant to the CDPA, Cal. Civ.

Code § 54.3, in the amount of $1,000 per violation, based on Defendants' wrongful policy and

practice of failing to provide full and equal access to disabled Californians as alleged herein.

110.     This action should be certified as a class action under Rules 23(a) and (b)(2) of the

Federal Rules of Civil Procedure for the Nationwide Class and California Subclass because the

Class and Subclass each satisfy the class action prerequisites of numerosity, commonality,

typicality, and adequacy, as described below.

111.     ***Numerosity.***  Members of the Class and Subclass are so numerous that their

individual joinder herein is impracticable.  On information and belief, the Nationwide Class and

California Subclass each comprise at least millions of disabled individuals throughout the United

States and California, respectively, who have been harmed and suffered discrimination due to

Defendants' failure to comply with the ADA's requirements.  The precise number of Class and

Subclass members and their identities are unknown to Plaintiff at this time but may be determined

through discovery.  Class and Subclass members may be notified of the pendency of this action by

mail and/or publication through the distribution records of Defendants.

112.     ***Commonality and Predominance.***  There is a well-defined community of interest

and common questions of law and fact exist as to all Class and Subclass members and predominate

over questions affecting only individual Class and Subclass members.  Specifically, all Class and

Subclass members have been denied their civil rights to full and equal access to, and use and

enjoyment of, Defendants' facilities and/or services due to Defendants' failure to comply with

federal and state law as described above.  Common legal and factual questions include, but are not

limited to: whether Plaintiff is disabled within the meaning of the ADA, Unruh Act, Section 504,

and the CDPA; whether Defendants operate places of public accommodations; whether

Defendants' Attraction Access Pass program and other unlawful conduct as alleged herein comply

with the provisions of Title III of the ADA, 42 U.S.C. §§ 12101, *et seq*.; whether Defendants'

policies and practices comply with the provisions of California's Unruh Act, Cal. Civ. Code §§ 51,

*et seq*.; whether Defendants' policies and practices comply with the provisions of California's CDPA, Cal. Civ. Code §§ 54, *et seq*.; whether Defendants should be enjoined from further engaging in the misconduct alleged herein; whether Plaintiff and members of the Class and Subclass are entitled to statutory damages pursuant to the Unruh Act and/or CDPA; and whether Plaintiff and members of the Class and Subclass are entitled to attorneys' fees and costs.  The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendants' encounters with disabled individuals seeking accommodations in their facilities.

113.    ***Typicality.***  The claims of Plaintiff are typical of the claims of the Class and Subclass in that Plaintiff and members of the Class and Subclass were injured as a result of Defendants' uniform wrongful conduct, based upon Defendants' unlawful policy and practice of failing to provide full and equal access to disabled individuals in the United States and California as alleged herein.

114.    ***Adequacy***.  Plaintiff will fairly and adequately protect Class and Subclass members' interests.  Plaintiff has no interests antagonistic to Class and Subclass members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class actions and consumer protection cases.

115.    ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

116.    Additionally, class certification of the Nationwide Class and California Subclass is appropriate under Fed. R. Civ. Proc. 23(b)(2) because Defendants have acted on or refused to act on grounds generally applicable to the Class and Subclass, making appropriate declaratory, injunctive, and equitable relief with respect to the Plaintiff and the Class and Subclass as a whole.

117.    Without a class action, Defendants will continue a course of action that will result in further injury to Plaintiff and members of the Class and Subclass, and will likely retain the benefits of their wrongdoing.

118.    Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## COUNT I
### Violations of Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*
### (On Behalf Of The Nationwide Class And California Subclass)

119.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

120.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendants.

121.    Defendants own, lease, and/or operate a place of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7) ("place of exhibition and entertainment," "place of recreation," "sales or rental establishment," and "service establishments").

122.    At all times relevant to the action, Plaintiff has suffered from several ADA-qualifying disabilities, including sciatic nerve damage on the left side of his body, PTSD, and GERD.  *See* 42 U.S.C. § 12102(1)(A).  These physical and mental impairments substantially limit several "major life activities," including Plaintiff's ability to independently care for himself, perform manual tasks, eat, stand, bend, concentrate, think, communicate, and work.  42 U.S.C. § 12102(2)(A).

123.    Defendants violated, and continue to violate, the general rule set forth by the ADA under 42 U.S.C. § 12182(a) because their Attraction Access Program, including the pre-screening, timing, and documentation requirements thereunder, and their failure to properly train Park employees to respectfully communicate with and assist disabled persons seeking accommodation at Defendants' facilities discriminates against such persons in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the Six Flags Amusement Parks.  *See* 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of

disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.").

124.    Based on the same conduct as described in the paragraph above, Defendants also violated, and continue to violate, the following provisions of the ADA:

      a.    42 U.S.C. § 12182(b)(1)(A)(i) (**denial of participation**), in that Defendants have "subject[ed] an individual [Plaintiff] or class of individuals [putative Class Members] on the basis of a disability …, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity;"

      b.    42 U.S.C. § 12182(b)(1)(A)(ii) (**participation in unequal benefit**), in that Defendants "afford[ed] an individual [Plaintiff] or class of individuals [putative Class Members], on the basis of a disability …, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals;"

      c.    42 U.S.C. § 12182(b)(1)(A)(iii) (**separate benefit**), in that Defendants "provide[d] an individual or class of individuals, on the basis of a disability …, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals …;"

      d.    42 U.S.C. § 12182(b)(1)(D) (**administrative methods**), in that Defendants have, "directly or through contractual or other arrangements, utilize[d] standards or criteria or methods of administration … that have the effect of discriminating on the basis of disability; [and/]or … that perpetuate the discrimination of others who are subject to common administrative control;"

e.     42 U.S.C. § 12182(b)(2)(A)(i) (**eligibility criteria**), in that Defendants "impos[ed] or appli[ed] [] eligibility criteria that screen[s] out or tend[s] to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations …;"

f.     42 U.S.C. § 12182(b)(2)(A)(ii), in that Defendants "fail[ed] to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities …."

125.    Further, the requirement that all guests seeking accommodation at Defendants' Parks must submit sensitive medical documentation to request accommodation violates the federal regulations implementing Title III of the ADA, including the rule that "[a] public accommodation shall not ask about the nature or extent of a person's disability … [and] shall not require documentation[.]"  28 C.F.R. § 36.302(c)(6).

126.    Removing the blanket documentation requirement and permitting guests to request accommodations in-person, on the same day as their Park visit, would not "fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered" at the Amusement Parks, and "[n]or would [it] result in an undue burden[.]"  42 U.S.C. § 12182(b)(2)(A)(ii).

127.    As set out above, absent injunctive relief, there is a clear risk that Defendants' actions will recur with Plaintiff and/or other disabled individuals seeking Defendants' amusement park services.

128.    Plaintiff is therefore entitled to injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1) and/or common law.

**COUNT II**
**Violations of California's Unruh Civil Rights Act ("Unruh Act"),**
**Cal. Civ. Code §§ 51, *et seq.***
**(On Behalf Of The California Subclass)**

129.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

130.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

131.    Defendants are a business establishment within the meaning of the Unruh Act. Defendants are the owners and operators of business establishments.

132.    The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their … disability[ or] medical condition … are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).

133.    The Unruh Act further provides that "[a] violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section." Cal. Civ. Code § 51(f).

134.    Defendants violated the Unruh Act by discriminating against Plaintiff through violations of the ADA, as described in detail above.  Specifically, based on their inflexible Attraction Access Program, including the burdensome pre-screening, timing, and documentation requirements thereunder, Defendants discriminate against disabled persons in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the Six Flags Amusement Parks, in violation of the ADA under 42 U.S.C. § 12182(a) (general rule), 42 U.S.C. § 12182(b)(1)(A)(i) (denial of participation), 42 U.S.C. § 12182(b)(1)(A)(ii) (participation in unequal benefit), 42 U.S.C. § 12182(b)(1)(A)(iii) (separate benefit), 42 U.S.C. § 12182(b)(1)(D) (administrative methods), 42 U.S.C. § 12182(b)(2)(A)(i) (eligibility criteria), and 42 U.S.C. § 12182(b)(2)(A)(ii) (failure to make reasonable modifications in policies, practices, or procedures), as well as the ADA's implementing regulations set forth under, *inter alia*, 28 C.F.R. § 36.302. These violations are ongoing.

135.    Defendants have also failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Unruh Act.

136.    Plaintiff is entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and losses they sustained as a result of Defendants' discriminatory conduct pursuant to Cal. Civ. Code § 52.

137.    Plaintiff is further entitled to seek and recover statutory, punitive, and/or exemplary damages to rectify and deter Defendants' discriminatory conduct as hereinbefore alleged, pursuant to Cal. Civ. Code § 52.

**COUNT III**
**Violations of the California Disabled Persons Act ("CDPA"),**
**Cal. Civ. Code §§ 54, *et seq.***
**(On Behalf Of The California Subclass)**

138.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

139.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

140.    The CDPA, Cal. Civ. Code §§ 54-54.3, guarantees full and equal access for people with disabilities to all accommodations, advantages, facilities, and privileges of "all places of public accommodation" and "other places to which the general public is invited."  Defendants' Amusement Parks located throughout California constitute "places of public accommodation" or "other places where the public is invited" within the meaning of the CDPA.

141.    Defendants' Amusement Parks constitute goods, services, facilities, advantages, privileges, and/or accommodations provided by Defendants to members of the public in California and are, therefore, subject to the access requirements of Cal. Civ. Code § 54.1, which is applicable to "all places of public accommodation" and "other places to which the general public is invited."

142.    Defendants are violating the right of disabled persons to full and equal access to public places by denying full and equal access to Defendants' Amusement Parks, in violation of Cal. Civ. Code §§ 54-54.3.

143.   Defendants are also violating the CDPA, in that their actions are a violation of the ADA.  Any violation of the ADA is also a violation of Cal. Civ. Code § 54.1.

144.   As a result of Defendants' wrongful conduct, the individually named Plaintiff Vargas and the California sub-class are entitled to statutory minimum damages under Cal. Civ. Code § 54.3 for each offense.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.   For an order certifying the Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representatives of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the proposed Class and Subclass;

b.   For an order declaring Defendants' conduct violates the statutes referenced herein;

c.   For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

d.   For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.   For prejudgment interest on all amounts awarded;

f.   For an order of restitution and all other forms of equitable monetary relief;

g.   For injunctive relief as pleaded or as the Court may deem proper; and

h.   For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: December 26, 2023                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   _/s/ Julia K. Venditti_____
        Julia K. Venditti

Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com
        jvenditti@bursor.com

*Attorneys for Plaintiff and the Putative Class*