UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.T. *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SIX FLAGS ENTERTAINMENT CORP., *et al.*,<br><br>Defendants. | Case No. 1:23-cv-01769-KES-CDB<br><br>FINDINGS AND RECOMMENDATIONS TO GRANT IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION<br><br>(Doc. 70)<br><br>**21-DAY DEADLINE** |

Plaintiffs C.T. and Judy Martinez (collectively, "Plaintiffs") initiated this action with the filing of a complaint against Defendants Six Flags Entertainment Corporation, Magic Mountain, LLC, Park Management Corporation, and Six Flags Concord, LLC (collectively, "Defendants"). (Doc. 1).

Pending before the Court is Plaintiffs' motion for class certification. (Doc. 70). For the reasons explained herein, the undersigned will recommend that Plaintiffs' motion for class certification be granted in part.

## I.   **Background**

### A.  Procedural Background

Plaintiffs initiated this action with the filing of a complaint on December 26, 2023. (Doc. 1). Plaintiffs filed their first amended complaint on May 2, 2024. (Doc. 23). On August 8, 2025,

the Court granted in part and denied in part both Plaintiffs' motion to proceed under pseudonym and Defendants' motion to dismiss.  (Doc. 65).  On August 22, 2025, Plaintiffs filed the operative second amended complaint.  (Doc. 67).

Plaintiffs assert three causes of action on behalf of themselves and a putative class: violation of Title III of the Americans with Disabilities Act ("ADA"), violation of the California Unruh Civil Rights Act ("Unruh Act"), and violation of the California Disabled Persons Act ("CDPA").  *See id.*

On September 26, 2025, Plaintiff filed the instant motion to certify class.  (Doc. 70).  Defendants filed their opposition on October 17, 2025.  (Doc. 71).  Plaintiffs filed a reply on October 31, 2025.  (Doc. 72).  Defendants filed objections to reply evidence on November 7, 2025.  (Doc. 75).  Both Plaintiffs and Defendants filed accompanying requests to seal documents.  (Docs. 69, 82).  The Court convened for hearing and oral argument on Plaintiffs motion on November 13, 2025.  (Doc. 77).

### B.  Proposed Classes

Plaintiffs seek to certify the following putative classes (*see* Doc. 70):

**1. The Impermissible Inquiry Classes**:

a.  **Nationwide Class**: All persons in the United States with an ADA-qualifying disability who, from December 26, 2020, to and through the date of final judgment in this action, submitted an IBCCES application for accommodations in connection with a planned visit to any of Defendants' theme, amusement, and/or water parks in the United States (the "Impermissible Inquiry Class" or "Nationwide Impermissible Inquiry Class").

b.  **California Subclass**: All members of the Nationwide Impermissible Inquiry Class who, from December 26, 2021, to and through the date of final judgment in this action, submitted an IBCCES application in connection with a planned visit to any of Defendants' theme, amusement, and/or water parks in California (the "Impermissible Inquiry Subclass" or "California Impermissible Inquiry Subclass").

**2. The Inability to Seek Accommodations ("ISA") Classes**:

a.  **Nationwide Class**: All persons in the United States with an ADA-qualifying disability who, from December 26, 2020, to and through the date of final judgment in this action, visited any of Defendants'

2

theme, amusement, and/or water parks in the United States and attempted to request an accommodation at the Parks without having registered in advance with IBCCES, and were therefore unable to seek or obtain reasonable accommodations at Defendants' facilities on the day of the individual's park visit (the "ISA Class" or "Nationwide ISA Class").

b. **California Subclass**: All members of the Nationwide ISA Class who, from December 26, 2021, to and through the date of final judgment in this action, visited any of Defendants' theme, amusement, and/or water parks in California and attempted to request an accommodation at any of the California Parks without having without having registered in advance with IBCCES, and were therefore unable to seek or obtain reasonable accommodations at Defendants' facilities on the day of the individual's park visit (the "ISA Subclass" or "California ISA Subclass").

For the purposes of ruling on the motion, the undersigned will refer to the first class, titled above as the Impermissible Inquiry Class, as the "Inquiry Class" and the second class, titled above as the Inability to Seek Accommodations Class, as the "Request Class."

### C. Factual Background[1]

#### i. *Defendants*

Defendant Six Flags Entertainment Corporation ("SFEC") is a Delaware corporation that owns, leases, and operates numerous Six Flags brand amusement parks across California and the United States, including Discovery Kingdom in Vallejo, California; Hurricane Harbor in Los Angeles, California; Hurricane Harbor in Concord, California; and Magic Mountain in Valencia, California. SFEC is a private entity and its parks are places of public accommodation pursuant to Title III of the ADA. (Doc. 67 ¶¶ 27-28).

Defendant Magic Mountain, LLC, is a California limited liability company and wholly owned subsidiary of SFEC. Magic Mountain, LLC, owns and operates Six Flags Magic Mountain,

---

[1] The facts relied upon for purposes of this motion only are derived from the undersigned's review of Plaintiff's second amended complaint (Doc. 67) and the parties' class certification briefing and evidence. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir, 2008) ("Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.").

located in Valencia, California.  Magic Mountain, LLC, is a private entity and its park is a place of public accommodation.  *Id.* ¶ 29.  Defendant Park Management Corporation ("PMC") is a California corporation and wholly owned subsidiary of SFEC.  PMC owns and operates Six Flags Discovery Kingdom, located in Vallejo, California.  PMC is a private entity and its park is a place of public accommodation.  *Id.* ¶ 30.  Defendant Six Flags Concord, LLC, is a California limited liability company and wholly owned subsidiary of SFEC.  Six Flags Concord, LLC, owns and operates Hurricane Harbor in Concord, California.  Six Flags Concord, LLC, is a private entity and its park is a place of public accommodation.  *Id.* ¶ 31.

### ii.    *Defendants' Accommodations Program*

In 2020, Defendants implemented the "Attraction Accessibility Program" (the "AAC"), their current system for making accommodation requests at Six Flags amusement parks in the United States.  Under the Program, park guests with disabilities must obtain an Individual Accessibility Card ("IAC") by registering with IBCCES (the International Board of Credentialing and Continuing Education Standards), a separate private company.  (Doc. 70 at 10).[2]  Guests must register with IBCCES using their online application, take the IAC to the park, and get access to the available accommodations.  *Id.* at 11.  As an example of accommodations provided, Six Flags offers the "Attraction Access Pass" ("AAP") which permits individuals to avoid waiting in lines for attractions at parks.  *Id.* at 13.

Only IBCCES can issue the IAC, and so a prospective guest must abide by both the IBCCES rules and Defendants' rules.  The online registration process requires filling out an online application on the IBCCES website, where guests must submit documentation regarding medical conditions and contact information for a healthcare, education, or government professional.  To obtain the IAC, guests must specify their disability[3], list the types of accommodations sought,

---

[2] References herein to the parties' briefing on Plaintiffs' motion for class certification use the CM/ECF-assigned page numbers.

[3] The allegation that IBCCES requires a person seeking an IAC to identify their disability is contradicted by information provided by IBCCES relating to the application process.  *See* (Doc. 71-1, Exhibit 9 at 97) ("IBCCES does not require or request individuals to disclose their specific medical or psychological diagnosis, diagnosis code, or condition. … Specific diagnoses details

submit documentation and a photo of the person to be using the IAC, as well as a statement from either a healthcare provider or educational support professional related to the requested accommodations. *Id.* This system does not vary based on the nature of a guest's disability or the particular accommodations requested. *Id.* at 12. Once the application is completed, guests receive access to their digital IAC. IACs last for one year and can be used worldwide, at any property that partners with IBCCES. After one year, the IAC expires and guests must apply for a new IAC. *Id.* at 12-13.

Plaintiffs assert that there is no other format in which to request accommodations besides the online IBCCES application, nor can guests seek accommodations in-person at the park on the day of their visit. Plaintiffs contend that Defendants do not provide any accommodations to guests who arrive at parks without an IAC, even as a one-time courtesy. *Id.* at 12-13. Defendants dispute these contentions (*see* Doc. 71) as further addressed herein.

### iii.    *Plaintiff C.T.*

Plaintiff C.T. suffers from postural orthostatic tachycardia syndrome ("POTS"), which is a disorder related to blood circulation, as well as borderline personality disorder ("BPD"). (Doc. 67 ¶ 86). C.T., as a result, experiences frequent light-headedness and dizziness, as well as occasional symptoms of fatigue, brain fog, nausea, headaches, and shakiness. These symptoms worsen in situations involving lengthy amounts of standing. C.T. also experiences heightened sensitivity to crowds, noise, and touch, and frequently suffers from anxiety and paranoia in large crowds. These impairments substantially limit C.T.'s major life activities, including walking, standing, breathing, concentrating, thinking, and communicating. C.T.'s impairments also limit several of her major bodily functions, including her digestive, neurological, brain, respiratory, and circulatory functions. *Id.* ¶ 87.

Thus, C.T. requires various accommodations to make full use of Defendants' facilities. *Id.* ¶ 88. C.T.'s son, a minor, often accompanies her to Six Flags park locations, doing so on all of

---

should be excluded or redacted from documentation submitted."); *id.* Exhibit 11 at 104 (noting that registration requires merely "[s]tatement indicating the guest has a disability or other qualifying impairment" under the ADA or applicable state law).

C.T.'s park visits discussed in the complaint.  Her son has autism spectrum disorder and attention-deficit/hyperactivity disorder ("ADHD") and, as a result, also requires various accommodations in order to make full use of Defendants' facilities.  *Id.* ¶ 89.  C.T. was a season ticket holder during the 2022-2023 season at Six Flags, and visited Six Flags Discovery Kingdom in Vallejo, California, several times in 2023, in or around January, March, June, July, August, September, and October, being accompanied by her minor son on each such visit.  *Id.* ¶¶ 90-91.

C.T. was unaware of new procedures that had been implemented at Six Flags for requesting accommodations through IBCCES when she and her son visited Discovery Kingdom in or around early-2023.  C.T. arrived at the park assuming she could make these requests in person as had been the case under Defendants' prior Equal Access Pass ("EAP") program with which she was familiar.  Upon arrival, she began to feel dizzy due to her POTS and asked a park employee where to obtain a wheelchair. The employee directed her to the Guest Services area, where C.T. was informed by staff that she must have submitted an application prior to her visit through the IBCCES application.  This was C.T.'s first time hearing of the IBCCES system or any such new procedures.  C.T. asked if she could instead show them documentation in her possession from the Social Security Administration, indicating disability, but was told the IBCCES website was the exclusive method to request park accommodations, and nothing could be done once a guest was at the park.  *Id.* ¶ 91.  Neither C.T. nor her son, therefore, received any accommodation during their visit.  *Id.* ¶ 92.

Prior to her next visit, C.T. applied for accommodations by submitting two applications through the IBCCES website; one for herself and one for her minor son.  Due to "Defendants' and IBCCES's rules, with each of these IBCCES applications, C.T. disclosed sensitive personal information and submitted medical documentation substantiating her and her son's claimed impairments and need for accommodation." *Id.* ¶ 93.  C.T. submitted screenshots from her medical insurance provider's website showing her and her son's medical identification numbers, dates of birth, and list of diagnoses, including those unrelated to the accommodation requests.  *Id*.  C.T. found the process confusing due to the structure of the form questions; for example, she was prompted to select accommodations from a list shown in a drop-down menu, but "several common accommodations she sought to request appeared to be missing from that list."  She also experienced

"glitches" that failed to save her progress, resulting in C.T. having to restart the application from the beginning. *Id.* ¶ 94.

C.T. and her son each received digital IACs after submission of their IBCCES applications. The IACs included her and her son's photographs, noted their limitations, and listed various helpful accommodations. *Id.* ¶ 95. Later, C.T. and her son visited Discovery Kingdom on several occasions between July and October 2023. Each time, she presented her and her son's IAC upon arrival to the park and the requested accommodations were provided. However, "several of these visits were tainted by inappropriate treatment" from employees. In or around the July 2023 visit, after presenting their IACs and receiving their AAPs, a ride operator reprimanded C.T.'s son for failing to remain behind the yellow line at the attraction. C.T. apologized to the ride operator, explained her son is disabled and has autism and ADHD, and "can't help it." The ride operator was unsympathetic and expressed doubt regarding C.T.'s son's disabilities because he did not appear disabled. C.T. responded that "some disabilities are not visible, they're mental," after which the ride operator examined C.T. and her son's AAPs and asked C.T. detailed questions regarding the nature and extent of their disabilities. C.T. was left "feeling distraught and embarrassed" and "humiliated by the ride operator asking her detailed question[s] regarding sensitive medical information in a very public setting," where others could and did overhear the discussion. *Id.* ¶ 97.

During a subsequent visit to Discovery Kingdom in 2023, C.T. had a similar experience where, after navigating to the ADA accessible parking lot and parking her car, she was heading toward the park entrance with her son when the parking lot attendant "gave her a hard time about having parked there," stating, "You don't look like you're disabled." *Id.* ¶ 98. C.T. now panics and experiences severe anxiety when in transit with her children to Six Flags. *Id.* ¶ 99.

### iv.    Plaintiff Judy Martinez

Plaintiff Martinez suffers from muscular dystrophy, resulting mobility impairment and chronic physical pain. She requires assistance to complete ordinary everyday tasks and uses a wheelchair. She has a personal caregiver for ten hours per day. *Id.* ¶ 101. As a result of her disabilities, she requires accommodations to make full use of Defendants' facilities. *Id.* ¶ 103. Martinez was a Six Flags season ticket holder during 2023, visiting the Magic Mountain and

7

Hurricane Harbor locations multiple times. She purchased a season ticket because she previously enjoyed bringing her children on spontaneous day trips to Six Flags and other amusement parks in California. *Id.* ¶ 104.

Her first visit was to Magic Mountain in July 2023. She was unaware of the new procedures implemented at the park regarding the IBCCES application and IAC, and assumed she could request her needed accommodations at the guest services area, as was the case under the prior program with which she was familiar and had used. Martinez informed Defendants' employee at the guest services area that she had an access card she uses for transportation services, which states her need for mobility accommodations. The employee explained that Defendants would not consider her request because it was in an improper form and her need for accommodations was unsubstantiated. *Id.* ¶ 105. Because she had not registered through the IBCCES website prior to her July 2023 visit, Martinez did not receive any accommodations during her visit. She did not enjoy her visit and felt excluded and embarrassed, and was "offended by the employee's insinuation that [she] was lying about her impairment." *Id.* ¶ 107.

Martinez's next visit was to Hurricane Harbor in August 2023. Approximately two or three days prior to this visit, she submitted an application for accommodations through the IBCCES website, which included "mandatory disclosure of sensitive personal information and submission of medical documentation." In her application, she submitted her transportation access card and a placard issued by the Department of Motor Vehicles to disabled individuals. *Id.* ¶ 107. Martinez was embarrassed about having to provide private information and documentation and offended by Defendants' demand for proof of disability, particularly in light of her use of a wheelchair. She found the application process confusing, lacking in guidance, and with certain pre-selected responses inapplicable or inaccurate. She was not contacted by IBCCES nor Defendants and did not receive information as to whether she would receive her requested accommodations on the day of her visit. *Id.* ¶ 108.

Martinez received a digital IAC, including her photograph, relevant limitations, and various helpful accommodations. *Id.* ¶ 109. She visited Hurricane Harbor in August 2023 and presented her IAC to park employees, requesting the accommodations listed thereon. She was told by

employees that she was not on their list and that they had no awareness of IBCCES, and that they were unaware as to whether Martinez was entitled to accommodations. As a result of deficient training of their employees, Defendants denied Martinez the reasonable accommodations she requested. *Id.* ¶ 110.

## II.    Defendants' Evidentiary Objections

### A. General Objections

Defendants assert numerous objections under the Federal Rules of Evidence to approximately 48 of Plaintiffs' exhibits and numerous of their declared statements filed in support of their motion for class certification. (Doc. 71-2). "In determining whether class certification is appropriate under Rule 23, courts 'may consider all material evidence submitted by the parties … and need not address the ultimate admissibility of evidence proffered by the parties." *Blair v. CBE Grp., Inc.*, 309 F.R.D. 621, 627 (S.D. Cal. 2015) (citations omitted). In particular:

> Since a motion to certify class is a preliminary procedure, courts do not require strict adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence. S*ee Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974) (The class certification procedure "is not accompanied by the traditional rules and procedures applicable to civil trials."). At the certification stage, "the court makes no findings of fact or announces no ultimate conclusions on Plaintiffs' claims." *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D. Cal. 2011) (quoting *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 616 (C.D. Cal. 2008)). Therefore, the Court may consider inadmissible evidence at the class certification stage. *Keilholtz v. Lennox Hearth Prods., Inc.*, 268 F.R.D. 330, 337 n.3 (N.D. Cal. 2010). "The court need not address the ultimate admissibility of the parties' proffered exhibits, documents and testimony at this stage, and may consider them where necessary for resolution of the [Motion for Class Certification]." *Alonzo*, 275 F.R.D. at 519.

*Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 459 (S.D. Cal. 2012).

In light of the "lenient evidentiary standard" that applies at this stage of the proceedings, the undersigned rejects Defendants' evidentiary objections (Doc. 71-2). *Blair*, 309 F.R.D. at 627.

///

///

///

**B. Objections to Reply Evidence**

Defendants further object to new evidence offered by Plaintiffs in their reply brief (*see* Doc. 75), specifically, portions of the deposition transcript of Plaintiff Martinez (Doc. 72, Ex. 1) and a rebuttal expert report from Plaintiffs' expert witness Christine Phillips (*id.*, Ex. 2).

As to the inclusion of portions of the deposition transcript of Plaintiff Martinez, the Court notes that Defendants attached portions of said deposition to their opposition. *See* (Doc. 71-1, Ex. 4). Defendants failed to comply with the Local Rules, requiring that, before or upon filing of any document making reference to a deposition, counsel relying on said deposition shall ensure that a copy of the entire deposition is submitted, either in paper or electronic format, to the Clerk of the Court or chambers' email inbox. Local Rule 133(j). Thus, as Defendants themselves have relied upon the deposition of Plaintiff Martinez and failed to provide a copy of the entire deposition, the undersigned finds Defendants' objections to Plaintiffs' attaching portions of Martinez's deposition transcript to be without merit.

As to the rebuttal report of Dr. Phillips, the undersigned notes that it was signed on October 30, 2025. (Doc. 72-1 at 37). Plaintiffs do not provide an explanation regarding preparation of the report, nor why it was not included with the motion and attached only to the reply brief. *See* (Doc. 72 at 13). The signature date evidences that Dr. Phillips' report was finalized after filing of the motion and Defendants' opposition (filed October 17, 2025). However, a review of the rebuttal report evidences no "new evidence." Dr. Phillips, rather, rebuts the Defendants' expert Joseph Krock's arguments as included in his report attached to the opposition. (Doc. 71-1, Ex. 20).

A district court "is not limited to considering only admissible evidence in evaluating whether Rule 23's requirements are met." *Gomez v. J. Jacobo Farm Labor Contractors, Inc.*, 334 F.R.D. 234, 249 (E.D. Cal. 2019) (quoting *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018)). "Nonetheless, 'the district court need not dispense with the standards of admissibility entirely." *Id.* (quoting *Sali*, 909 F.3d at 1006). "Rather, the district court should analyze the 'persuasiveness' of the evidentiary proof presented at the class certification stage and 'may consider whether the plaintiff's proof is, or will likely lead to, admissible evidence.'" *Id.* (quoting *Sali*, 909 F.3d at 1006). Here, as Dr. Phillips' rebuttal report attached to Plaintiffs' reply brief does not

provide new evidence, and as the Court does not find the rebuttal report necessary to resolution of Plaintiffs' class certification motion, the Court will not strike it.  *See McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 154 n.6 (S.D. Cal. 2019) ("Thus, the Court will not strike Bacon's report or any associated filings on this basis.  Moreover, the Court does not find that Bacon's report [attached to the reply] is necessary to the resolution of Plaintiffs' class certification motion."), *amended by* No. 17-cv-00986-BAS-AGS, 2020 WL 4582686 (S.D. Cal. Aug. 10, 2020) (decertifying class on other grounds).

### III.    Legal Standard for Class Certification

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis." *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 320 (C.D. Cal. 2015). "Before it can certify a class, a district court must conduct a 'rigorous analysis' to ensure that the requirements of Federal Rule of Civil Procedure 23 are satisfied." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 862 (9th Cir. 2025), *cert. pet. docketed* (Jan. 22, 2026) (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651, 664 (9th Cir. 2022) (en banc)). "[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Id*. (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)).

The Court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable [numerosity requirement]; (2) there are questions of law or fact common to the class [commonality requirement]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality requirement]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy requirement]." Fed. R. Civ. P. 23(a).  The purpose of these requirements is to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks omitted).

In addition to these four requirements, the Court must find that at least one of the following

three conditions is satisfied: (1) the prosecution of separate actions would create a risk of: (a) inconsistent or varying adjudications, or (b) individual adjudications dispositive of the interests of other members not a party to those adjudications; (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or (3) questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b).

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule[.]" *Dukes*, 564 U.S. at 350; *see Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) ("the party seeking certification ... bears the burden of showing she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)").  Rule 23 further provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the "class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5).  "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

A trial court has broad discretion to grant or deny a motion for class certification.  *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).  The Court's class certification analysis "may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 465-66 (2013) (quoting *Dukes*, 564 U.S. at 351).  "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. at 466.

## IV.    Discussion

Plaintiffs assert claims for relief pursuant to Title III of the ADA and related state law statutes.  Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation by any person who owns ... or operates a place of public accommodation." 42 U.S.C. § 12182(a). The ADA establishes that failure to provide disabled individuals with an "opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation" equal to those without disabilities constitutes discrimination. *Id.* § 12182(b)(1)(A)(ii). Additionally, the ADA defines discrimination to include the "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." *Id.* § 12182(b)(2)(A)(ii).

## A. Standing

### i. *Plaintiffs*

As a preliminary matter, Defendants challenge Plaintiffs standing to bring this action. Defendants assert that neither Plaintiff has standing because, after already registering with IBCCES and considering the ease of annual renewal, they cannot demonstrate a realistic threat of repeated, future injury. Additionally, since Plaintiffs have their IACs, they cannot demonstrate threat of repeat injury for the Request Class either. (Doc. 71 at 22).

Plaintiffs point out that another application will be required, in practice, on the IBCCES website if either Plaintiff fails to timely renew their IAC upon expiration. (Doc. 72 at 8-9). And they assert that, if they choose not to complete such renewal due to invasiveness of the process or otherwise, they will suffer the injury of the Request Class by being refused accommodation at park locations. *Id.* at 9-10. Although Plaintiffs argue that they have shown that they intend to continue to visit Defendants' parks and seek accommodations, thus, adequately showing likelihood of future injury (*see id.* at 9 n.6 (citing Docs. 70-2 ¶ 6, 70-3 ¶ 6)), the Court notes that the cited paragraphs of Plaintiffs' declarations do not expressly manifest their intent to return to any of Defendants' parks.

In a class action, at least one of the named plaintiffs must meet the Article III standing requirements. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). Article III requires that (1) a named plaintiff suffered an injury in fact, (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision. *Lujan v.*

13

*Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  When seeking prospective injunctive relief, the named plaintiffs must additionally show a likelihood of future injury.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).  In the ADA context, a "plaintiff can show a likelihood of future injury when he intends to return to a noncompliant accommodation and is therefore likely to reencounter a discriminatory architectural barrier.  Alternatively, a plaintiff can demonstrate sufficient injury to pursue injunctive relief when discriminatory architectural barriers deter him from returning to a noncompliant accommodation."  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 950 (9th Cir. 2011).  "The standard for injury in fact is whether [a plaintiff] has encountered at least one barrier that interfered with her access to the particular public facility and whether she intends to return or is deterred from returning to that facility."  *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017).

"In addition, an ADA plaintiff who has Article III standing as a result of at least one barrier at a place of public accommodation may, in one suit, challenge all barriers in that public accommodation that are related to his or her specific disability.  Thus, a plaintiff need not have encountered all the barriers that impede his or her access in order to have standing to seek an injunction to remove those barriers."  *Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 849 (N.D. Cal. 2011); *see Chapman*, 631 F.3d at 951.  "An ADA plaintiff must show at each stage of the proceedings either that he is deterred from returning to the facility or that he intends to return to the facility and is therefore likely to suffer repeated injury.  He lacks standing if he is indifferent to returning to the store or if his alleged intent to return is not genuine, or if the barriers he seeks to enjoin do not pose a real and immediate threat to him due to his particular disability."  *Chapman*, 631 F.3d at 953.

Here, Plaintiff C.T. and Martinez both assert an injury-in-fact.  Both Plaintiffs assert that they attempted to acquire accommodations upon visiting Defendants' park locations without registering prior to their visit with the IBCCES and receiving an IAC, and were refused accommodations.  (Doc. 67 ¶¶ 91-92, 105-107).  Both also attest to, then, registering on the IBCCES website, receiving an IAC, and visiting park locations.  Both challenge Defendants' disability accommodations policies and, namely, both assert that they were required to provide

information and documentation concerning their disabilities when registering with the IBCCES in order to receive their IAC and thereby obtain accommodations at Defendants' park locations. *Id.* ¶¶ 93-97, 107-110.

Further, Plaintiff Martinez alleges that she was denied accommodations, despite registering on IBCCES and possessing an IAC, on a visit to a park location. *Id.* ¶ 107-110. Among their claims, Plaintiffs challenge the training of Defendants' employees and staff, including with respect to aspects of ADA compliance, the AAP, IBCCES registration, and accommodations. *See* (Doc. 70 at 19-22); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008) (finding plaintiff had standing to assert ADA claim where he was deterred from visiting a noncompliant establishment due to barriers to accessibility; noting courts "take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits are the primary method of obtaining compliance with the Act") (quotation and citation omitted).

While, as noted above, neither Plaintiff attests expressly that she intends to return to Defendants' parks in the future, for standing purposes, the Court construes Plaintiffs' declarations as a whole, coupled with the pleadings and motion papers, as reasonably demonstrating that Plaintiffs presently are deterred from visiting Defendants' parks and seeking accommodations in light of Defendants' alleged noncompliance with the ADA. *See Greater Los Angeles Agency on Deafness, Inc. v. Reel Servs. Mgmt. LLC*, No. CV 13-7172 PSG (ASX), 2014 WL 12561074, at *3 (C.D. Cal. May 6, 2014) (noting and applying the "more nuanced approached under the ADA" to the injury-in-fact element of Article III standing under the Ninth Circuit's *Doran* opinion); *Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1082 (D. Haw. 2000) (noting the "broad language" of the ADA "expand[s] the definition of what constitutes an injury and appear[s] to allow for broad injunctive relief.") (quotations and citations omitted; alterations in original); *see also Access Now, Inc. v. LifePoint Hosps., Inc.*, No. CV 09-1156 JCH/LAM, 2012 WL 13081448, at *6 (D.N.M. Feb. 10, 2012) ("Both plaintiffs have presented evidence that they have endured past discrimination at these facilities, but neither avers in his or her affidavit any specific intent or need to return to the facility in the imminent future, as required to establish standing. On the other hand, the Plaintiffs do aver generally in their Third Amended Complaint that they intend to return in the future to the

15

facilities they have visited.  Construing this in the light most favorable to the Plaintiffs, the Court concludes that this allegation is sufficient to establish an 'injury in fact,' and therefore standing …").

### ii.  Class Members

A court may certify a class seeking injunctive or other equitable relief, notwithstanding some of its putative members lack Article III standing.  *See Olean Wholesale Grocery Coop.*, 31 F.4th at 682 n.32 ("We therefore overrule the statement in *Mazza* that 'no class may be certified that contains members lacking Article III standing,' which does not apply when a court is certifying a class seeking injunctive or other equitable relief.") (citing *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 594 (9th Cir. 2011)).

However, as to certification of a class seeking damages, "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quotation and citation omitted); *see Harvey v. Morgan Stanley Smith Barney LLC*, No. 19-16955, 2022 WL 3359174, at *3 (9th Cir. Aug. 15, 2022) (explaining, on appeal challenging district court's approval of class settlement, that the "certified class was not limited to those Morgan Stanley employees … who had contributed money to the challenged AFG program, and there is evidence in the record indicating that that [*sic*] there were class members who had not suffered injury through Morgan Stanley's AFG program.  And the district court did not make a factual finding that every class member suffered some injury through the AFG program …").

With these authorities in mind, the Court will consider the issue of ascertaining Article III standing for class members when analyzing the proposed California subclasses, each of which seek damages under the Unruh Act, pursuant to the requirements of Rule 23 of the Federal Rules of Civil Procedure.

### B.  Statute of Limitations

The parties dispute the applicable statute of limitations regarding the ADA claims. Plaintiffs assert that the Ninth Circuit "has acknowledged as a conceivable option California's three-year period for an action upon a liability created by statute."  (Doc. 70 at 9 n.1; citing *Estate of Stern v. Tuscan Retreat, Inc.*, 725 F. App'x 518, 521 (9th Cir. 2018)).  Defendants contend the

16

applicable statute of limitations is two years.  (Doc. 71 at 21; citing, *inter alia*, *Hartline v. Nat'l Univ.*, No. 2:14-cv-0635 KJM AC (PS), 2015 WL 4716491, at *3-4 (E.D. Cal. Aug. 7, 2015), *report and recommendation adopted*, 2016 WL 426643 (E.D. Cal. Feb. 4, 2016)).

The Court agrees with Defendants.  In the case relied upon by Plaintiffs (*Estate of Stern*), the court was examining whether the claims, including those brought under the Rehabilitation Act, were barred by the applicable statute of limitations and found that, even under the more permissive three-year statute of limitations, the action would be barred.  *See Estate of Stern*, 725 F. App'x 518 at 521 ("We need not conclusively determine the statute of limitations period applicable to the Rehabilitation Act, but the longest option is California's three-year provision for an action upon a liability created by statute.  So we use it.") (quotations and citations omitted); *see also Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 869 (9th Cir. 2014) ("The statute of limitations for claims under Section 504 of the Rehabilitation Act is provided by analogous state law.").  Thus, the court in *Estate of Stern* plainly employed the more expansive statute of limitations to show that, even given such time, the action nonetheless was time-barred, thus demonstrating that it would be time-barred for any shorter statute of limitations as well.  The court in *Estate of Stern* did not use a three-year statute of limitations for any reason other than said analysis, including to demonstrate that the action would be barred even given the longest applicable statute of limitations.

In *Hartline*, another judge of this Court noted that, though the Ninth Circuit had not resolved the question as to the applicable statute of limitations for ADA actions brought pursuant to Title III, it had explained how the applicable statute of limitations should be determined: "'[t]o determine the applicable statute of limitations for a cause of action created by a federal statute, we first ask whether the statute expressly supplies a limitations period.  If it does not, we generally "borrow" the most closely analogous state limitations period.'"  *Hartline*, 2015 WL 4716491, at *4 (quoting *Sharkey v. O'Neal*, 778 F.3d 767, 770 (9th Cir. 2015)).  The *Hartline* court noted two plausible candidates for analogous state limitations periods, namely the Unruh Act and the state personal injury statute (Cal. Civ. Proc. Code § 335.1).  The court then noted the difference to be merely academic, as both provide a two-year statute of limitations, and adopted a two-year statute of limitations for the plaintiff's ADA claims.  *Id.*

Based on these authorities, the undersigned concludes that a two-year statute of limitations governs Plaintiffs' ADA claims.  The Unruh Act is the most plausible candidate for an analogous statute of limitations period, particularly as Plaintiffs' two subclasses seek relief pursuant to the Unruh Act and use a two-year statute of limitations as a result.  As the California personal injury statute also supplies a two-year statute of limitations, the result is the same regardless of which is adopted.  *See Z.F. ex rel. M.A.F. v. Ripon Unified Sch. Dist.*, No. 2:10-cv-00523-GEB-JFM, 2011 WL 320249, at *3 (E.D. Cal. Jan. 28, 2011) (agreeing with the parties that the two-year statute of limitations from California's personal injury statute governed the plaintiffs' Title II ADA claims).

As such, the Court will modify the definitions of the proposed Inquiry Class and Request Class consistent with the applicable statute of limitations.  *See United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 712 (E.D. Cal. 2025) (collecting cases and noting courts have "discretion to cure defects of a proposed class definition …").  The nationwide classes are modified as follows:

1. The nationwide Inquiry Class: "All persons in the United States with an ADA-qualifying disability who, from December 26, 2021, to and through the date of final judgment in this action, submitted an IBCCES application for accommodations in connection with a planned visit to any of Defendants' theme, amusement, and/or water parks in the United States."

2. The nationwide Request Class: "All persons in the United States with an ADA-qualifying disability who, from December 26, 2021, to and through the date of final judgment in this action, visited any of Defendants' theme, amusement, and/or water parks in the United States and attempted to request an accommodation at the Parks without having registered in advance with IBCCES, and were therefore unable to seek or obtain reasonable accommodations at Defendants' facilities on the day of the individual's park visit."

///

///

///

///

**C. Rule 23(a) Requirements**

   ***i. Numerosity***

      a. Legal Standard

The first Rule 23(a) prerequisite is numerosity. Fed. R. Civ. P. 23(a)(1). To meet the numerosity requirement, the class must be "so numerous that joinder of all members is impracticable." *Id.* Numerosity does not impose a precise numerical threshold. *Gen. Tel. Co. of the Northwest, Inc. v. E.E.O.C*, 446 U.S. 318, 330 (1980). However, "[c]ourts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." *E.E.O.C. v. Kovacevich '5' Farms*, No. CV-F-06-165 OWW/TAG, 2007 WL 1174444, at *21 (E.D. Cal. Apr. 19, 2007). *See, e.g., Cruz v. MM 879, Inc.*, 329 F.R.D. 639, 644 (E.D. Cal. Jan. 18, 2019) (certifying class of 181 employees alleging Labor Code claims).

A plaintiff must present evidence to satisfy the numerosity requirement. *See Dukes*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties ...."); *e.g.*, *Barbosa v. Delta Packing Co. of Lodi, Inc.*, No. 2:20-cv-01096-TLN-KJN, 2023 WL 5280009, at *2 (E.D. Cal. Aug. 16, 2023). A "failure to present evidence to show numerosity precludes class certification." *Diacakis v. Comcast Corp.*, No. C 11-3002 SBA, 2013 WL 1878921, at *5 (N.D. Cal. May 3, 2013) (citing *Black Faculty Ass'n of Mesa College v. San Diego Cmty. College Dist.*, 664 F.2d 1153, 1157 (9th Cir. 1981)). Each subclass for which a plaintiff seeks certification must satisfy the numerosity requirement. *See Betts*, 659 F.2d at 1005.

"There is no hard and fast rule for determining whether a class is sufficiently numerous. 'The numerosity requirement is not tied to any fixed numerical threshold – it requires examination of the specific facts of each case and imposes no absolute limitations.'" *Sarmiento v. Sealy, Inc.*, No. 18-cv-01990-JST, 2020 WL 4458915, at *4 (N.D. Cal. May 27, 2020) (quoting *Rannis v. Recchia*, 380 Fed. App'x 646, 651 (9th Cir. 2010) (noting that a 20-member class, though not precluded, would be a "jurisprudential rarity")) (internal quotation omitted); *cf. Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051-52 (9th Cir. 2003) (noting a proposed class of 15 has been held to be too small, but a class of more than 60 satisfies numerosity). Where the exact size of the

class is unknown, the Court may rely on "common sense" deductions to determine whether numerosity is met. *Tucrios v. Carma Labs., Inc.*, 296 F.R.D. 638, 645 (C.D. Cal. 2014).

> b. Parties' Contentions

Plaintiffs contend that Six Flags has identified over 11,000 individuals who submitted IBCCES applications for disability accommodations, were issued IACs, and received AAPs based on such while at a California park location, during the limitations period from December 26, 2021, to July 22, 2024.[4] Plaintiffs state each such individual is a California subclass member and a nationwide Request Class member. Plaintiffs' retained expert, Dr. Christine Phillips, analyzed United States Census Bureau data for the period 2020-2023 on the nationwide population of non-institutionalized individuals with a disability in the United States and California; analyzed amusement park attendance data reported by Six Flags in its annual 10-K and quarterly 10-Q reports filed with the Securities and Exchange Commission ("SEC") between 2020 and the present; and analyzed attendance data complied by the research institutions AECOM/TEA in the annual Global Attractions Attendance Reports for the period 2020-2023. Plaintiffs assert that this analysis showed at least 751,333 legally disabled class members nationwide and at least 96,017 legally disabled class members in California during the respective class periods.

Defendants assert that, while they disclosed in discovery that the California-based Six Flags and Hurricane Harbor parks issued over 11,000 AAPs from December 26, 2021, to July 22, 2024, that were associated with IAC numbers, "that figure does not establish any individuals who received one or more AAPs actually had an 'ADA-qualifying disability,' as required by the class definition, or were subject to any allegedly impermissible inquiry." Defendants argue that it also does not show any such individuals were denied accommodations without pre-registering or that such individuals first pre-registered with IBCCES before visiting a park, and that it "merely establishes the volume of individuals who received an AAP after registering with IBCCES," regardless of whether they were legally disabled or an accommodation was necessary. Defendants

---

[4] Plaintiffs redacted this information in their motion. (Doc. 70 at 23). However, Defendants filed it publicly on the docket in their opposition. (Doc. 71 at 26). Thus, the Court finds that Defendants have waived any claim to treating this information as confidential.

assert that it would be a "perverse result" to provide for relief to "non-disabled individuals who pre-registered and received IAC cards, without an individualized inquiry into the validity of their registration and accommodation request" to determine whether they are qualified individuals with disabilities and "properly part" of the class. (Doc. 71 at 26).

Defendants argue that their expert, Dr. Joseph Krock, refutes Dr. Phillips' findings. Dr. Krock concludes that any statistical measure cannot identify whether an individual would meet any of the relevant class definitions in this matter and that Dr. Phillips' estimates are speculative, her calculations involve ad hoc assumptions and simulations to create an "appearance of rigor" but the number of disabled attendees of nationwide and California Six Flags parks is unknown and cannot reliably be estimated. Defendants further argue that, even the smallest estimate in Dr. Phillips' report lacks foundation, and her fundamental assumption that the United States Census American Community survey disability rates correlate with attendance at Six Flags is "fundamentally wrong." *Id.* at 23-24. Defendants note that Dr. Phillips admitted during deposition that coming to an actual number of individuals with a qualified disability that would meet the class definitions was outside the scope of her engagement, that her analyses were based on certain assumptions and provide broad estimates and are not based on data from Six Flags, that the rate of error in her supplied number for individuals who self-identified as having a disability was unknown, that she did not independently asses the Census Bureau definition of disability, that she did not account for how disability rates differ between older or younger populations, and that she was unable to locate data on whether disability rates in locales where Six Flags parks are located differ from the national rate.

    c.    Analysis – Inquiry Classes

Contrary to Defendants' assertion, Dr. Phillips' report reflects that she reviewed data regarding attendance created or reported by Six Flags through its annual and quarterly reports filed with the SEC. (Doc. 70-1 at 50).[5] Finding that those numbers did not distinguish by country or by park, Dr. Phillips uses AECOM/TEA annual reports that break down attendance by park in

---

[5] The same excerpt of Dr. Phillips' deposition testimony that Defendants cite for the supposed proposition she did not rely on "specific data from Six Flags" proves the opposite. *See* (Doc. 71 at 24) (citing Doc. 71-1, Ex. 19, Tr. 160-62) (testifying "there are the values that Six Flags reported as attendance numbers that I entered into my script").

estimating attendance for parks in the United States. *Id.* at 51-52. Dr. Phillips uses United States Census Bureau American Community Survey data to base her estimates as to the number of disabled individuals visiting parks, noting her expectation that the percentage of attendees with a disability will not be higher than the national disability rate. *Id.* at 52. The national disability rates from the Census Bureau data range from 12.70% for 2020 to 13.00% for 2023, with a margin of error of plus-minus 0.1%. Dr. Phillips used a range of minimum and maximum attendance figures for parks in the United States, as well as a range of estimates of percentage of attendees with disabilities, from a minimum of 1% to a maximum of 10%. *Id.* at 54-55.

Dr. Phillips undertook additional steps to calculate attendance figures for 2024 and 2025. In the spring of 2024, Six Flags merged with Cedar Fair, resulting in a lack of a second quarter SEC filing with attendance information. *Id.* at 58. Dr. Philips used a statistical simulation to estimate attendees for the second quarter of 2024, based on second quarter data from 2021, 2022, and 2023. *Id.* at 59. That estimate was combined with the data on hand for an estimated total attendance figure for Six Flags parks located in the United States. *Id.* at 60. Dr. Phillips found a low estimate of 14,922,118 and a high estimate of 21,459,933, with a median of 18,648,294. *Id.* For the numbers for the first quarter of 2025, Dr. Phillips estimated the percentage of Six Flags attendees attributable to parks located in the United States and multiplied this percentage by the data on the overall number of attendees for Six Flags parks globally. This was the last quarter in which data was available at the time Dr. Phillips prepared her report. *Id.* at 61 n.42.

Dr. Phillips used similar methods to estimate the numbers for the California subclass. She took attendance figures for Magic Mountain and Hurricane Harbor for 2021, 2022, 2023, and used these numbers as a minimum, operating on the assumption that other California parks had zero attendees. As there was no available data for Hurricane Harbor for 2021, it was left at zero and only the numbers for Magic Mountain were used for 2021. *Id.* at 63. For December 26, 2021, to December 31, 2021, Dr. Phillips found the overall global percentage of Six Flags attendance events that occurred in fourth quarters and estimated a set of median, lower, and upper bound percentages for California, to account for scenarios where California attendance may be notably more or notably less than global attendance. She multiplied these percentages by the number of attendance events

22

at Magic Mountain in 2021. *Id.* at 63-64. Finally, she noted that the date range of December 26-31, 2021, accounted for six of the 92 days in the quarter and, after running an additional simulation to account for a lack of uniform distribution of attendance across each day, arrived at a final set of estimated numbers. *Id.* at 64-65.

Lastly, Dr. Phillips estimated the California attendance numbers for 2024 to 2025, with an estimate she opines likely is lower than the actual number as she based it on the assumption that only Magic Mountain and Hurricane Harbor contributed to park attendance. *Id.* at 65. Dr. Phillips estimated the percentage of attendance attributed to California parks for 2024 and 2025, multiplied these percentages by global attendance estimates, identifying a median number as well as a lower and upper bound. She multiplied these numbers by various possible disability rates, from 1%, to 5%, to 10%, noting the census rate was 10.60%. *Id.* at 66-67. In total, for California attendance numbers using a 1% rate of disability, Dr. Phillips arrived at a low estimate of 96,017 for the period of December 26, 2021, to first quarter 2025. *Id.* at 68.

Dr. Krock contends that Dr. Phillips' calculations are speculative and without basis, providing only a range of numbers for a rate of attendance of disabled individuals, none of which Dr. Phillips knows to be the "correct" scenario. (Doc. 71-1, Ex. 20 at 304). Dr. Krock provides that the assumption made by Dr. Phillips that Census Bureau disability rates correlate with attendance at Six Flags parks is wrong. Dr. Krock highlights the definition of disability employed by the Census Bureau, as well as the fact that the statistics used by Dr. Phillips include age groups for which it is unlikely they would be attending Six Flags facilities, such as those under the age of five and over 65. Dr. Krock notes that the statistics used by Dr. Phillips are at a national level and Six Flags parks only operate in 11 states, many of which have lower than average disability rates; that the statistical analysis does not account for non-disability conditions that would limit an ability to ride rides; and that it does not account for disabled attendees who would not request accommodations. *Id.* at 305-06. Dr. Krock further asserts that Dr. Phillips appears to have errors in her calculation tables. *Id.* at 318-319.

The undersigned notes that Dr. Phillips relies on statistical analysis using United States Census Bureau and industry attendance data. Courts commonly rely on such data in determining

whether a class to be certified satisfies Rule 23's numerosity requirement.  *See, e.g., Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 608 n.8 (N.D. Cal. 2004), *amended in part*, No. C 02-5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012) (noting that "[c]ensus data [is] frequently relied on by courts in determining the size of proposed classes") (citations omitted; alterations in original). Still, the Court shares some of Defendants' skepticism regarding Plaintiffs' methodology.  As Dr. Krock points out, it is doubtful that the definition of disability used by the Census Bureau in formulating their data correlates with the definition in the Inquiry Class, namely, disabilities that are specifically ADA-qualifying.  Further, such data likely includes individuals who would not be able to attend Defendants' parks, whether due to age or other reasons, and may not correlate with attendance.

Nonetheless, even using the minimum attendance numbers for parks in the United States in 2020, 2021, 2022, and 2023, and a disability rate for attendees of 1%, the number of disabled individuals attending parks would be 59,670 in 2020; 256,130 in 2021; 160,650 in 2022; and 169,610 in 2023.  If even 1% of these attendees sought accommodations, the numbers would be 596 in 2020; 2,561 in 2021; 1,606 in 2022; and 1,696 in 2023.  These totals do not include 2024 and 2025, which would no doubt increase these numbers.  The same is true for the California subclasses, where even a 1% disability rate estimate results in a total of 96,017 individuals, with 1% of that number being 960 individuals.

Additionally, the potential errors raised by Dr. Krock, even if assumed true, appear to be relatively *de minimis*.  *See* (Doc. 71-1 at 318-319).  The sources of errors raised by Dr. Krock are confined to small deviations in calculations.  Some of the claimed errors reduce the attendance figures, thereby lowering the estimate.  Regardless, even for those that increase the figure, the deviations do not appear to significantly impact the proffered estimates.

Defendants' citation to the *Brooks v. Morphe LLC* opinion of a different judge from this Court for the unremarkable proposition that an expert's reliance on "suspect" statistics and questionable assumptions and use of ambiguous data undermines a showing of numerosity (Doc. 71 at 25) is misplaced.  In *Brooks*, the court found that the plaintiff had failed to satisfy the numerosity requirement in part because, not only were some of the underlying assumptions of

24

plaintiff's calculations questionable, but the execution of the calculation was also flawed.  *See Brooks*, No. 2:20-cv-01219-KJM-DB, 2022 WL 2052680, at *2-3 (E.D. Cal. June 7, 2022).  The plaintiff did not use the number of unique visitors to the website at issue but, rather, a different entity, apparently a vestige from a prior motion her counsel filed in a different case.  Further, the plaintiff did not cite her referenced surveys nor offer the findings of an expert.  *Id.*

Relevant here, the *Brooks* court explained: "When courts have granted motions to certify classes in reliance on statistics and census data like those Brooks has presented here, a party has presented the data clearly and accurately with citations to sources and explanations for its relevance and usefulness, including from those with helpful experience and expertise.  In other cases, proposed classes remained 'numerous' even after the court corrected errors and tempered unrealistic assumptions.  The court has no such assurances or correctives here.  Brooks has not proven that there are *in fact* sufficiently numerous parties."  *Id.* at *3 (quotations and citations omitted; emphasis in original).

In contrast here, Plaintiffs have offered the credentials and report of an expert.  Dr. Phillips cites the data sources she used and explains her methodology.  Even after correcting possible errors and unrealistic assumptions, and using the lowest possible estimates, it is clear that the Inquiry Classes are sufficiently numerous.  *See Shields v. Walt Disney Parks & Resorts US, Inc.*, 279 F.R.D. 529, 545 (C.D. Cal. 2011) ("Nonetheless, even this lower estimate suggests that at least 25,000 annual visitors to the Walt Disney World Resort and at least 11,000 annual visitors to the Disneyland Resort have visual disabilities. Thus, in examining the putative class of visually impaired persons who were or will become patrons of the Disney resorts in California or Florida, the Court concludes that it is far too numerous to practicably join all members."); *Arnold v. United Artists Theatre Cir., Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994), *as amended on denial of reconsideration* (Sept. 15, 1994) ("In light of the foregoing, it appears that the number of disabled persons affected by the alleged access violations at the more than 70 theaters operated by defendant in California is in the thousands.  By the very nature of this class, its members are unknown and cannot be readily identified.  For these reasons, the Court concludes that joinder of the class members would be impracticable—indeed, impossible.").

Thus, the undersigned concludes that the numerosity requirement is satisfied for both the nationwide Inquiry Class and the California subclass, as joinder of the class members would be impracticable, if not impossible.

d.   Analysis – Request Classes

Although Plaintiffs establish that there are sufficiently numerous attendees or potential attendees to support certification of the Inquiry Class, the Request Classes require further analysis. This is because the Inquiry Classes involve a clearly established, nationwide policy of Defendants, namely IBCCES registration.  That visitors desiring accommodations are required to register and apply using the IBCCES website is not disputed.  *See* (Docs. 70, 71).  Thus, the Court can draw a "common sense" inference that a sizeable portion of the estimated attendees during the period in question who were disabled used the IBCCES website to request accommodations.  *Tucrios*, 296 F.R.D. at 645.

However, the same does not hold for the Request Class.  Plaintiffs assert that Defendants' policy was to refuse accommodations for any individual who visited park locations without registering beforehand on the IBCCES website.  (Doc. 70 at 12-13).  Defendants dispute this and assert that such individuals were, in fact, provided accommodations.  (Doc. 71 at 15).  Thus, to resolve the dispute, the Court is obligated to examine the merits of the parties' positions in relation to the evidence and information relied upon.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (explaining that "it is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements") (emphasis in original).

The undersigned finds, as discussed *infra* in subpart (ii)(d), that Plaintiffs fail to provide sufficient evidence to plausibly assert the existence of any universally applicable policy while, in contrast, Defendants offer some evidence to refute its existence.  As such, the Court cannot find the existence of a unifying common policy, unwritten or otherwise, pursuant to which a collection of individuals could be defined as members.  Unlike the case Plaintiffs cite (*Davis v. Lab. Corp. of Am. Holdings*, No. CV 20-0893 FMO (KSX), 2022 WL 22855520 (C.D. Cal. June 13, 2022), *see* Doc. 70 at 23-24) where the court had before it consumer survey responses usable to estimate the

number of injured class members, here, Plaintiffs offer no similar data or information, such as absent class member declarations, to which the Court could tether its numerosity analysis. There is no dispute that, as to the Inquiry Class, Defendants' policy is that any individual seeking accommodations shall register with IBCCES and receive an IAC. Based on the undisputed existence of this policy, it is reasonable to assume that, even using the lowest possible estimates of disabled individuals attending park locations during the period at issue, a sufficiently numerous set of individuals utilized the IBCCES registration system. However, to find the Request Classes sufficiently numerous, the Court would be required to assume that a sizeable number of individuals who did not so register in advance with IBCCES then visited the park and were denied accommodations. Plaintiffs, however, offer no compelling evidence to plausibly assert the existence of such a policy nor any declarations from other individuals besides themselves who were so denied accommodations.

Thus, the Court finds that Plaintiffs fail to satisfy the numerosity requirement for both the nationwide Request Class and the California subclass.

### ii. Commonality

#### a. Legal Standard

Commonality, the second Rule 23(a) prerequisite, requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The commonality requirement in class certification is satisfied when class members' claims 'depend upon a common contention .... of such a nature that is capable of class-wide resolution.'" *Powers v. McDonough*, 163 F.4th 1162, 1184 (9th Cir. 2025) (quoting *Dukes*, 564 U.S. at 350). "Commonality does not require that 'every question in the case, or even a preponderance of questions, is capable of class-wide resolution. So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement.'" *Id.* (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)). In contrast to a common issue, an individual issue is one where "the members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citing Newberg on Class Actions § 4:50).

27

Rule 23(a) "sometimes [requires] the court to probe behind the pleadings before coming to rest on the certification question." *Wang*, 737 F.3d at 544 (quoting *Dukes*, 564 U.S. at 350). "[T]he merits of the class members substantive claims are often highly relevant when determining whether to certify a class," and "a district court must consider the merits" if they overlap with Rule 23(a)'s requirements. *Ellis*, 657 F.3d at 981. As such, a court must resolve any factual disputes "to determine whether there was a common pattern and practice that could affect the class as a whole." *Id*. at 983 (emphasis original); *see Wang*, 737 F.3d at 544 (noting that even as to a class consisting only of 200 members, "there are potentially significant differences among the class members").

b. Parties' Contentions

Plaintiffs contend that courts within the Ninth Circuit have "regularly granted class certification in cases that challenge the lawfulness of policies or practices under the ADA," with such cases focusing "on common proof regarding the policies and practices themselves, the conduct of senior officials, admissions contained in corporate documents, expert testimony and other common evidence." (Doc. 70 at 25-26). Plaintiffs assert that common questions involve whether Defendant's AAC program violates Title III of the ADA and the Unruh Act; whether the AAC Program has been uniformly implemented across Six Parks locations in the United States; whether the IBCCEC and IAC requirements apply equally to all disabilities; whether the IBCCES application asks about the nature or extent of disabilities in violation of 28 C.F.R. § 36.302(c)(6); and whether Defendants provide inadequate training to employees regarding guests with disabilities. *Id.* at 26.

In opposition, Defendants do not directly challenge Plaintiffs' showing of commonality under Rule 23(a), but rather, note that courts "often" consider the element of commonality together with the separate requirement under Rule 23(b)(3) that a class plaintiff show that common issues predominate. (Doc. 71 at 19).

c. Analysis – Inquiry Classes

1. *Nationwide Class*

The Ninth Circuit has held that "the commonality requirement is satisfied 'where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.'"

28

*Powers*, 163 F.4th at 1185 (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005)).  In *Armstrong*, the Ninth Circuit affirmed class certification of a group of prisoners and parolees who suffered from six different categories of disability.  The plaintiffs claimed that California's policies for parole "discriminated against class members based on their disabilities" and the defendant argued that the wide variation in the nature of the particular class members' disabilities precluded a finding of commonality.  The Ninth Circuit disagreed, holding that "individual factual differences among the class members are not sufficient to negate a finding of commonality.  Because class members suffered a 'similar harm' from the defendant's 'failure to accommodate their disabilities, .... [t]he commonality requirement [wa]s met.'"  *Id.* (alterations in original; quoting *Armstrong*, 275 F.3d at 868).

Here, the Inquiry Class challenges Defendants' disability accommodations request procedure, namely the AAC, requiring guests with disabilities to register with the IBCCES ahead of their visits to any park locations, and acquire from the IBCCES the IAC.  Plaintiffs challenge this policy, and the information and documentation that it requires, as violating Title III of the ADA and the Unruh Act. (Doc. 70 at 8).  Plaintiffs note that the AAC was implemented in 2020, requiring guests to obtain an IAC by registering at least 48 hours ahead of their visit with the IBCCES and submit an online application with documentation regarding guests' medical conditions and contact information from a healthcare, education, or government professional, as well as specify their disability, list the accommodations sought, and provide medical records verifying the claimed disability which could be either a statement from a healthcare provider or from an educational support professional, as well as a photo of the person using the pass.  *Id.* at 10-12.  After the application and materials are submitted, applicants receive their digital IAC.  Once at the park location, the IAC must be presented to receive any necessary accommodations.  The IAC lasts for one year and may be used worldwide at any attraction that partners with IBCCES.  After one year, guests must reapply for a new card.  *Id.* at 12-13.

Plaintiffs further assert that the AAC was implemented uniformly across all of Defendants' parks in the United States, as shown by Defendants' policy statements on their websites, and that

the "unlawful aspects of the [AAC]" have not been materially changed throughout the class period. *Id.* at 14-15. In support of this characterization, Plaintiffs proffer numerous screenshots from Defendants' websites using the Wayback Machine Internet Archive, relating to several of their theme parks, namely: the Six Flags Magic Mountain webpage dated July 2017, describing the AAC (Doc. 70-1 at 92-97); the Six Flags Magic Mountain webpage dated October 2020 to July 2025, describing the AAC and application requirements and providing answers to "Frequently Asked Questions" relating to the AAP (*id.* at 99-144); the Six Flags Discovery Kingdom webpage dated October 2020 to July 2025, describing the AAC and application requirements and providing answers to "Frequently Asked Questions" (*id.* at 146-63); the Six Flags Hurricane Harbor, Los Angeles, webpage dated November 2021 to April 2025, describing the AAC and providing answers to "Frequently Asked Questions" (*id.* at 165-83); the Six Flags Hurricane Harbor, Concord, webpage dated December 2020 to June 2025, describing the AAC and application requirements and providing answers to "Frequently Asked Questions" (*id.* at 185-95); the Six Flags Great Adventure webpage dated October 2020 to an unreadable date, describing the AAC and providing answers to "Frequently Asked Questions" (*id.* at 197-203); the Six Flags America webpage, undated, describing "Sensory Friendly Days" that are "focused on reducing environmental triggers throughout the park," and including IBCCES information and mentioning AAC sign-up requirement 48 hours prior to a visit (*id.* at 204); and the IBCCES webpage, undated, containing an article titled "Six Flags to Become First Family of Parks to Earn Certified Autism Center Designation" (*id.* at 217). Plaintiffs also reference the Six Flags Safety & Accessibility Guide (*id.* at 247-299) and an exhibit provided with their accompanying request to seal in support (*id.* at Ex. 27 at SF-000041).

Defendants, broadly, do not dispute Plaintiffs' account of the AAC procedures. *See* (Doc. 71). Defendants assert that Six Flags contracted IBCCES to obtain the Certified Autism Center ("CAC") certification and "assess alternative queuing programs" at park locations. Defendants state that "CAC certification establishes operating procedures for accessibility across amusement parks, to include developing guides for guests with disabilities that rate park attractions on, *e.g.*, noise levels, crowd density, lighting effects, motion intensity, and stimulation levels."

30

Additionally, Defendants explain that "IBCCES also assessed and advised on an alternative queuing program for Six Flags parks, which considered sensory and accessibility needs to facilitate improved safety procedures, reduce incidents in queues, and minimize unsafe ride evacuations." The IAC was a component of this "alternative queuing" program and which, Defendants describe, is "a free resource for individuals who need to request accommodations or assistance at participating amusement parks and attractions." *Id.* at 13. Defendants provide that registration can be online or on a mobile application, and requires a recent photo, contact information, and a statement from a medical provider, government entity, or other entity related to the accommodations requested. Defendants represent that IBCCES has never required individuals to disclose their "specific medical or psychological diagnosis, diagnosis code, or condition." *Id.*

Defendants support these representations with the declaration of Randall Wilke (Doc. 71-1 at 77-78), screenshots of the IBCCES website (*id.* at 80-83), an IBCCES "Frequently Asked Questions" information sheet (*id.* at 85), screenshots of the website www.accessibilitycard.org (dated October 16, 2025) presenting information regarding the IAC application process with IBCCES (*id.* a 93-98), and two-pages of information about the IAC application process titled "IBCCES Accessibility Card Information" (*id.* at 104-105). Mr. Wilke represents that he is presently the corporate vice president of operations, safety, and security at Six Flags, having started in the role in May 2025, and formerly was employed as Six Flags' corporate director of public safety and operations. *See* (Doc. 71-1 at 77-78).

The registration policies challenged by the Inquiry Class present a set of common questions arising out of system-wide policies. Defendants' policies required park visitors seeking accommodations for their disabilities, prior to any visit, to access the IBCCES website or mobile application, complete the form and upload documentation, after which they would receive their digital IAC, which must then be brought to the park location and provided to staff. It follows that there is a single online portal where this process takes place, as well as a single entity managing the portal and maintaining it, and Defendants have system-wide policies in place to integrate the IBCCES registration and IAC into their disability accommodation procedures. The undersigned finds that Plaintiffs' claims requiring determination of whether Defendants' policies unlawfully

discriminate on the basis of disability is a sufficiently material common issue under Rule 23(a). *See Powers*, 163 F.4ths at 1185 ("Plaintiffs challenge the VA's failure to provide permanent housing on or near the Campus, a system-wide practice that Plaintiffs claim is discriminatory and that affects all of the putative class members. This suffices for commonality purposes."); *Nevarez v. Forty Niners Football* Co., LLC, 326 F.R.D. 562, 578 (N.D. Cal. 2018) (finding that whether the defendants' stadium complied with federal and state accessibility standards presented a common question likely "to drive the resolution of the litigation.") (quoting *Ellis*, 657 F.3d at 982).

Further, that members of the putative class may experience various forms and severity levels of disabilities does not preclude a finding of commonality as the IBCCES registration and AAC procedures are system-wide and affect all class members. *See Armstrong*, 275 F.3d at 868 (finding that "wide variation in the nature of the particular class members' disabilities" did not preclude commonality due to system-wide pattern and practice that affected all class members); *see also Reel Servs. Mgmt.*, 2014 WL 12561074, at *9 ("Other cases, both pre- and post-[*Dukes*], have followed the Ninth Circuit's lead in this respect, finding that variation in the type or level of disability does not bar commonality when a common policy or practice of discrimination is alleged by a representative plaintiff, such as here.").

Additionally, an "injunction applicable to all class members could include multiple remedial measures to remedy the violation of a common right … It suffices to say that the necessity of providing multiple ameliorative measures within a single injunction does not preclude certification of the [] [c]lass." *Shields*, 279 F.R.D. at 558 ("A reasonable accommodation might entail, by way of example only, the provision of signage, menus, and schedules in large type and Braille, the availability of similar information via a GPS-based audio description device, a pre-recorded telephonic synopsis of the menu, and a requirement that employees read menus in full upon request.").

Thus, the undersigned concludes that the commonality requirement is satisfied for the nationwide Inquiry Class. *See Reel Servs. Mgmt.*, 2014 WL 12561074, at *9 ("Answering each one of these questions will undoubtedly resolve issues of central importance to the present case. Or, put differently, because the members of the putative class are similarly affected by Defendant's

purported failure to provide closed captioning in all of its theatres, a classwide proceeding will generate common answers to fully drive the resolution of this litigation.").

### 2. California Subclass

The California Unruh Act prohibits arbitrary discrimination, including based on disability, in enjoyment of public accommodations. Cal. Civ. Code § 51(b); *Jankey v. Lee*, 55 Cal. 4th 1038, 1044 (2012). "The Unruh Act has been described as 'coextensive with the ADA,' and in the disability context, 'operates virtually identically to the ADA.'" *Arafiles v. Safeway, Inc.*, No. 2:24-cv-02801-TLN-SCR, 2025 WL 457834, at *2 (E.D. Cal. Jan. 27, 2025) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007)). "As the Unruh Act allows for monetary damages, 'litigants in federal court in California often pair state Unruh Act claims with federal ADA claims.'" *Id.*; *see Williams v. Amazone.com Inc.*, No. 2:20-cv-513-JDP PS, 2020 WL 5909060, at *1 (E.D. Cal. Oct. 6, 2020) ("[A]ny violation of the ADA necessarily constitutes a violation of the Unruh Act."). "The Unruh Act allows for monetary damages including automatic minimum penalties in the amount of $4,000 and attorneys' fees as may be determined by the court. Proof of actual damages is not required to recover statutory minimum damages under the Act." *Johnson v. Baglietto*, No. 19-cv-06206-TSH, 2020 WL 3065939, at *6 (N.D. Cal. May 21, 2020) (citing *Molski*, 481 F.3d at 731), *report and recommendation adopted*, 2020 WL 3060902 (N.D. Cal. June 9, 2020).

Thus, for the same reasons as are applicable to the nationwide Inquiry Class, the Court finds that the existence of Defendants' nationwide policy, also in effect in the state of California, presents common questions for the California subclass. *See Nevarez*, 326 F.R.D. at 578 (finding commonality across ADA and Unruh Act claims); *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 551 (N.D. Cal. 2007) (denying certification due to lack of numerosity but finding commonality was satisfied, and noting that "whether the ADA requires Marriott to provide single-rider golf carts encompasses numerous legal questions common to the class (such as whether Marriott is liable as an operator under the ADA and whether providing accessible carts is a reasonable modification under the ADA), as well as factual questions common to the class (such as whether providing single-rider carts would impose an undue burden or cause damage to defendant's golf courses)"); *see also Armstrong*, 275 F.3d at 868; *Reel Servs. Mgmt.*, 2014 WL 12561074, at *9.

33

d. Analysis – Request Classes

The nationwide Request Class consists of putative members who visited any of Defendants' parks in the United States, without registering in advance with the IBCCES, and attempted to request accommodations at the park and were unable to obtain them. The California subclass seeks the same but for individuals within California.

While the parties dispute whether Defendants employed a practice, policy, or procedure of refusing accommodations to park visitors who have not registered on the IBCCES website and received an IAC prior to their visit, it is unclear from Plaintiffs' motion what facts are relied upon to satisfy commonality as to the Request Class. It is clear, however, that the evidence proffered by Plaintiffs for the existence of the AAC policies and procedures cannot by itself demonstrate commonality as required under Rule 23(a) for the Request Class, as the Request Class includes only those individuals who did not register in advance of their visit to Defendants' parks with the IBCCES and, therefore, were not subject to the AAC policies and procedures. Neither can the evidence Plaintiffs identify regarding any failure by Defendants to train employees satisfy the commonality element as that evidence speaks only to the failures of Defendants' employees to follow the established AAC. It does not speak to Defendants' practices, policies, or procedures operative when an individual visits a park without having registered in advance with the IBCCES.

Plaintiffs provide insufficient evidence of practices, policies, or procedures that Defendants uniformly denied accommodations to guests who did not register with the IBCCES and receive an IAC prior to their visit. Plaintiffs do not offer, for example, any written guidelines, employee handbooks, or other internal or external materials that persuasively demonstrate the existence of any such practice. In the second amended complaint, Plaintiffs allege that "if a guest … simply shows up to the park and requests accommodations upon arrival … it is already too late; Six Flags will not accommodate guests under such circumstances, as advance registration is required." (Doc. 67 at 32). In support of this allegation, Plaintiff cites only to the current Six Flags Magic Mountain website section on accessibility, generally.[6] There is no policy described as such on the website.

---

[6] Six Flags Magic Mountain, "Attraction Accessibility," *available at* https://www.sixflags.com/magicmountain/plan-your-visit/accessibility (last accessed on January 22, 2026).

34

The website, insofar as it addresses the topic, states that, "[i]f guests visit the park without the card, they can apply on a smartphone at the park and receive the card immediately once the application has been completed online." *Id.*

In opposition to Plaintiffs' motion, Defendants assert that it was the "practice of the relevant parks to accommodate guests even if they were not registered with IBCCES." (Doc. 71 at 15). In support, Defendants proffer the declarations of employees Alexander Neuzil, Jeremy Bushek, and Josue Lupercio. (Doc. 71-1, Exs. 6, 7, 15).

Mr. Neuzil declares that he began working at Six Flags Discovery Kingdom in September 2021 and is currently the park manager of operations and maintenance. (Doc. 71 at 158 ¶ 2). Mr. Neuzil is familiar with the processes and procedures at Discovery Kingdom related to accommodations, including the AAP, and declares that since he began working at the park it was the "practice that if a guest came to guest services to obtain an AAP, and that guest did not already have an IAC card, we would provide an AAP pass for the day as a courtesy," and that though it "should have been a one-time exception, it is likely additional exceptions would have been given to the guest on subsequent visits." Mr. Neuzil declares that "there is nothing preventing any of our associates from giving more than one exception when providing AAPs for the same guest." *Id.* ¶¶ 4-5. He notes that, "[w]hen an AAP is provided to guest, whether the guest has an IAC or not, it should be logged into [Six Flags'] Salesforce system," and that he has not been made aware during his time at Discovery Kingdom, by guest complaint or guest services report, of any guest being refused an AAP pass because the guest had not previously obtained an IAC. *Id.* ¶¶ 6-7.

Mr. Bushek declares that he worked at Six Flags in food services in 2001, then returned to the company in 2004, working there since then in many different roles, and since 2018 as the manager of the Six Flags Entertainment Corporate Guest Relations & National Support Center. *Id.* at 267 ¶ 2. According to Mr. Bushek, since December 26, 2021, to the present, guest services agents were "instructed and trained to log [in Salesforce] when guests receive an AAP without having an IAC at the time they receive an AAP." *Id.* ¶ 5 (emphasis omitted). Mr. Bushek declares that, for the period of time from December 26, 2021, to July 1, 2025, his review of Salesforce records "indicate that Magic Mountain provided AAPs to 47,466 guests without IBCCES

registration" and "Discovery Kingdom provided AAPs to 6,344 guests who did not have an IAC number at the time they received an AAP." *Id.* ¶ 6.

Mr. Lupercio declares that he began working at Six Flags Magic Mountain 2003 and is currently the operations director for the Magic Mountain and Hurricane Harbor, Los Angeles, theme parks, noting that both parks are on the same property but have separate ticketed gates. Mr. Lupercio provides that, based on his experience and knowledge, he is familiar with the processes and procedures of guest accommodations, including the AAP, IBCCES registration, and IAC. *Id.* at 118 ¶ 2-3. According to Mr. Lupercio, prior to the COVID-19 pandemic, the policy at Magic Mountain was to make a one-time exception if a guest "sought an accessibility accommodation without a doctor's note disclosing only the accommodations needed." The guest would be asked to "bring something next time" and provided a list of items needed, as well as not needed (such as not needing to disclose the disability or diagnosis). Mr. Lupercio declares that "[w]e did not enforce the one-time exception and would still provided requested accommodations." *Id.* ¶ 6.

After Magic Mountain and Hurricane Harbor reopened in 2021, they began using the IBCCES registration system. According to Mr. Lupercio, despite this, it has continued to be the practice at Magic Mountain and Hurricane Harbor to "accommodate anyone who asks for an accommodation, including by providing one-time attraction accessibility accommodations," with guest services staff at each park who are "trained to provide general customer service as well as assist guests seeking accommodations." *Id.* ¶¶ 7-8. Mr. Lupercio declares that, when a guest arrives seeking accommodations without an IAC, guest services staff ask certain questions so proper accommodations can be provided, and do not ask guests "if they are disabled or what their disability is," nor for proof of disability. Mr. Lupercio asserts that there is no "one-time exception rule for handing out an AAP" to a guest without an IAC, and issuance of an AAP to a guest without an IAC is recorded in the Salesforce system. *Id.* ¶¶ 9-10.

If the picture on the IBCCES pass does not match the guest or "looks fake," guest services are trained to still issue an AAP to the guest. Mr. Lupercio attests he is "unaware of any guests ever being turned away from either Magic Mountain or [Hurricane Harbor] or not being accommodated because they are not registered with IBCCES." Mr. Lupercio declares that a refusal

to issue an AAP to a guest because the guest did not have an IBCCES registration or IAC would have been a mistake on the part of the staff.  *Id.* ¶¶ 11-14.

Considering the lack of evidence proffered by Plaintiffs in comparison to the declarations proffered by Defendants, the Court finds that Plaintiffs have not plausibly established that Defendants had either a formal written policy or de-facto unwritten policy or practice requiring denial of accommodations to individuals who had not registered with IBCCES and received an IAC prior to their visit to Defendants' parks.  Plaintiffs proffer no declarations from individuals other than the named Plaintiffs who (1) did not register prior to their visit with the IBCCES, (2) visited a park location, and (3) were denied reasonable accommodations.  As such, Plaintiffs present no evidence that individuals other than the named Plaintiffs were turned away at park locations, instead of being offered accommodations, when they had not registered on the IBCCES website prior to their visit.

"While commonality may be established based on a pattern of officially sanctioned ... [illegal] behavior, merely pointing to a pattern of harm, untethered to the defendant's conduct, is insufficient."  *C.R. Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1104 (9th Cir. 2017) (affirming denial of motion for class certification based, in part, on lack of commonality; acknowledging that a "practice may indeed be evidence of a systematic policy," but that plaintiffs failed to offer "evidence of a single, 'general policy of discrimination' that could serve as a common issue" for their ADA claims) (quoting *Dukes*, 564 U.S. at 352-53).  Here, because Plaintiffs fail to demonstrate the existence of a uniform practice, policy, or procedure, unwritten or otherwise, with respect to denial of accommodations at park locations for individuals who did not register in advance with IBCCES and receive an IAC, they cannot carry their burden under Rule 23(a) of establishing a common source of evidence necessary to certify this class.  *See Stiner v. Brookdale Senior Living, Inc.,* 665 F. Supp. 3d 1150, 1192 (N.D. Cal. 2023) ("In the end, Plaintiffs have not identified the kind of evidence of common architecture, barriers to access, or policies that can make the proposed question of whether Brookdale's new or altered facilities comply with federal and California disability laws capable of resolution by classwide proof."); *Vega v. Delaware North Cos., Inc.*, No. 1:19-cv-00484-ADA-SAB, 2023 WL 6940198, at *39 (E.D. Cal. Oct. 20, 2023)

37

(noting that conflicting testimony as to a challenged, unwritten policy "provides additional weight favoring denial of class certification"); *Rojas-Cifuentes v. ACX Pac. Nw. Inc.*, No. 2:14-cv-00697-JAM-CKD, 2018 WL 2264264, at *6 (E.D. Cal. May 17, 2018) ("evidence showing that some employees may have been deprived of an opportunity to take an uninterrupted meal break does not amount to a 'policy and practice capable of determining [Defendants'] liability on a class-wide basis.'") (citation omitted). Accord *Trevino v. Golden State FC LLC*, No. 1:18-cv-00120-ADA-BAM, 2023 WL 3687377, at *13 (E.D. Cal. May 26, 2023) ("The absence of a uniform policy consistently applied throughout the class period across the variety of Amazon's facilities precludes resolution of Plaintiffs' claims on a class-wide basis …"). While Plaintiffs may themselves have indeed been denied accommodations at Defendants' park locations when visiting without registration prior with the IBCCES, any such fact does not, by itself, satisfy Plaintiff's burden to demonstrate common questions exist such as to warrant class certification.

It follows that Plaintiffs have not proffered sufficient proof that the entire putative nationwide Request Class and California subclass suffered a common injury relating to any practice, policy, or procedure of Defendants. *See Thomasson v. GC Servs. Ltd. P'ship*, 539 Fed. App'x 809, 810 (9th Cir. 2013) ("To satisfy commonality, there must be significant proof that the entire class suffered a common injury.") (citing *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012)). Therefore, the Court concludes that Plaintiff has not satisfied the commonality requirement under Rule 23(a) for this claim.

### iii. Typicality

#### a. Legal Standard

The third Rule 23(a) prerequisite is typicality. Fed. R. Civ. P. 23(a)(3). "[T]he claims or defenses of the representative parties [must be] typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). The representative and class need not be clones; rather, all that is required is that the claims or defenses be "reasonably co-extensive." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (noting that this standard is a "permissive" one and requires only that the claims of the class representatives be "reasonably co-extensive with those of absent class members; they need not be substantially identical"), *overruled on other grounds by Dukes*, 564

U.S. 338. Typicality is satisfied if the representative's claims arise from the same course of conduct as the class claims and are based on the same legal theory. *See*, *e.g.*, *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (claims are typical where named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class … The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.*

   b.   Parties' Contentions

Plaintiffs contend typicality is satisfied because they are "both legally-disabled persons who require reasonable accommodations at amusement parks" and, due to the "uniformity of Defendants' [AAC], none of the Plaintiffs' or the [c]lass's claims are based on conduct unique to them or the Defendants." Plaintiffs assert that, as they were both subject to the "same discriminative uniform policy," they both "suffered identical injuries," namely the "inability to seek accommodations in-person" at park locations when they had not registered in advance with IBCCES, and being subject to "unlawful inquiries, burden, and disparate treatment" when they did complete the IBCCES application. Plaintiffs note they also seek to recover damages under the same legal theories as the proposed California subclasses and, if their claims are successful, they would be entitled to the same remedies of injunctive relief and statutory damages. (Doc. 70 at 27).

In their opposition, Defendants assert that there are "several unique defenses to each Plaintiff," such as whether each is disabled within the meaning of Title III of the ADA, whether each required reasonable accommodations that were denied, and whether each were required to and did submit "disability/diagnosis-identifying documentation." Defendants contend that these unique defenses make Plaintiffs' claims "unsuitable for class treatment." (Doc. 71 at 26).

In reply, Plaintiffs argue that Defendants' proposed unique defenses are "merely [] three broad questions" which are "capable of resolution by reference to common evidence (such as Defendants' policy documents) or class member attestations in claim forms." (Doc. 72 at 14).

c. <u>Analysis</u>

While "a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it" (*Hanon*, 976 F.2d at 508), here, it is unclear how the "unique defenses" identified by Defendants render Plaintiffs atypical. The existence of a class member's disability within the meaning of Title III of the ADA, the denial of reasonable accommodations, and submission by the class member of documentation relating to disability are merits issues resolved on the facts; as such, they do not undermine a showing of typicality here. *See Stiner*, 665 F. Supp. 3d at 1194 ("Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interests of the class representative align with the interests of the class. [] The requirement is permissive, such that representative claims are 'typical' if they are 'reasonably coextensive' with those of absent class members; they need not be substantially identical.") (citing *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017)). Defendants do not offer any reasoning as to why such "defenses" for Plaintiffs C.T. and Martinez would be unique, nor why they would result in preoccupation that would detrimentally impact the proposed classes.

Both Plaintiffs attest that they used the registration and application system of the IBCCES and received an IAC. Both Plaintiffs further attest that, prior to said registration, they attempted to obtain accommodations at park locations, without registering with the IBCCES and without an IAC, and were denied. Both Plaintiffs did so in California and are residents of the state. Plaintiff Martinez further asserts that she was denied accommodations upon visiting Defendants' park location, despite registering on IBCCES and possessing an IAC. (Doc. 67 ¶¶ 91-92, 93-97, 107-110).

Thus, the undersigned concludes that Plaintiffs sufficiently establish typicality for the Inquiry Class and for the Request Class. *See Nevarez*, 326 F.R.D. at 580 ("In this type of case, courts in this circuit as well as other circuits … have routinely held that class certification of classes

composed of people with disabilities affected by the systemic access barriers is appropriate.") (quotation and citation omitted); *see id.* ("[T]he essence of defendants' argument—that in order to prove the existence of the forest the plaintiffs must individually prove the existence of each tree— is anathema to the very notion of a class action.  Taken to its logical conclusion, under defendants' reasoning, no civil rights class action would ever be maintainable, because, in order to prove the existence of a discriminatory pattern or practice, each class member would have to individually prove the highly individualized factors relating to each instance of discrimination they allegedly suffered.") (alterations in original; quoting *Californians for Disability Rts., Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 345 (N.D. Cal. 2008)).

### iv.  Adequacy

The final Rule 23(a) prerequisite is adequacy of representation.  Fed. R. Civ. P. 23(a)(4). "[T]he representative parties [must] fairly and adequately protect the interests of the class." *Id*.  In determining whether that requirement is met, the Court asks two questions: (1) do the representative plaintiff and his counsel have any conflicts of interest with other class members; and (2) will the representative plaintiff and his counsel prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon*, 150 F.3d at 1020).

#### a.  Parties' Contentions

Plaintiffs represent that they do not have any conflicts with the class and subclass members that they propose to represent, that they are aware of the duties of a class representative, and that they are willing and able to serve in such a role.  Plaintiffs also provide that counsel, Bursor & Fisher, P.A., are a "prominent law firm with extensive experience in complex and class action litigation," and do not have conflicts of interest with the members of the putative classes, and that they intend to "vigorously prosecution this action."  (Doc. 70 at 28; citing Docs. 70-1, 70-2, 70-3).

Defendants assert that, in forsaking actual damages and pursuing minimum statutory damages, Plaintiffs intend to "advance their prospects of class certification and realize personal benefits of class litigation," such as "incentive awards and pressure to settle."  Defendants argue that Plaintiffs have a "fiduciary duty" to class members and, since the Supreme Court's decision in *Standard Fire Insurance Company v. Knowles* (568 U.S. 588 (2013)), the Ninth Circuit recognized

41

that "stipulating to or seeking less damages than potentially available undermines plaintiffs' adequacy as class representatives." Defendants assert that Plaintiff Martinez had made two false statements about having a son, on the record, who does not exist. Defendants contend that this, along with her producing medical documentation that does not show a muscular dystrophy diagnosis and stating in discovery that she had "never been a party in a lawsuit or judicial proceeding" despite being divorced and bringing a workers' compensation claim, evidence a lack of engagement in the legal process, among other things. (Doc. 71 at 27-28).

Defendants separately argue that Plaintiff C.T. failed to disclose that she had been party to four lawsuits when asked during discovery, including three class actions, and six other legal matters, which Plaintiffs learned of after questioning her during her deposition, resulting in amended interrogatory responses. Defendants assert that both Plaintiffs failed to conduct reasonable searches for documents responsive to discovery, and did not produce the documentation they allegedly submitted as part of their IBCCES registrations. Defendants argue that Plaintiffs' counsel are implicated in these actions. *Id.* at 29-30. Defendants separately argue that Plaintiff C.T. testified that she visited Discovery Kingdom after commencement of this action, received documentation regarding accommodations and AAPs provided during said visits, yet failed to retain or preserve copies of the documents. *Id.* at 30.

In reply, Plaintiffs assert that statutory damages are "uniquely susceptible to calculation on a classwide basis" and the fact that Plaintiffs seek minimum statutory damages instead of actual damages is of no consequence as to their adequacy, and is a "litigation choice they are permitted to make." Plaintiffs argue that Defendants take issue with "minor and innocent typographical errors, of which Plaintiff Martinez and her counsel only became aware when Defendants raised the issue for the first time during Ms. Martinez's deposition." Plaintiffs assert that they "immediately issued a correction on the record." Plaintiffs contend that Defendants attacks on their adequacy are "not in good faith." (Doc. 72 at 14-16).

b.  Analysis – Plaintiffs' Counsel as Class Counsel

Plaintiffs' counsel Julia K. Venditti attests that her firm is adequate to serve as counsel and to represent the interests of the class. In support, she declares that her firm, Bursor & Fisher, P.A.,

42

"has represented several millions of consumer class actions across the country, and has significant experience in litigating class actions of similar size, scope, and complexity in the instant action." (Doc. 70-1 at 2 ¶¶ 4, 6).  Ms. Venditti catalogs a list of cases in which her firm has been appointed class counsel or interim class counsel, all within the Northern District of California, as well as citations to orders appointing her firm as class counsel or interim class counsel.  *Id.* ¶¶ 7-8; *see* (Doc. 70-1, Ex. 1).  The firm resume lists 82 cases before district courts across the country in which the firm has been appointed class counsel or interim class counsel. (Doc. 70-1, Ex. 1at 12-18).  The resume states that the firm has won high-dollar verdicts or recoveries in six of six class action jury trials since 2008.  *Id.* at 12.  The resume provides background regarding Ms. Venditti, other co-counsel in this action and other attorneys with the firm.

Plaintiffs' proffer demonstrates that the attorneys at Bursor & Fisher possess significant experience, knowledge, and resources in acting as class counsel and there is no evidence suggesting counsel have any conflicts undermining their ability to capably and ethically litigate the case.  Thus, the undersigned concludes that Plaintiffs' counsel establish adequacy as class counsel.  *See Ms. Wheelchair California Pageant, Inc. v. Starline Tours of Hollywood, Inc.*, No. CV 11-2620-JFW (CWX), 2011 WL 13586057, at *6 (C.D. Cal. July 28, 2011) ("Plaintiffs' counsel have submitted a declaration demonstrating that they have had substantial experience with similar class actions and other complex litigation and have the time and resources to adequately represent the Plaintiffs in this action.  Plaintiffs' counsel have also conducted a significant amount of work in this action to date.  Accordingly, the Court concludes that class counsel will fairly and adequately represent the interests of the Class.").

c.  Analysis – Plaintiffs as Class Representatives

First, Defendants' contention that Plaintiffs are inadequate representatives because they limit their requested relief to statutory damages is unavailing.  Thus, "a strategic decision to pursue those claims a plaintiff believes to be most viable does not render her inadequate as a class representative."  *Nevarez*, 326 F.R.D. at 582 (quotation and citation omitted).  Relevant here, "courts generally allow the class representative to pursue only statutory damage claims, and to deliberately eschew actual damage claims, without jeopardizing a finding of adequacy even if

43

pursuing actual damage claims might be to the advantage of some class members." *Id.* (citing William B. Rubenstein, 1 Newberg on Class Actions § 3:59 (5th ed.)).  The authorities Defendants cite to the contrary (Doc. 71 at 27 & n.14) either are nonbinding, amount to dicta expressed in a dissimilar procedural posture (*i.e.*, removal) or otherwise are unpersuasive.  *See id.* ("Defendants contend Plaintiffs betrayed class members' interests by limiting them to statutory damages instead of pursuing a potentially larger award of actual damages.  This is unpersuasive.  Plaintiffs' decision to limit class members (and themselves) to statutory damages relieves them of any obligation to prove actual damages.  That allows Plaintiffs and class members to sidestep the difficulties in proving damages that can frequently preclude certification of a Rule 23(b)(3) class.") (citing cases).

Second, Defendants cite to Plaintiff C.T.'s verified interrogatory response, signed June 25, 2025, for the proposition that she did not disclose that she was party to four other lawsuits filed before her response was submitted, including three class actions with one filed 11 days before her original response, as well as six other responsive legal matters.  (Doc. 71 at 29; citing Doc. 71-1 at 331-338).  The original interrogatory response provides that Plaintiff C.T. "has never been a party in a lawsuit or other judicial proceeding other than the present matter," including "class or collective lawsuits." (Doc. 71-1 at 333).  Defendants do not cite to, and the Court cannot locate, the portions of Plaintiff C.T.'s deposition testimony during which Defendants assert they questioned her regarding her response.  However, the deposition took place on August 6, 2025 (*id.* at 9), and Defendants attach Plaintiff C.T.'s amended verified interrogatory responses, with signature dated August 19, 2025 (*id.* at 340-351).  In her amended response, Plaintiff C.T. identifies numerous lawsuits and judicial proceedings, including multiple class actions.

Plaintiff C.T. verified her original interrogatory response, containing incorrect information that she later corrected, and apparently did so only after being questioned by Defendants during Plaintiff C.T.'s deposition.  In their reply, Plaintiffs do not dispute these allegations nor challenge the evidence attached to Defendants' opposition.

Defendants also cite to C.T's deposition for their assertion that she received documentation from visits to the park after commencement of this lawsuit regarding her accommodations and she failed to retain it.  (Doc. 71 at 30; citing Doc. 71-1 at 13-24).  C.T. attested during her deposition

that, upon her visits to park locations, she received papers with the accommodations she was provided written thereon, that she never read the entirety of the papers as they change extensively upon each visit, that she normally placed them in her backpack where they are damaged by water from rides, and that she cleans out her backpack and throws everything away, including tissues and other wipes alongside the papers.  She attested she never kept the papers and did not think that she needed them because Six Flags retains records of the accommodations.  *See id.*

Based on this, Defendants charge that C.T. failed to conduct searches for documents responsive to discovery requests and failed to produce the documents she submitted to IBCCES, despite having a record of said documents.

"Only when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate.  There is inadequacy only where the representative's credibility is questioned on issues directly relevant to the litigation or there are confirmed examples of dishonesty, such as a criminal conviction for fraud." *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (quotations and citations omitted).  The undersigned finds that, taken in total, there are some credibility issues regarding C.T.'s adequacy as a class representative.  However, C.T.'s failure to initially disclose prior lawsuits and class actions, though notable in that the action C.T. has initiated is itself a class action, does not speak directly to the issues relevant to the instant motion.

C.T.'s representations during her deposition regarding her failure to retain documentation potentially relevant to this action may speak to a level of carelessness but do not appear to evidence a clear example of dishonesty or deliberate destruction of evidence.  Further, because Defendants do not offer the whole of CT's relevant testimony in their opposition, the Court does not have a clear picture of the full context of the testimony.  Additionally, based on Defendants representations regarding record-keeping (Doc. 71 at 15), C.T.'s explanation that Defendants would retain copies of relevant records is reasonable.

Third, Defendants' assertions concerning Plaintiff Martinez's false statements regarding a son she does not have, as well as her production of medical documentation that does not evidence a muscular dystrophy diagnosis, are not issues directly relevant to the litigation.  Though disability

45

is relevant to the classes proposed by Plaintiffs, specific diagnoses are not. Insofar as such omissions or errors may speak to a lack of engagement in the legal process or a failure to appreciate the seriousness of statements made under oath, the Court does not take such behavior lightly. However, it appears to the undersigned that a failure to disclose a divorce and workers' compensation claim, when questioned in written discovery regarding prior lawsuits or judicial proceedings, does not materially call into question credibility on issues directly relevant to the litigation or rise to the level of intentional dishonesty fatal to a proposed representative's ability to adequately advocate for a putative class's interests. Further, it seems plausible that a layperson, questioned regarding prior lawsuits or judicial proceedings, would not necessarily contemplate a divorce proceeding or workers' compensation claim as responsive.

As for Plaintiff Martinez's false statement concerning a son, counsel for Plaintiffs characterizes the discrepancy as a mistake or clerical error during deposition. (Doc. 72 at 15 n.12). In any event, the above examples cited by Defendants do not call into question Plaintiffs or their counsel's credibility as to the issues relevant to this action.

During the hearing on Plaintiffs' motion for class certification, Plaintiffs' counsel asserted that the documentation Plaintiffs submitted to IBCCES concerned a merits issue and that Plaintiff Martinez did not possess her submittal documents, though IBCCES may retain copies. Plaintiffs' counsel asserts they subpoenaed IBCCES but only received a small production with assurance of a future production. (Doc. 77). Defendants assert that Plaintiffs failed to produce these documents and, as such, they and their counsel have engaged in misconduct that undermines their adequacy to serve the class's interests. *See* (Doc. 71 at 29-30). However, as to these claims, Defendants did not move to compel production and have not moved for any motion concerning spoliation of evidence in which they seek the evidentiary sanctions they reference in their motion papers in passing. *See Williams v. PillPack LLC*, 343 F.R.D. 201, 213 (W.D. Wash. 2022) (finding plaintiff adequate as class representative and noting that, "[t]o the extent PillPack claims Williams spoliated evidence, PillPack should bring such claims in a proper motion for this Court to consider").

In sum, the undersigned finds that Defendants' cited examples evidencing Plaintiffs' dishonesty or lack of credibility do not fatally undermine their adequacy of class representatives.

*See Del Campo v. Am. Corrective Counseling Servs., Inc.*, No. C 01-21151 JW PVT, 2008 WL 2038047, at *4 (N.D. Cal. May 12, 2008) (noting that "[g]enerally, unsavory character or credibility problems will not justify a finding of inadequacy unless related to the issues in the litigation") (quotation and citation omitted).

### D. Rule 23(b) Requirements

In addition to satisfying Federal Rule of Civil Procedure 23(a)'s prerequisites to class certification, a "proposed class or subclass must also satisfy the requirements of one of the sub-sections of Rule 23(b), which defines three different types of classes." *Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014).

Here, Plaintiffs move to certify the proposed classes pursuant to Rule 23(b)(2) and 23(b)(3). (Doc. 70 at 28-32).

#### i.  *Appropriateness*

##### a.  Legal Standard

A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Supreme Court has explained that the "key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360-61. Stated otherwise, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant … [nor] when each class member would be entitled to an individualized award of monetary damages." *Id.*

"These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688. "When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific inquiry into

whether class issues predominate or whether class action is superior method of adjudicating the dispute. Predominance and superiority are self-evident." *Dukes*, 564 U.S. at 362-63.

### b. Analysis – Nationwide Inquiry Class

As to the nationwide Inquiry Class, Plaintiffs have satisfied the Rule 23(a) criteria and seek only injunctive relief pursuant to Title III of the ADA. (Doc. 70 at 9, 29). Plaintiffs do not propose individualized and different injunctions for each class members. *See id.* Thus, as the nationwide Inquiry Class is suitable to class-wide injunctive relief, the Court finds Rule 23(b)(2) satisfied thereto. *See Brooks v. Pressed Juicery, Inc.*, 336 F.R.D. 484, 492 (E.D. Cal. 2020) ("The primary remedy sought in the complaint is class-wide, homogenous, injunctive relief … Given the significant suitability of this controversy to singular injunctive relief, this court finds Rule 23(b)(2) is satisfied, and need not reach plaintiff's argument regarding Rule 23(b)(3)."); *Californians for Disability Rts., Inc.*, 249 F.R.D. at 345-46 ("Cases challenging an entity's policies and practices regarding access for the disabled represent the mine run of disability rights class actions certified under Rule 23(b)(2). Indeed, Rule 23(b)(2) was designed specifically for civil rights cases like this, where plaintiffs seek system-wide injunctive relief for a large class.") (citations omitted); *Siddiqi v. Regents of Univ. of California*, No. C 99-0790 SI, 2000 WL 33190435, at *8 (N.D. Cal. Sept. 6, 2000) (rejecting defendant's argument that predominance of individualized fact questions precluded certifying ADA Title II class under Rule 23(b)(2); reasoning that the "allegations that plaintiffs seek to adjudicate on a class-wide basis, the legality of the specified UC policies, are not based on individualized determinations but can be efficiently determined on a class-wide basis").

### ii. Predominance

#### a. Legal Standard

Federal Rule of Civil Procedure 23(b)(3) requires a finding that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "This calls upon courts to give careful

48

scrutiny to the relations between common and individual questions in a case." *Tyson Foods*, 577 U.S. at 453.

"When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022. "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 577 U.S. at 453 (quotations and citations omitted).

Common issues are unlikely to predominate if "a great deal of individualized proof" would need to be introduced to address most or all of the elements of a claim, *Gomez v. J. Jacobo Farm Labor Contr., Inc.*, 334 F.R.D. 234, 256 (E.D. Cal. 2019) (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004)), or "a number of individualized legal points" would need to be established after common questions were resolved, *id.* (citing *Klay*, 382 F.3d at 1255), or "the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Id.* (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 722 (11th Cir. 2004)). By contrast, common questions likely will predominate if "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria — thus rendering unnecessary an evidentiary hearing on each claim," *id.* (citing *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st Cir. 2003)), or "when adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced." *Id.* (citing Newberg on Class Actions § 4:50).

A finding of predominance generally will not be defeated merely because there is a need to make individualized damage determinations. *See Just Film, Inc.*, 847 F.3d at 1121; *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

///

b.   Parties' Contentions

Plaintiffs argue they satisfy Rule 23's predominance requirement because significant aspects of the case can be resolved through common evidence.  For instance, Plaintiffs assert that Defendants' liability for implementation of their accommodation procedure "will be resolved through internal corporate and public records regarding the terms of the [AAC]" and "the [p]rogram's features facially violate multiple provisions of the ADA," namely the inclusion of questions about the nature or extent of a person's disability and the requirement to upload documentation.  (Doc. 70 at 30).  Plaintiffs note that they seek only minimum statutory and treble damages, not actual or compensatory damages, which flow directly from Defendants' conduct in violation of the ADA, as any such violation is also a violation of the Unruh Act.  Plaintiffs state that each California subclass member, and named Plaintiffs, are entitled to damages of $4,000.00 per violation of the Unruh Act; that is, for each visit to Defendants' park locations.  Any such class members "may be identified from Defendants' records regarding purchases for [p]ark tickets and IBCCES's records regarding IAC applications submitted." *Id*. at 31.

Defendants contend that for Plaintiffs to prevail, each class member would need to supply proof that they satisfy the ADA's definition of "disabled" and were refused reasonable accommodations, and that these inquiries require individualized proof necessitating individualized trials.  Defendants argue that the question of whether a class member is disabled under the ADA is a factual issue, with a right to a jury's determination.  (Doc. 71 at 31).  Defendants point to their right to cross-examine witnesses regarding "each and every class member's alleged disability – an issue that predominates over the common question of whether Six Flags' accommodations procedures are lawful and precedes any award of even 'minimum statutory damages,'" and to their right to examine witnesses regarding whether any class member requested and was denied a necessary accommodation. *Id*. at 32.

c.   Analysis – California Inquiry Subclass

"Where, as here, a plaintiff's claims arise under state law, the court looks to state law to determine whether the plaintiffs' claims – and [defendant's] affirmative defenses – can yield a

common answer that is apt to drive the resolution of the litigation." *Davis*, 2022 WL 22855520, at *8 (quotations and citations omitted; alterations in original).

Though the Inquiry Class satisfies the commonality requirement of Rule 23(a), the predominance requirement of Rule 23(b) asks whether those common issues predominate over the individual issues (*see Hanlon*, 150 F.3d at 1022), which is a "far more demanding" inquiry. *Windsor*, 521 U.S. at 623-24.  That Plaintiffs seek only minimum statutory damages for the California subclass means that individualized calculations of damages will not be necessary. However, treble damages under the Unruh Act are "up to a maximum of three times the amount of *actual damage* …" Cal. Civ. Code § 52(a) (emphasis added).  Thus, in seeking treble damages, Plaintiffs would, in fact, require individualized calculations of damages.  *But see Just Film, Inc.*, 847 F.3d at 1121; *Leyva*, 716 F.3d at 514 (predominance generally will not be defeated merely because there is a need to make individualized damage determinations).  Regardless, even if Plaintiffs were to disavow their request for treble damages and seek an award of only minimum statutory damages pursuant to the Unruh Act for the California Inquiry Subclass, the Court would be required to adjudicate numerous other individual questions.

To begin with, the Court acknowledges the Unruh Act does not require that class members demonstrate injury, such as personal exclusion or "difficulty, discomfort, or embarrassment" to recover statutory damages. *See Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1197 (N.D. Cal. 2023), *opinion clarified*, No. 17-CV-03962-HSG, 2024 WL 3498492 (N.D. Cal. July 22, 2024).  "But as a matter of Article III standing, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law. The California Legislature is free to authorize plaintiffs to recover from defendants who violate a provision of the ADA, [b]ut under Article III, an injury in law is not an injury in fact." *Id.* at 1197-98 (quotations and citations omitted; alterations in original).

A class member must have Article III standing to recover damages. *See TransUnion LLC*, 594 U.S. at 431.  Thus, the Court is required to determine whether putative class members are disabled under the Unruh Act and, accordingly, the ADA. *See Williams*, 2020 WL 5909060, at *1

51

("[A]ny violation of the ADA necessarily constitutes a violation of the Unruh Act."). This, by itself, raises significant individualized questions, particularly as the IBCCES application system, and the resulting records, do not define disability pursuant to the ADA and do not structure the registration requirements around specifically determining any ADA-defined disabilities of applicants. Plaintiffs do not propose any mechanism or method otherwise, using a common pool of evidence, by which the Court could ascertain whether putative class members were disabled as defined pursuant to the ADA.

Further, even if such determination of ADA-defined disability can be ascertained with common sources of proof as to class members, and the IBCCES registration process (including the IAC, the AAC, or the AAP, or any training thereto) is found to violate the ADA, to demonstrate standing, each class member would be required to show how Defendants' policies interfered, in some way, with their full and equal enjoyment of the park locations and their facilities. *See Stiner*, 665 F. Supp. 3d at 1198 ("But to have Article III standing to challenge [defendants'] policies and practices, each class member still must show how those policies and practices in some way interfered with their full and equal enjoyment of [defendants'] services."). For standing to seek damages, members of the California subclass would be called upon to provide individualized proof that they were exposed to the policy and were harmed in a way giving rise to liability.

First, the definition of the class provides that a member must have "submitted an IBCCES application in connection *with a planned visit* to any of Defendants' theme, amusement, and/or water parks." (Doc. 70 at 9; emphasis added). A putative class member could establish Article III standing by showing deterrence from visiting Defendants' park locations as a result of the IBCCES application system. *See Doran*, 524 F.3d at 1047. However, Plaintiffs offer no method to ascertain such deterrence without individualized inquiries. In other words, Plaintiffs fail to identify a mechanism that, drawing from a common pool of evidence or information, would facilitate determination of individuals who were deterred from accessing Defendants' park locations *as a result* of the IBCCES application system.

Second, the Court cannot presume that an individual who signed up on the IBCCES website and received an IAC thereafter visited a park location in California and requested accommodations.

52

Despite Plaintiffs' claim that members of the class may be identified from Defendants' records regarding park ticket purchases and IBCCES records regarding IAC applications, Plaintiffs provide no methods by which class membership may be ascertained without extensive individual assessments. *See Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 640 (N.D. Cal. 2010) ("The fact that the information relating to individual employees may be available (or capable of being extracted) from [the defendant's] system and other computerized systems does not mean that these are issues that are not dependant [*sic*] on an individualized inquiry."). Even if some of these questions may be answered by a common source of evidence held by Defendants (*e.g.*, ticket sales records), others would require individualized factual assessments to properly determine whether a member of the putative class had been harmed. Assuming the Court were to cross-reference ticket sales with IBCCES records to ascertain which individuals visited park locations in California with an IAC, Plaintiffs propose no method by which the Court might, from a common pool of evidence or information, ascertain which of such individuals sought accommodations at the park and were harmed in a way giving rise to liability; for example, the accommodations requested were denied or inappropriate accommodations were provided, as a result of inadequate policies, practices, procedures, training, or otherwise. *See Stiner*, 665 F. Supp. 3d at 1199 ("But the policy is not enough to establish liability as to individual class members, because they have not suffered an injury unless the policy affected their full and equal enjoyment of the facility, a highly individualized inquiry. In other words, individualized issues regarding who knew of or encountered enforcement of the [] [p]olicy predominate over common ones."); *Mateo v. V.F. Corp.*, No. C 08–05313 CW, 2009 WL 3561539, at *6 (N.D. Cal. Oct. 27, 2009) (finding individual issues predominated over common issues and observing that class claims implicating application of a defendant's policy often require putative members "to prove individual elements in order to show [the defendant's] liability").

Third, if Defendants' IBCCES application system and related policies are found to violate the ADA but, despite this, Defendants provide some, or all, individuals with accommodations at park locations regardless of whether or not they followed the applicable policies and procedures, said individuals who were provided accommodations likely could not demonstrate, without more,

53

Article III standing under the Unruh Act. *Stiner*, 665 F. Supp. 3d at 1198 ("So even if [defendants'] [p]olicy is found to violate the ADA on its face, the Court does not see how a power wheelchair user who, for example, was nevertheless always allowed to sit on their scooter while boarding vehicles and during transit could, without more, have Article III standing to recover under the Unruh Act.").

In short, determining whether any class member suffered an identifiable harm by Defendants' policies implicates evidentiary questions that would require a member-by-member inquiry and analysis. This necessarily would entail an individualized inquiry for each class member to determine the issue of standing. The Court cannot shortcut any such analysis, nor can the class members include those who lack standing as the California Inquiry Subclass seeks damages, not injunctive relief. Numerous issues summarized above require individualized inquiries that would materially complicate the Court's ability to assess Article III standing for each and every class member. *See id.* at 1198-99 ("It is enough to recognize that whether and to what extent the members of the proposed class were concretely injured by [defendants'] policies raises evidentiary questions that likely will vary by class member … an individualized inquiry would be needed to determine whether class members actually suffered an injury sufficient to confer Article III standing to bring a claim because the standard at issue focuses on whether the [] [p]olicy affect[ed] the plaintiff's full and equal enjoyment of the facility on account of his particular disability.") (quotation and citation omitted).

Thus, the Court finds that Plaintiffs fail to establish that common questions predominate over individual ones as to the California Inquiry Subclass.

d.   Analysis – California Request Subclass

The undersigned has found that the Request Class fails to satisfy the numerosity and commonality requirements, as discussed *supra*. However, assuming *arguendo* that the Request Class satisfied all Rule 23(a) prerequisites, the undersigned finds Plaintiffs fail to satisfy Rule 23(b)(3).

As with the Inquiry Subclass, the Court would be required to adjudicate numerous individual questions as to the California subclass, including whether an individual is disabled under

the Unruh Act, whether she visited any park locations, how many times she visited park locations, whether she sought accommodations at the park and during which particular visits she did so, whether she was denied accommodations, and whether she was then denied full and equal access. *See Vondersaar v. Starbucks Corp.*, 719 F. App'x 657, 659 (9th Cir. 2018) ("Here, however, class-wide issues do not predominate over the numerous individual questions posed by plaintiffs' Unruh Act claims, including whether a class member is disabled, which Starbucks store or stores he visited, how many visits he made, how high the handoff counter was at the time he visited, whether he presented himself with the intent of purchasing a product, what that product was and whether it would normally have been served via the handoff counter, and whether the class member was actually denied full and equal access.").

Despite their argument that members of the class may be identified from Defendants' records regarding park ticket purchases and IBCCES records regarding IAC applications, Plaintiffs provide no methods by which class membership may be ascertained without extensive individual assessments. *See Joe's Crab Shack*, 271 F.R.D. at 640. As discussed *supra*, even if some of these questions may be answered by a common source of evidence held by Defendants (*e.g.*, ticket sales records), others would require individualized factual assessments to properly determine whether a member of the putative class had been harmed. Assuming the Court were to cross-reference ticket sales with IBCCES records to ascertain which individuals visited park locations without an IAC, Plaintiffs neither propose any method by which the Court might, from a common pool of evidence or information, ascertain which of such individuals sought accommodations at the park and were denied, nor identify any common source of information available to facilitate such analysis. Without such, the Court would be required to determine on a member-by-member basis, first, which of said individuals had ADA-qualifying disabilities, then, whether they asked for accommodations during each visit to any California park location, and finally, whether they were denied said accommodations.

Accordingly, Plaintiffs do not meet their burden of satisfying the predominance inquiry. *See Zinser,* 253 F.3d at 1192 ("If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not superior.")

(quotation and citation omitted).

## V.    Conclusion and Recommendations

For the foregoing reasons, the undersigned finds that Plaintiffs have established, by a preponderance of the evidence, that the requirements of Rule 23(a) and Rule 23(b) are met for the nationwide Inquiry Class. However, as detailed above, the Rule 23 requirements are not met for the California Inquiry Subclass, the nationwide Request Class, nor for the California Request Subclass.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' evidentiary objections (Doc. 71-2) be DENIED;

2. Defendants' objections to reply evidence (Doc. 75) be DENIED;

3. Plaintiff's motion for class certification (Doc. 70) be GRANTED in part:

  a. Certification of the nationwide Inquiry Class be GRANTED;

  b. Certification of the California Inquiry Subclass be DENIED;

  c. Certification of the nationwide Request Class and California Request Subclass be DENIED.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within 21 days after being served with these findings and recommendations, any party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:    **February 13, 2026**    _____

UNITED STATES MAGISTRATE JUDGE